**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Andersen Corporation,

Plaintiff,

v.

Fiber Composites, LLC,

Defendant.

Civil No. 00-2548 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

---

Ronald J. Schutz, Rita Coyle DeMeules, Becky R. Thorson and Nicholas Boebel, Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, Minnesota, for Plaintiff.

John M. Skenyon and Michael E. Zeliger, Fish & Richardson P.C., Boston, Massachusetts; and Jonathan E. Singer and R.J. Zayed, Fish & Richardson P.C., Minneapolis, Minnesota, for Defendant.

---

## Introduction

Plaintiff Andersen Corporation ("Andersen") owns several patents relating to a polymer and wood composite material used to make window frames and other structural parts. Six of those patents are at issue in this dispute. Andersen claims that Fiber Composites, LLC ("Fiber Composites") is infringing a number of the claims of the six patents by producing and selling its FIBERON® railing and spindle products. Both parties moved for a Markman[1] hearing, asking the Court to construe a number of disputed terms.

[1] See Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995).



APR 0 9 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Currently before the Court are the parties' proposed claim constructions. Having reviewed the parties' submissions and held a hearing on the matter, the Court will now construe two key terms in dispute. The Court recognizes that the parties disagree about whether this determination will resolve the infringement action and that the Court will, at a later stage, be required to construe the other terms in dispute. At this stage, however, the Court construes the following terms: "composite composition" and "composite structural member."

## Background

### I. Parties and Factual Background

Andersen is a Minnesota corporation that manufacturers and sells windows and doors, among other products. (Compl. ¶ 2.) Historically, these products were made primarily of wood. About ten years ago, due to a shortage of wood and an abundance of contaminated sawdust, Andersen began looking for alternative materials to use in making its products. Andersen eventually developed a material composed of sawdust "intimately mixed" with a polymer.[2] (See e.g., Declaration of John M. Skenyon ("Skenyon Decl.") Ex. 1.) The material Andersen developed is strong and versatile and can be shaped and

---

[2]A polymer is defined as "a natural or synthetic chemical compound or mixture of compounds formed by polymerization and consisting essentially of repeating structural units." See Webster's Third New International Dictionary 1759 (1986). Polymerization is "a chemical reaction in which two or more small molecules combine to form larger molecules that contain repeating structural units of original molecules and that have the same percentage composition as the small molecules if the small ones were all of the same kind." Id.

cut into pieces of the material suitable for constructing windows, doors, and other items. Andersen now uses this material as a wood substitute for its windows and other products. Andersen owns several patents relating to this composite material, six of which are at issue in this case (the "patents-in-suit").

Fiber Composites is a Delaware corporation with its primary place of business in North Carolina. (Answer ¶ 3.) It manufactures and sells railing and spindle products sold under the FIBERON® trademark (the "FIBERON® products"). The FIBERON® products are directly extruded[3] from a polymer and wood mixture. (See Fiber Composites' Markman Br. at 2.) Fiber Composites contends that, because its products are directly extruded, they are not infringing the claims of Andersen's patents because all of Andersen's patents require a pelletizing process or a linear extrusion step. (Id. at 4.)

## II. Patents-in-Suit

The patents-in-suit are U.S. Patent No. 5,486,553 ("the '553 Patent"), U.S. Patent No. 5,539,027 ("the '027 Patent"), U.S. Patent No. 5,827,607 ("the '607 Patent"), U.S. Patent No. 5,932,334 ("the '334 Patent"), U.S. Patent No. 6,015,611 ("the '611 Patent"), and U.S. Patent No. 6,015,612 ("the '612 Patent"). (Skenyon Decl. Exs. 1-6.)[4] The

---

[3]"Direct extrusion is a one step extrusion operation in which the polymer and wood fibers are added to an extruder, mixed and melted, and then forced through a die to form the ultimate structural part." (Fiber Composites' Final Markman Br. at 1.)

