UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Andersen Corporation,

Plaintiff,

v.

Civ. No. 00-2548 (JNE/JGL)
ORDER

Fiber Composites, LLC,

Defendant.

---

Ronald J. Schutz, Esq., and Rita Coyle DeMeules, Esq., Robins, Kaplan, Miller & Ciresi L.L.P., appeared for Plaintiff Andersen Corporation.

R.J. Zayed, Esq., J. Richard Soderberg, Esq., and John M. Skenyon, Esq., Fish & Richardson P.C., appeared for Defendant Fiber Composites, LLC.

---

This is a patent-infringement case involving six patents held by Andersen Corporation (Andersen). Andersen alleges that railing parts produced by Fiber Composites, LLC (Fiber) and a material used in the production of the parts infringe several patent claims. The case is before the Court on cross-motions for partial summary judgment on the issues of infringement and invalidity. For the reasons given below, the Court grants the motions in part and denies them in part.

## I. BACKGROUND[1]

Andersen manufactures doors and windows. In the early 1990s, Andersen began researching wood substitutes. It identified a composite consisting of polymer and wood fiber as a suitable alternative to wood, and it eventually obtained six patents related to the composite. Four of the patents cover the composite itself—U.S. Patent Nos. 5,827,607 (issued Oct. 27,

---

[1] For a more detailed recitation of the facts underlying this case, see *Andersen Corp. v. Fiber Composites, LLC*, Civ. No. 00-2548, 2002 WL 535089, at *1-*4 (D. Minn. Apr. 9, 2002).

FILED JUL 2 2 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

1998) (the '607 Patent), 5,932,334 (issued Aug. 3, 1999) (the '334 Patent), 6,015,611 (issued Jan. 18, 2000) (the '611 Patent), 6,015,612 (issued Jan. 18, 2000) (the '612 Patent) (collectively, the Group I Patents). The other two patents cover parts made from the composite—U.S. Patent Nos. 5,486,553 (issued Jan. 23, 1996) (the '553 Patent), 5,539,027 (issued July 23, 1996) (the '027 Patent) (collectively, the Group II Patents).

Fiber manufactures FIBERON railing parts, some of which are made using a polymer and wood-fiber composite. Railing parts that do not meet Fiber's standards are reground and reused as an ingredient in the manufacturing process. This material is known as "N-10" or "repro." According to Andersen, repro infringes several claims of the Group I Patents, and FIBERON railing parts infringe several claims of the Group II Patents.

## II. STANDARD OF DECISION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. INFRINGEMENT

### A. Fiber's Motion

Fiber asserts that it is entitled to summary judgment of noninfringement with respect to the Group I Patents because repro does not contain each of the limitations set forth in the asserted claims. Fiber argues, *inter alia*, that repro is not a "composite composition" within the meaning of the patents. Fiber also asserts that it is entitled to summary judgment of noninfringement with respect to the Group II Patents insofar as wood fiber accounts for less than 30% of the weight of its railing parts.

Patent-infringement analysis proceeds in two steps. *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1266 (Fed. Cir. 2003); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1113 (Fed. Cir. 2002). The first step is to properly construe the claims made by the patent. *RF Del.*, 326 F.3d at 1266; *Fantasy Sports*, 287 F.3d at 1113. Claim construction is a question of law. *RF Del.*, 326 F.3d at 1266; *Fantasy Sports*, 287 F.3d at 1113. The second step is to compare the properly construed claims to the accused product to determine whether all of the claim limitations are present. *RF Del.*, 326 F.3d at 1266; *Fantasy Sports*, 287 F.3d at 1113. Literal infringement occurs if the accused product contains every limitation in the asserted claims. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002); *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1308 (Fed. Cir. 2002). Under the doctrine of equivalents, a claim limitation not literally met may be satisfied by an element of the accused product if the difference between the two is insubstantial to one of ordinary skill in the art. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed. Cir. 2003); *Eagle Comtronics, Inc. v. Arrow Communication Labs., Inc.*, 305 F.3d 1303, 1315

(Fed. Cir. 2002). Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *RF Del.*, 326 F.3d at 1266; *Fantasy Sports*, 287 F.3d at 1113.