[4]In this Memorandum Opinion and Order, the patents-in-suit will be referenced by the patent numbers and not the exhibit numbers.

patents-in-suit fall into two general groups: Group I and Group II patents.

### A. Group I Patents

The Group I patents include the '607, '611, '334, and '612 patents and are classified by both parties as being "composite composition claim" patents. They are either entitled "Advanced Polymer Wood Composite" ('607, '611, '334) or "Polymer Wood Composite." ('612.) In general, the Group I patents cover inventions that relate to a polymer and wood fiber composite that is used as a wood replacement. (See e.g., id. Abstract.)

Each of the Group I patents are continuation patents based on U.S. Patent Application Serial No. 938,364 ("the '364 Application") and on a second continuation application, U.S. Patent Application Serial No. 224,396 ("the '396 Application"). ('607, '611, '334, '612.) The '364 and the '396 Applications have been abandoned. (Id.)

The claims-at-issue in this Memorandum Opinion and Order use similar language. At issue in the '607 patent is Claim 21, an independent claim for:

> (21) A **composite composition**, capable of extrusion into a dimensionally stable structural member, which composition comprises a thermoplastic material consisting of:
> (a) about 40 to 70 wt-% of a polymer comprising vinyl chloride;
> (b) about 30 to 50 wt-% of wood fiber having a minimum width of about 0.3 mm and a minimum length of about 0.54 mm and an aspect ration of greater than about 1.8;
> (c) about 0.1 to 25 wt-% of an intentionally recycled impurity comprising thermoplastic resin or mixtures thereof; and
> (d) less than about 10 wt-% water; wherein the polymer and wood fiber are mixed at elevated temperature and pressure such that an intimate admixture is formed in which the wood fiber is dispersed throughout a continuous polymer

> phase and wherein the composite has a Young's modulus greater than 600,000 psi.

('607 (emphasis added).) The claim-at-issue in the '611 patent, Claim 41, and the claim-at-issue in the '334 patent, Claim 19, are independent claims that are structured similarly to the above-quoted Claim 21, although the valuation amounts in steps (a)-(d) vary slightly and the language is not identical. (See '611 & '334.) The key disputed term, however, is virtually the same: "composite composition," ('607, c. 13, ll: 32 & '611, c. 12, ll: 53) and "thermoplastic composite composition." ('334, c. 14, ll: 12.) The claim-at-issue in the '612 patent is Claim 1, an independent claim, which varies slightly in structure from the claims-at-issue in the other Group I patents. The key disputed term, however, is similar: "thermoplastic polymer composite composition" or "thermoplastic composite composition." ('612, c. 11, ll: 1, 3.) Claim 1 of the '612 patent reads:

> (1) A **thermoplastic polymer composite composition** capable of formation into a structural profile or formation or member, the **thermoplastic composite composition** comprising:
>
> (a) an effective amount, sufficient to form a continuous phase in the composite, of a thermoplastic polymer composition comprising vinyl chloride; and
>
> (b) an effective amount of wood fiber having a minimum aspect ration of about 2 to provide structural properties to the composite;
>
> wherein the polymer and wood fiber are mixed at elevated temperature and pressure such that the composition comprises less than about 8 wt-% water, the composition comprises an intimate admixture of wood fiber dispersed throughout the continuous thermoplastic polymer phase such that the polymer wets and penetrates into the interior volume of wood fiber cells, the composition is a recyclable thermoplastic and the composite has a Young's modulus of at least about 500,000 psi.

(Id. (emphasis added).)

## B. Group II Patents

The Group II patents include the '553 and '027 patents and are classified by the parties as "structural member" patents. Both are entitled "Advanced Polymer/Wood Composite Structural Member." ('553 & '027.) In general, the Group II patents describe inventions relating to polymer and wood composite structural members that can be used as wood replacement material for shaped wood products. (See id. Abstracts.) Both of the Group II patents are continuation patents based on U.S. Patent Application Serial No. 938,365 ("the '365 Application"), which has since been abandoned.