*1. Group I Patents*

All of the asserted claims of the Group I Patents describe a "composite composition" possessing certain qualities. (*See* '607 Patent, claim 21; '334 Patent, claim 19; '611 Patent, claim 41; '612 Patent, claim 1.) According to Fiber, repro does not infringe the asserted claims because repro is not a "composite composition." The Court construed the term "composite composition" in its April 2002 Order. *See Andersen*, 2002 WL 535089, at *5-*9. The parties' present disagreement largely results from their divergent interpretations of the Court's claim construction. To provide some context, the Court will briefly review the relevant portions of the Order.

The Order contains an extensive discussion of whether the term "composite composition" is restricted to material in a certain form. *See id.* Fiber offered a narrower construction than Andersen. Fiber argued that the term was limited to material (1) in the form of either a solid pellet or a solid linear extrudate from which pellets can be cut and (2) used to make a structural member. *See id.* at *5, *7. In contrast, Andersen argued that the term encompassed extruded material, without regard to its form. *See id.*

The Court accepted Fiber's proposed construction and rejected Andersen's. Its ruling was founded on the claim language, the patent specifications, and the prosecution history of the Group I Patents. Starting with the claim language, the Court noted that it described a material "capable of extrusion into" a structural member, and not the structural member itself. *Id.* at *6. It then stated, "Thus, the composite composition of the Group I [P]atents is the material, the

intermediate solid in the form of either a pellet or linear extrudate, that is used to form a structural member." *Id.*

Moving on to the patent specifications, the Court identified "repeated references . . . to pellets or the linear extrudate (which can be cut into small pieces to form pellets)." *Id.* For example, the specification found in the '607 Patent teaches that the "'pellets or linear extrudate of the invention are made by extrusion of the . . . composite through an extrusion die resulting in a linear extrudate that can be cut into a pellet shape.'" *Id.* (quoting '607 Patent, c. 4, ll. 44-48)) (emphasis omitted). The specification also provides that "'the successful manufacture of structural members . . . requires the preliminary manufacture of the . . . composite in the form of a pellet wherein the materials are intimately mixed and contacted in forming the pellet prior to the extrusion of the members from the pellet material.'" *Id.* (quoting '607 Patent, c. 3, ll. 1-7). The Court paraphrased another portion of the specification as follows: "The material is first blended by heating the polymer and wood fibers, and then the material is placed in an extruder device from which the linear extrudate is formed. If desired, the linear extrudate can then be cut into pellets." *Id.* at *7 (citing '607 Patent, c. 7, ll. 46-68, c. 8, ll. 1-68).

Finally, the Court looked to the prosecution history of the Group I Patents, which confirmed that the material must be "either a pellet or linear extrudate because no other form was contemplated." *Id.* at *8. Several of the claims in one of Andersen's patent applications were initially rejected by the United States Patent and Trademark Office (PTO) on the ground that they were anticipated by another patent. *Id.* In response, Andersen distinguished the other patent by stating:

> [in the other patent,] the composite is directly extruded and kept hot during the entire operation. . . . This type of composite is not the composite taught in the present invention. In contrast, the presently claimed composite is prepared by

> mixing the melted polymer and wood pulp, forming pelletized material, cooled, and then extruded.

*Id.* (emphasis omitted). Based on Andersen's representation to the PTO, the Court stated that "it is evident that the composite that is the subject of Andersen's invention is the pellet or linear extrudate of the pelletizing step, not the final structural member made through direct extrusion." *Id.*

The claims of a second application were also initially rejected by the PTO as anticipated by a patent and an article in the Journal of Vinyl Technology, both of which taught a composite material comprised of wood or cellulosic fiber and polymer. *Id.* In distinguishing its invention from the patent and the article, Andersen referred to its invention as a pellet or to the pelletizing process "no less than 13 times," *id.*, and it "never attempted . . . to differentiate between the pellet and the composite," *id.* at *9. Andersen's response to the PTO specifically stated that its "'invention comprises a pellet,'" and that the prior art "'does not teach the pelletizing of the composite material.'" *Id.* (emphasis omitted). The response continued: "'[Andersen] first pelletizes the thermoplastic composite material, and then, manufactures a structural member from the pelletized materials by melting and extruding the composite. [The article] does not teach or suggest the manufacture or composition of the thermoplastic pellet materials of [Andersen's] invention.'" *Id.* (emphasis omitted).