For purposes of this Memorandum Opinion and Order, the claims-at-issue in the '553 patent include independent Claim 1 and dependent Claims 2-6. Claim 1 of the '553 patent reads:

> 1. A polymer wood thermoplastic **composite structural member**, suitable for use as a replacement for a wood structural member, which thermoplastic **composite structural member** comprises a **composite member** with a Youngs modulus of greater than 500,000, and a coefficient of thermal expansion less than 3 x $10^{-5}$ in/in-°F. and which composite member comprises a continuous organic phase comprising about 35 to 65 wt-% of a polymer comprising vinyl chloride and, dispersed in the continuous phase, about 35 to 55 wt-% of wood fiber having an aspect ratio of at least about 2.

('553 (emphasis added).) Claims 2 and 3 of the '553 patent refer to the "composite

structural member of Claim 1," (Id., c. 17, ll: 12, 15) and Claim 4 through 6 refer to the "composite member of claim 1" or of "claim 2." (Id., c. 17, ll: 18, 20, 22.)

The claims-at-issue in the '027 patent are claims 1-6 and 9. ('027.) Claim 1 of the '027 patent is an independent claim that describes a "wood-thermoplastic polymer composite structural member." (Id., c. 15, 11: 57-58.) It is structured similarly to Claim 1 of the '553 patent, although some valuation amounts are either not present or in different amounts. (Id., c. 15, ll: 66-64.) The remaining dependent claims-at-issue in the '027 patent, like those in the '553 patent, refer to the "composite structural member" or "composite member" of claim 1. (Id.) Thus, the key disputed term, "composite structural member," is present in both Group II patents. ('553, c. 17, ll: 1-2 & '027, c. 15, ll: 57-68.)

## III. Procedural History

Andersen filed suit on November 16, 2000, with a six-count Complaint, alleging that the FIBERON® products infringe one or more of the claims of each of the patents-in-suit, that Fiber Composites had knowledge of Andersen's patents, and that Fiber Composites has continued to manufacture the FIBERON® products with that knowledge. (Compl.) Fiber Composites denies these allegations. (Answer.) The parties disagree about the meaning of a number of terms in the patent claims, and both have presented these disputes to the Court for construction.

## Analysis

A patent infringement claim presents a two-step legal analysis. First, a court must determine as a matter of law the meaning and scope of any disputed terms in the patent claims alleged to be infringed. Itron, Inc. v. Benghiat, 169 F. Supp. 2d 1073, 1081 (D. Minn. 2001) (citations omitted) (Tunheim, J.) Next, the trier of fact must determine whether the accused device infringes the claims as properly construed. Id. In this Memorandum Opinion and Order, the Court performs part of the first step of the two-step analysis–determining as a matter of law the meaning of two disputed claim terms.[5]

## I. Claim Construction

In interpreting an asserted claim, the Court first looks at the intrinsic evidence of record: (1) the patent itself, including the claims themselves; (2) the specification; and (3) the prosecution history. Id.; see also Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (explaining that the intrinsic evidence must be considered in the order listed). A court may also refer to extrinsic evidence to educate itself about the invention and relevant technology, but it may not use that extrinsic evidence to construe a claim in a manner at odds with the intrinsic evidence. Itron, 169 F. Supp. 2d at 1081. In this instance, extrinsic evidence does not need to be used to construe the claims.

---

[5]A district court has discretion regarding when to make its claim construction ruling. See Sofamor Danek Group v. DePuy-Motech, 74 F.3d 1216, 1221 (Fed. Cir. 1996) (in a preliminary injunction context, noting that a trial court may use its discretion to determine when to interpret claims conclusively). A Court must, however, complete its claim construction before a jury determines whether the accursed device infringes the claims. See Markman, 52 F.3d at 981.