The Court ultimately construed the term "composite composition" to mean "a solid pellet or solid linear extrudate, which may subsequently be remelted and extruded to make a structural member."[2] *Id.* at *9, *11. This construction captures the idea that the material must be an intermediate solid that can be used to make a structural member, rather than the structural

---

2 Andersen requested permission to file a motion for reconsideration of this ruling pursuant to D. Minn. R. 7.1(g). (Docket No. 154.) The Court denied Andersen's request. (Docket No. 214.)

member itself, as well as the idea that the material must be in the form of either a solid pellet extrudate or a solid linear extrudate.

Having reviewed the claim construction, the Court will now consider whether repro is a "composite composition." Andersen concedes that repro is not in the form of "a solid pellet." Its position is that repro is "a solid linear extrudate." As a threshold matter, it is unclear whether Andersen is accusing Fiber's rejected railing parts themselves or the material that is created by regrinding those parts. The report prepared by Andersen's infringement expert assumes that repro refers to the rejected railing parts themselves. (*See* Liukkonen Exp. Rep. at 39, 44, 47, 53, 55, 61.) Nearly all of the evidence indicates, however, that repro is the reground material. Fiber's chief operating officer testified, for example, that repro is "material that has been produced within [Fiber's] facility that has been rejected, sent out, *chopped into chunks*, and then brought in for reuse." (Pryzblinski Dep. at 228 (emphasis added).) According to Fiber's infringement expert, repro "is simply *reground or pulverized* material." (Gardner Dec. ¶ 2 (emphasis added); *see also* Gardner Exp. Rep. at 3-4 (stating repro "is *re-ground*, off-spec . . . products" (emphasis added).) A "true and accurate" picture of repro submitted by Fiber's counsel shows material that has been reground.[3] (Zayed Dec. ¶ 20, Ex. 20). Finally, footage from Andersen's videotaped inspection of Fiber's facilities also indicates that repro is the reground material. (DeMeules Dec. Ex. KK.)

The only evidence that arguably provides support for the proposition that repro refers to the rejected railing parts themselves is the ambiguous deposition testimony of Fiber's president, which reads:

Q: Where in the plant is the . . . repro kept?

---

[3] A copy of this exhibit is attached as Appendix 1.

A: Typically it's behind the extruders near the mixing area.

Q: Tossed in a bin—

A: No, no. It's in a . . . box.

Q: Is it then subsequently ground up or cut up in some way?

A: Yes. The parts that have been ground up and then placed in a [box] for reintroduction in the mixing phase.

Q: The product that is referred to as . . . repro has passed through an extruder and a dye?

A: Yes. The product is our parts—rejected parts.

(Mancosh Dep. at 149.) On one hand, Fiber's president gave an affirmative answer to the question whether repro is "subsequently ground up or cut up," and he stated that the "product [repro] is our parts—rejected parts." (*Id.*) This testimony suggests that repro refers to the rejected railing parts. On the other hand, he also testified that repro is kept in a box, and that the material in the box consists of "parts *that have been ground up*," (*id.* (emphasis added)), which suggests that repro is the reground material.

Andersen's motion papers contain several characterizations of repro, each one varying to some degree from the other. Its papers state that repro refers to "extruded, rejected parts," (Docket No. 167 at 9), "re-ground[,] rejected, extruded parts," (*id.* at 9), a material "derived from" rejected railing parts, (*id.* at 11), "a mix of PVC and wood fiber [that] is nothing more than ground, and then re-extruded railing products," (*id.* at 14), and the "railing part itself made ready for reprocessing," (*id.* at 16). To the extent that these characterizations focus on the reground material, Andersen's conception of repro differs from that of its infringement expert.