To determine claim meaning, a court begins with the language of the claims themselves. Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999). As a general rule, all terms in a patent claim are to be given their plain, ordinary, and accustomed meaning to one of ordinary skill in the relevant art. Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1299 (Fed.Cir.1999). If the claim language is not clear on its face, then the Court's consideration of the rest of the intrinsic evidence is directed to resolving the lack of clarity. Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) (citations omitted). Thus, if the terms "chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used," the intrinsic evidence serves as a guide to interpret those terms. Johnson, 175 F.3d at 990.

If, however, the claim language is clear on its face, the Court's consideration of the rest of the intrinsic evidence is restricted to two situations. Id. In the first situation, the Court looks to the specification to see if the patentee has acted as his or her "own lexicographer and used terms in a manner other than their ordinary meaning." See id. The specification contains a written description of the invention and sets forth the "best mode contemplated" for carrying out the invention. 35 U.S.C. § 112. Also, the specification provides a "valuable context" for determining the meaning of claim language because it teaches about "problems solved by the claimed invention, the way the claimed invention solves those problems, and the prior art that relates to the invention."

Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1554 (Fed. Cir. 1997). To be his or her own lexicographer, the patentee must clearly and expressly define the claim term in the specification. Rexnord v. Laitram, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Therefore, the Court looks to the specification to see if the patentee has clearly and expressly defined a claim term. In doing so, the Court recognizes that there is a fine line between "reading a claim in light of the specification" and "reading a limitation into the claim from the specification." Interactive Gift, 256 F.3d at 1331-32. The former is required, the latter is prohibited. See id.

In the second situation, the Court must determine if the "patentee has relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." Interactive Gift, 256 F.3d at 1331; see also Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1303 (Fed. Cir. 1997) (stating that the public has a right to rely on arguments that are part of the prosecution history in determining the scope of the claims). Therefore, the Court looks to the prosecution history of the patent, if it is in evidence. Markman, 52 F.3d at 979. The prosecution history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the patent. Vitronics, 90 F.3d at 1582. It is "helpful in understanding the intended meaning as well as the scope of technical terms, and to establish whether any aspect thereof was restricted for purposes of patentability." Vivid Tech., Inc. v. American Science & Eng'g, Inc., 200

F.3d 795, 804 (Fed. Cir. 1999). Moreover, the "prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." CVI/Beta Ventures v. Tura, LP,112 F.3d 1146, 1155 (Fed. Cir. 1997). "The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1457 (Fed. Cir. 1998).

Thus, when a court construes the claim language, the central focus remains on the claim language itself, but it is viewed "as illuminated by the written description and the prosecution history." KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1321, 1355 (Fed. Cir. 2000). Having set forth the relevant standards, the Court now construes two of the disputed terms.

## II. "Composite Composition"

Some of the claims of the Group I patents describe a composite that is comprised of a composite pellet, and other claims describe a composite that comprises a linear extrudate. The remainder of the claims in the Group I patents claim a "composite composition, capable of extrusion into a dimensionally stable structural member." ('607, c. 13, ll: 32-33 & '611, c. 12, ll: 52-54; see also '334, c. 14, ll: 12-13 & '612, c. 11, ll: 50-51 (using slightly different language).) The parties disagree about whether this "composite composition" is limited to a particular form. Fiber Composites proposes that the term is "limited to a composite composition which is used to make structural parts,

and [it does] not cover the structural part itself." (Fiber Composites' Proposed Claim Construction Order at 1.) Fiber Composites also argues that the term is limited to a "composite composition in the form of a solid pellet or a solid linear extrudate from which pellets can be cut." (Id.) Andersen proposes that the term means "a mixture of polymer and wood fiber, which if thermoplastic, can be melted, shaped, remelted and reshaped." (Andersen's Proposed Claim Constructions and Br. in Supp. at 14.) Andersen states that the term "is directed to a composite material without a particular form." (Andersen's Proposed Claim Construction Order at 3.) Furthermore, in response to Fiber Composites' proposed claim construction, Andersen argues Fiber Composites' proposed construction would make the claim-at-issue equivalent to the other independent claims in the Group I patents. (Andersen's Markman Br. at 6-7.)