In all events, it is ultimately of no consequence whether Andersen is accusing Fiber's rejected railing parts or the material obtained by regrinding those parts because neither the parts

nor the reground material are "solid linear extrudates" within the meaning of the Court's claim construction.

The Court will first consider the rejected railing parts. The report submitted by Andersen's infringement expert states: "Repro is a 'composite composition' . . . because it is, before grinding, a 'solid linear extrudate.' In other words, before grinding the part is solid, *it has a length to it (so it is linear)*, and it has been obtained through an extrusion process, therefore it is an extrudate." (Liukkonen Exp. Rep. at 39 (emphasis added); *see id.* at 47, 55, 61.) Put differently, according to Andersen's infringement expert, a solid extrudate is "linear" if it has length.[4] This definition of "linear" is incompatible with the word's ordinary meaning. The first definition of "linear" listed in the dictionary is as follows: "of or relating to a line[;] following a straight course[;] being or going in a straight direction." *Webster's Third New International Dictionary* 1315 (3d ed. 1961). Furthermore, all solid extrudates, including pellets, have length. Thus, if "linear" means "having length," then all solid extrudates, regardless of their particular form, are solid linear extrudates. It should be apparent from the excerpts of the claim-construction Order set forth above that the phrase "a solid linear extrudate" refers to a solid extrudate that can be cut into pellets. Because Andersen's infringement expert used an improper definition of the word "linear," his opinion that Fiber's rejected railing parts are solid linear extrudates is of no help to Andersen's cause.

The evidence in the record demonstrates that Fiber's rejected railing parts are not "solid linear extrudates." It is undisputed that the parts are reground, rather than cut into pellets. As explained in the report prepared by Fiber's infringement expert, "[r]egrinding or pulverizing extruded material into smaller chunks or granular material is not pelletizing and does not yield

---

4 The deposition testimony of Fiber's infringement expert appears to endorse the notion that a solid extrudate is linear if it "has some length to it." (Gardner Dep. at 77, 79.)

pellets." (Gardner Exp. Rep. at 8.) Andersen's president acknowledges that there is a difference between the material created by the regrinding process and pellets. (Garofalo Dep. at 114.) Andersen's infringement expert recognizes this difference as well; he describes the reground material as merely chip-like or pellet-like in shape. (Liukkonen Exp. Rep. at 44, 47, 56, 64.) Based on this evidence, no rational trier of fact could find that Fiber's rejected railing parts are solid linear extrudates. The Court therefore concludes as a matter of law that Fiber's rejected railing parts do not literally infringe the asserted claims in Andersen's Group I Patents.

With respect to infringement under the doctrine of equivalents, the question is whether the difference between Fiber's rejected railing parts and "solid linear extrudates" is insubstantial to one of ordinary skill in the art. Although the report prepared by Andersen's infringement expert discusses the subject of infringement under the doctrine of equivalents, it does not address the specific claim limitation missing from the rejected railing parts—that is, it does not offer an opinion as to whether one of ordinary skill in the art would consider the fact that the parts are reground, rather than cut into pellets, insubstantial. (*See* Liukkonen Exp. Rep. at 71-73.) Andersen has failed to identify any other evidence that would support a finding in their favor on this point. Accordingly, the Court concludes as a matter of law that the rejected railing parts do not infringe the asserted claims in Andersen's Group I Patents under the doctrine of equivalents.

As for Fiber's reground material, it is evident that the material cannot be cut into pellets. Thus, the reground material is not "a solid linear extrudate" within the meaning of the Court's Order. Andersen has failed to submit any evidence that would support a finding that the differences between the reground material and a solid linear extrudate are insubstantial to one of ordinary skill in the art. Based on these considerations, the Court concludes as a matter of law

that Fiber's reground material does not infringe the asserted claims of the Group I Patents, either literally or under the doctrine of equivalents.

2. *Group II Patents*

The Group II Patents cover parts made from a polymer and wood-fiber composite. The claim limitations require that wood fiber account for a certain percentage of the weight of the part. The Court will refer to this concept as "wood-fiber weight." The asserted claims of the '553 Patent contain a limitation requiring a minimum wood-fiber weight of "about" 35%. ('553 Patent, claims 1, 22.) The parties agree that this limitation covers parts with a wood-fiber weight of 30% or more. (Docket No. 163 at 28; Docket No. 167 at 21.) Similarly, the asserted claims of the '027 Patent contain a limitation requiring a minimum wood-fiber weight of exactly 30%. ('027 Patent, claim 1.)