The Court first looks to the claim language itself to construe the term "composite composition."[6] See Itron, 169 F. Supp. 2d at 1081. In the independent claims-at-issue, the composite composition is defined as a composite composition that is "**capable of extrusion** into a dimensionally stable structural member, which composition comprises a thermoplastic material." ('607, c. 13, ll: 32-34 (emphasis added).) The "capable of" formation language describes the product itself, the "composite composition" which is a thermoplastic material capable of being formed into a structural member. Thus, the

---

[6]When the claims-at-issue use the same or similar language, reference will be made to only one of the Group I patents.

composite composition of the Group I patents is the material, the intermediate solid in the form of either a pellet or linear extrudate, that is used to form a structural member (the subject of the Group II patents). It is important to note that it is the intermediate solid that is the subject of the Group I patents, not the structural member. In addition, the composite composition of the claims-at-issue must have "a Young's modulus of greater than 600,000 psi."[7] (Id., c. 14, ll: 23.) Thus, the intermediate material is a solid due to the required Young's modulus value. Finally, the claims-at-issue claim an "intentionally recycled impurity" limitation and a different percentage of water than can be found in the other independent claims of the Group I patents. (Id., c. 14, ll: 4-5, 8.) Thus, contrary to Andersen's assertions, the claim language reveals that Fiber Composites' proposed construction does not render the claims-at-issue equivalent to the other independent claims because they contain an "intentionally recycled impurity" limitation and a different percentage of water.

The Court next looks at the specification. Itron, 169 F. Supp. 2d at 1081. The specification confirms that the composite composition of the invention is either a pellet or linear extrudate intermediate solid that is used to form the structural member. The specification states "this invention relates to composite thermoplastic materials used for the fabrication of structural members." ('607, c. 1, ll: 13-14.) It teaches that the "**pellets**

---

[7]Young's modulus is a measure of strength and stiffness of a solid material. (Affidavit of R.J. Zayad ("Zayad Aff.") Ex. 38.); see also Fiber Composites Final Markman Br. at 6.)

**or linear extrudate** of the invention are made by extrusion of the . . . composite through an extrusion die resulting in a linear extrudate that can be cut into a pellet shape." ('607, c. 4, ll: 44-48 (emphasis added).) Moreover, repeated references are made to pellets or the linear extrudate (which can be cut into small pieces to form pellets) in the specification. (See e.g., '607, c. 4, ll: 6-7 ("moisture control is an important element of manufacturing a useful linear extrudate or pellet"); c. 3, ll: 1-7 ("the successful manufacture of structural members requires the preliminary manufacture of the polyvinyl chloride wood fiber composite in the form of a pellet wherein the materials are intimately mixed and contacted in forming the pellet prior to the extrusion of the members from the pellet material"); c. 4, ll: 66-68-c. 5, ll: 1 ("physical properties of an extruded member are improved when the polymer melt during extrusion of the pellet or linear member").) Finally, the specification teaches that the wood fiber used is often the "by-product of sawing or milling soft woods commonly known as sawdust or milling tailings" (id., c. 6, ll: 55-56) and that sometimes the "sawdust material can contain substantial proportions of waste stream by-products." (Id., c. 7, ll: 20-21.) Thus, the specifications teach that the invention is a product made with or without "intentionally recycled impurities," which shows that the claim-at-issue differs from the other independent claims.

Fiber Composites contends that because the specifications disclose only how to manufacture a "useful linear extrudate or pellet," the composite composition "can only cover a composite material in the form of solid pellets or solid linear extrudate from

which pellets are cut." (Fiber Composites' Markman Br. at 7, 9.) Andersen argues that imposing such a limitation on the claims is unfounded and contrary to law. Citing to the specification, Andersen admits that the composite composition "can be in the form of either (1) a linear extrudate, or (2) a thermoplastic pellet, either of which is used to manufacture composite structural members." (Andersen's Proposed Claim Constructions and Br. in Supp. at 14.) Andersen, however, defines linear extrudate as "simply extruded material (i.e., material that does not go through a pelletizing step)." (Andersen's Post Markman Br. at 9.) Thus, Andersen contends that linear extrudate can be material made through a direct extrusion process.