It is undisputed that some of the railing parts manufactured by Fiber had a wood-fiber weight of less than 30%. (*See* Zayed Dec. Ex. 8.) To the extent that Andersen accuses these parts of literally infringing the asserted claims of the Group II Patents, Fiber is entitled to summary judgment. However, according to the report prepared by Andersen's infringement expert, one of ordinary skill in the art would consider the difference between the wood-fiber weight of some of the parts and 30% insubstantial. (Liukkonen Exp. Rep. at 72-73.) Fiber has not submitted any evidence rebutting this conclusion. Viewing the evidence in the light most favorable to Andersen, a rational factfinder could return a finding in Andersen's favor on the issue of infringement under the doctrine of equivalents. Thus, insofar as Fiber seeks summary judgment on that issue, its motion is denied.

### B. Andersen's Motion

Andersen's motion for partial summary judgment on the issue of infringement is narrow in scope. Specifically, Andersen argues that Fiber's railing parts literally infringe the asserted claims of the Group II Patents to the extent that they have a wood-fiber weight of at least 30%. Fiber concedes this point. (*See* Docket No. 190 at 1 (stating "certain of Fiber['s] railing parts . . . infringe" the asserted claims of the Group II Patents), 7 (stating that railing parts with a wood-fiber weight of at least 30% infringe the asserted claims of the Group II Patents), 15 (stating "[s]ummary judgment should be granted [in favor of Andersen] to the extent that" the railing parts have a wood-fiber weight of at least 30%).) Accordingly, the Court grant's Andersen's motion.

## IV. INVALIDITY

### A. Fiber's Motion

Fiber moves for summary judgment of invalidity with respect to the asserted claims of the Group II Patents, arguing that they are either anticipated by a prior publication under 35 U.S.C. § 102(b) (2000), or obvious under 35 U.S.C. § 103 (2000). Patents shall be presumed valid. 35 U.S.C. § 282 (2000). To overcome this presumption, Fiber must demonstrate invalidity by clear and convincing evidence. *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319 (Fed. Cir. 2003); *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Fiber has failed to submit such evidence. Instead, its motion is based almost entirely on arguments made by its counsel. These arguments are particularly unavailing with respect to Fiber's theories of obviousness and anticipation under the doctrine of inherency, both of which require an analysis of prior art *from the point of view of one of ordinary skill in the art*. *See* 35 U.S.C. § 103 (obviousness); *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1380 (Fed. Cir. 2002)

(inherent anticipation). In addition, Andersen has submitted a report prepared by its infringement expert identifying reasons why the asserted claims are neither anticipated nor obvious. (*See* Sain Exp. Rep. at 12, 14-16.) Based on these considerations, the Court concludes that Fiber has failed to sustain the heavy burden of establishing invalidity at this stage of the litigation, and its motion is therefore denied. *See Schumer*, 308 F.3d at 1316 ("The burden of proving invalidity on summary judgment is high.").

**B. Andersen's Motion**

Andersen's motion for partial summary judgment of validity relates solely to the asserted claims of the Group I Patents. In light of the Court's ruling that repro does not infringe those claims, the Court need not consider this question.

## V. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Fiber's motion for partial summary judgment on the issue of infringement [Docket No. 162] is GRANTED with respect to the Group I Patents, and GRANTED IN PART and DENIED IN PART with respect to the Group II Patents.

2. Andersen's motion for partial summary judgment on the issue of infringement [Docket No. 187] is GRANTED.

3. Fiber's motion for partial summary judgment on the issue of validity [Docket No. 156] is DENIED.

4. Andersen's motion for partial summary judgment on the issue of validity [Docket No. 180] is DENIED AS MOOT.

Dated: July 21, 2003

JOAN N. ERICKSEN
United States District Judge

Appendix 1