Andersen's definition of "linear extrudate" is not supported by the patent, the specification, or the prosecution history. Andersen relies on sections of the specification that discuss the use of the linear extrudate after it has been formed and is being used "to make a structural unit." (Id. at 8 (citing '334, c. 1, ll: 40-44).) Andersen points to the following language to support its argument: "Alternatively, the extruded thermoplastic mass, in the form of an elongated linear extrudate without a pelletizing step, can be immediately directed **after formation** into an extruder or injection molding apparatus." (Patent '334, col. 1, line. 40-44; (emphasis added).) In this section, the specification teaches how to make the structural member, which can be made using the linear extrudate that already has been formed but not cut into pellets. This alternative method of forming a structural member does not teach a method of direct extrusion of the pellet or linear

extrudate itself. Rather, it teaches an alternative method in which the linear extrudate (the subject of the Group I patents) can be directly placed into an extruder to make a structural member (the subject of the Group II patents). Therefore, the section Andersen relies on actually supports Fiber Composites' proposed definition because it confirms that a useful structural member is made from using an extruded pellet or linear extrudate that is then re-extruded to form the structural member. It does not support a theory that the Group I patents cover a directly extruded composite structural member.

The Court's construction is confirmed in another section of the specification, which teaches that "[i]n the manufacture of the composition and pellet of the invention, the manufacture and procedure requires two important steps. A first blending step and a second pelletizing step." ('607, c. 7, ll: 43-45.) The specification teaches how to form the "composition and pellet of the invention." (Id., c. 7, ll: 46-68, c. 8, ll: 1-68.) The material is first blended by heating the polymer and wood fibers, and then the material is placed in an extruder device from which the linear extrudate is formed. (Id.) If desired, the linear extrudate can then be cut into pellets. (Id.) Therefore, the specification reveals how to manufacture the subject of the Group I patents, which is the pellet or linear extrudate made from the composite material.

Finally, the Court looks to the prosecution history. Itron, 169 F. Supp. 2d at 1081. The prosecution history confirms the Court's construction. The parties spend significant time discussing the impact of the prosecution history on the construction of "composite

composition." Fiber Composites contends that the prosecution history supports its proposed construction because during the prosecution Andersen disclaimed anything but pelletizing. (Fiber Composites' Final Markman Br. at 9-12.) Conversely, Andersen contends that the "patent examiner clearly understood that the pellet was merely an embodiment, but one that was patentably distinct from thc composite composition form of the invention." (Andersen's Reply Brief at 7.) Andersen contends that the prosecution history, in context and in total, establishes that Andersen distinguished its claims by citing several references and that it never limited its composite composition claims to a particular form. (Andersen's Final Markman Br. at 11-12.)

"[A]rguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary." Southwall, 54 F.3d at 1579. To the extent that the prosecution history is helpful to the Court, it confirms the Court's conclusion that the composite composition is either a pellet or linear extrudate because no other form was contemplated in the prosecution history.

All of the Group I patents are continuations on two abandoned applications, the '364 Application and the '396 Application. Representations made to the Patent Office during these applications are part of the prosecution history of the Group I patents. Jonsson v. Stanley Works, 903 F.2d 812, 818 (Fed. Cir. 1990). For example, one of the Patent Office's bases for rejecting Claims 1-20 of the '365 Application was that the

claims were anticipated, in part, by the Miani patent, U.S. Patent No. 4,915,764. (Zayad Aff. Ex. 31.) In response, Andersen states that in the Miani patent "the **composite is directly extruded** and kept hot during the entire operation . . . **This type of composite is not the composite taught in the present invention**. In contrast, the presently claimed composite is prepared by mixing the melted polymer and wood pulp, forming pelletized material, cooled, and then extruded." (Zayad Aff. Ex. 32 (emphasis added).) Thus, it is evident that the composite that is the subject of Andersen's invention is the pellet or linear extrudate of the pelletizing step, not the final structural member made through direct extrusion.

The prosecution of the '364 Application also reveals the invention covers a pellet or linear extrudate. The Abstract in the '364 Application states, "The invention relates to a composition . . . in the form of a **linear extrudate or thermoplastic pellet**." (Skeynon Decl., Ex. 8 (emphasis added).) The original '364 Application had thirty claims. (Id.) Claims 1-11 claimed a composite in the form of a pellet, claims 12-21 claimed a composite in the form of a linear extrudate, and claims 22-30 claimed a composite without an enumerated form. (Id.) The claim language for the independent claims in the '364 Application is nearly identical to that found in the Group I patents. The Patent Office responded to the '364 Application by rejecting all 30 of the claims "as being unpatentable over Hamed 3943079 in view of Maldas, Journal of Vinyl Technology; v. 11, no. 2." (Skenyon Decl., Ex. 9, p.2.) The Hamed patent and the Maldas article both

taught a composite material comprised of wood or cellulosic fiber and some type of a polymer. (Id.)

In responding to the Patent Office rejection of all 30 claims, Andersen referred to the invention as a pellet or the pelletizing process no less than 13 times. (Id. Ex. 10.) In so doing, Andersen never attempted to limit its references to the pellet or pelletizing process only to independent claims 1 and 12 nor to differentiate between the pellet and the composite. The response specifically stated:

> Applicant's invention comprises a **pellet** . . .
>
> * * *
>
> Further, Maldas does not teach the **pelletizing** of the **composite material**.
>
> * * *
>
> In contrast, Applicant first **pelletizes** the thermoplastic **composite material**, and then, manufactures a structural member from the **pelletized** materials by melting and extruding the **composite**. Thus, Maldas does not teach or suggest the manufacture or composition of the thermoplastic **pellet materials** of Applicant's invention.
>
> * * *

(Id. (emphasis added).) Thus, Andersen's response that the "invention comprises a pellet" and Andersen's references to the "composite material" are relevant to an understanding of the term as used in the Group I patents and help to show that the invention is the intermediate solid used to form the structural member, not the final product.

Therefore, the Court concludes that the term "composite composition," when viewed in light of the claim language, the specification, and the prosecution history, means as a solid pellet or a solid linear extrudate, which may subsequently be remelted and extruded to make a structural member.

## III. "Composite Structural Member"

The Group II patents claim a "polymer wood thermoplastic composite structural member, suitable for use as a replacement for a wood structural member." ('553, c. 17, ll: 1-2 & '027, c. 15, ll: 57-58 (using slightly different language).) The key disputed term in the Group II patents is "composite structural member." (Id.) The parties disagree about whether the composite structural member is limited by how it is formed. Fiber Composites proposes that this term is "limited to such parts, which are extruded or otherwise made, only by first forming the composite composition into a solid pellet or a solid linear extrudate from which the pellet can be made, and then using the solid pellet or linear extrudate to form the 'member.'" (Fiber Proposed Claim Construction Order at 2.) Andersen proposes that the term is defined as "an article having load bearing capability ('structural member'), made of polymer and wood fiber ('composite') and that is capable of being melted, shaped, remelted, and reshaped." (Andersen's Proposed Claim Construction and Br. in Supp. at 11.) Andersen also proposes that the term is directed to a "composite structural member obtained through an extrusion process." (Andersen's Proposed Claim Construction Order at 3.)

The Court first looks to the claim language itself.[8] Itron, 169 F. Supp. 2d at 1081. Claim 1 of the '553 patent describes a structural member "suitable for use as a replacement for a wood structural member." ('553, c. 17, ll: 1-2.) There is no reference to a pellet or linear extrudate in the claim language. Rather, the claim language describes the product itself, which is a composite structural member that is a replacement for a wood structural member. The claim-at-issue is not claiming a product made by a specific process; it is claiming the product itself–the structural member. Giving the words their ordinary and accustomed meaning, the words of the claim define the structural member as a product that is a replacement for a wood structural member.

This definition, however, must be viewed in light of the specification and the prosecution history. See KCJ Corp., 223 F.3d at 1355. For the purposes of this construction issue, the specifications of the '553 and '027 patents are identical. Specifically, the specification defines the term "structural member" to mean "a linear **member** with a regular cross-section or complex cross-section." ('553, c. 3, ll: 21-23 (emphasis added).) The specification teaches that it relates to "an improved **structural member** that can be used as a direct replacement for wood and metal components" (id., c. 1, ll: 13-15 (emphasis added)) and that the "**structural members** of the invention can also be extruded in complex shapes adapted to the assembly of windows and doors used

[8] When the claims-at-issue use the same or similar language, reference will be made to only one of the Group II patents.

in both residential and commercial structures." (Id., Abstract (emphasis added).) The superior qualities of the structural member include "strength, workability, fastner retention, resistance to rot and insect attack, and thermal properties." (Id.) Thus, the specification teaches that the invention covers a structural member with specific structural properties that is used as a wood replacement. It docs not teach that the structural member must be made by a certain process.

Andersen contends that with this intrinsic evidence as the guide, the preamble language of the claim-at-issue is properly construed as follows: "an article having load bearing capability . . ." (Andersen's Markman Br. at 12-13.) Fiber Composites disputes this and argues that the specifications of the Group II patents limit the claims to pellets or pelletizing. (Fiber Composites' Markman Br. at 24.) Fiber Composites, however, misapplies what the specification teaches. The specification details the preferred embodiment of the materials used to make the structural member. (See e.g., '553, c. 5, ll: 64-66.) It does not, however, limit the claimed invention to that preferred embodiment nor does it claim anything other than a "structural member" with superior strength, resistance to rot and insect attack, and other structural features.

In addition, Fiber Composites argues that the prosecution history of the Group II patents shows that Andersen "told the Patent office that the 'composite structural member' in the claims did *not* cover articles that were *directly extruded* from thermoplastic polymers and wood composite." (Fiber Composites' Reply Br. at 7, citing Ex. 32; pp. 7-8

(emphasis in original).) The Group II patents are continuations from the same parent application, the '365 Application, and like claims of the parent application of the Group I patent, the claims of the '365 Application were rejected as anticipated by several prior art references, including the Miani patent. Andersen states that Fiber Composites "misconstrues" the prosecution history because Andersen merely distinguished the prior art cited by the Patent Examiner based upon "structural properties [of the invention] and not any method of processing." (Andersen's Post Markman Br. at 6.) Thus, Andersen argues that the prosecution history reveals that it received its patent not because it disclaimed or claimed any method or process but rather because its invention had superior structural properties. (Id. at 5.) The Court agrees with Andersen. The prosecution history supports the construction that the subject of the Group II patents is the structural member itself, with its superior structural properties, without a limitation for how the member is formed.

Therefore, the Court finds that the term "composite structural member," when viewed in light of the claim language, the specification, and the prosecution history, means a polymer and wood article having load bearing capability, which can be obtained through a direct extrusion process or made from a composite material without a particular form.

## Conclusion

Upon all the files, records, and proceedings herein, and for the reasons stated above, **IT IS ORDERED** that

1. the motion by Plaintiff for a claim construction hearing (Doc. 49) has been **GRANTED**;

2. the term "composite composition" means a solid pellet or a solid linear extrudate, which may subsequently be used to make a structural member; and

3. the term "composite structural member" is defined as a polymer and wood article having load bearing capability, which can be obtained through a direct extrusion process or made from a composite material without a particular form.

Dated: April 9, 2002

Richard H. Kyle
United States District Judge