# Exhibit 7

LEXSEE 1996 US DIST LEXIS 639

**R.C.M. EXECUTIVE GALLERY CORP., CARMEN MARTINEZ, and ROGER MOJER, Plaintiffs, - against - ROLS CAPITAL CO., MARVIN GOLDMAN, PAUL GOLDMAN, JEROME GOLDMAN, and ALEX REIZNER, Defendants.**

**93 Civ. 8571 (JGK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***1996 U.S. Dist. LEXIS 639***

**January 24, 1996, Dated**
**January 25, 1996, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, corporation and individuals (corporation), filed a motion for an order permitting them to designate expert witnesses beyond the discovery deadline pursuant to *Fed. R. Civ. P. 26(a)(2)(C)*.

**OVERVIEW:** After allowing numerous extensions of the discovery deadline, the court set a final deadline of December 15, 1995. The court then permitted the corporation to take specifically designated depositions beyond the discovery deadline. Several months later, the corporation filed a motion for an order permitting it to designate certain expert witnesses beyond the discovery deadline. On ruling, the court denied the motion. The court ruled that the time for the corporation to supplement its interrogatory answers and identify expert witnesses had passed. The court stated that when it permitted the corporation to schedule specific depositions after the final deadline, the court made clear that it was not extending that deadline for other types of discovery. Furthermore, the court rejected the corporation's contention that the discovery deadline did not explicitly include identification of experts, so that such a designation could be made at any time up to 90 days prior to trial pursuant to *Fed. R. Civ. P. 26(a)(2)(C)*, in that the comprehensive discovery deadline necessarily encompassed designation and discovery of experts.

**OUTCOME:** The court denied the corporation's motion for an order to permit the designation of certain expert witnesses beyond the discovery deadline.

**COUNSEL:** [*1] For R.C.M. EXECUTIVE GAL, R.C.M. Executive Gallery Corp., CARMEN MARTINEZ, ROGER MOJER, plaintiffs: Carmen A. Pacheco, PACHECO & LUGO, NEW YORK, NY.

For ROLS CAPITAL CO., J.K. FUNDING, INC. dba Rols Capital Co., defendants: Jordan De Flora, Pearl River, NY.

For MARVIN GOLDMAN, PAUL GOLDMAN, ALEX REIZZNER, RUTH GOLDMAN, defendants: Paul Kaufman, Kaufman Gelbert & Bern, Fort Lee, NJ.

JEROME GOLDMAN, defendant, Pro Se, Hollywood, FL.

JEROME GOLDMAN, cross-claimant, Pro Se, Hollywood, FL.

For MARVIN GOLDMAN, PAUL GOLDMAN, cross-defendants: Paul Kaufman, Kaufman, Gelbert, Bern, Fort Lee, NJ.

For MARVIN GOLDMAN, PAUL GOLDMAN, ALEX REIZZNER, RUTH GOLDMAN, cross-claimants: Paul Kaufman, Kaufman Gelbert & Bern, Fort Lee, NJ.

JEROME GOLDMAN, cross-defendant, Pro Se, Hollywood, FL.

**JUDGES:** JAMES C. FRANCIS, IV, UNITED STATES MAGISTRATE JUDGE. Judge John G. Koeltl

**OPINIONBY:** JAMES C. FRANCIS, IV

**OPINION:**

MEMORANDUM AND ORDER

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

The plaintiffs in this action, R.C.M. Executive Gallery Corp., Carmen Martinez, and Roger Mojer, have moved for an order permitting them to designate expert witnesses beyond the discovery deadline. [*2] For the reasons that follow, the motion is denied.

Background

The plaintiffs filed this action in 1993. By order dated June 1, 1994, I directed that discovery be completed by October 3, 1994. In an order dated November 16, 1994, I extended the discovery deadline to January 31, 1995. On January 4, 1995, the deadline was extended again to March 31, 1995. On May 12, 1995, I noted that the discovery deadline had passed and ordered the pretrial order to be submitted by June 30, 1995. Plaintiffs' counsel thereafter prevailed upon me to permit further discovery, and by order dated October 16, 1995, I set a final deadline of December 15, 1995.

Because of scheduling difficulties, I have permitted counsel to take specifically designated depositions beyond the discovery deadline. However, I did not authorize discovery in general to extend beyond December 15, 1995.

Meanwhile, on February 28, 1995, the defendants propounded interrogatories, one of which asked the plaintiffs to identify any proposed expert witnesses and supply expert reports. The plaintiffs responded as follows:

> Plaintiffs have not yet determined whom they may call as an expert witness at trial. When such a witness [*3] has been identified, this answer will be supplemented accordingly, at the appropriate time.

The plaintiffs provided no such supplemental interrogatory answers prior to the discovery deadline.

Nevertheless, the plaintiffs now move for an order permitting them to designate expert witnesses beyond the discovery deadline. Now, for the first time, they identify two experts that they intend to call as witnesses, and three more that they "may call." According to plaintiffs' counsel, these experts were not retained until January 1996. Letter of Betty Lugo dated January 15, 1996.

Discussion

The plaintiffs advance two arguments in support of their motion. First, they contend that discovery is still open because depositions are continuing. That argument is frivolous. As noted above, the parties received numerous extensions of the discovery deadline. When I permitted them to schedule specific depositions after the final deadline, I made clear that I was not extending that deadline for other types of discovery. Therefore, the time for the plaintiffs to supplement their interrogatory answers and identify expert witnesses has passed.

Second, the plaintiffs contend that the discovery [*4] deadline did not explicitly include identification of experts, so that such a designation may be made at any time up to ninety days prior to trial pursuant to *Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.* This argument fails because the premise is wrong: the comprehensive discovery deadline necessarily encompassed designation and discovery of experts. In response to a similar contention, one court of appeals has said, "we find [plaintiff's] argument that the discovery deadline did not include expert testimony because it was not specifically mentioned in the order to be wholly without merit." *Derby v. Godfather's Pizza, Inc., 45 F.3d 1212, 1215 (8th Cir. 1995)* (footnote omitted). Moreover, in a telephone conference with counsel prior to December 15, 1995, I indicated that experts would have to be identified by that date.

The plaintiffs' case will undoubtedly be prejudiced to some extent by the inability to present expert testimony. But the defendants are prejudiced if they are unable to rely on court-imposed deadlines, and judicial efficiency is impaired if such deadlines are ignored with impunity. Here, any prejudice that the plaintiffs may suffer is attributable [*5] to counsel's inability to adhere to a reasonable schedule.

Conclusion

For the reasons set forth above, the plaintiffs' motion is denied, and no expert witnesses may be designated beyond the discovery deadline.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

January 24, 1996

Dated: New York, New York

# Exhibit 8

LEXSEE 2000 US DIST LEXIS 2529

**IN RE: PAOLI RAILROAD YARD PCB LITIGATION. THIS DOCUMENT RELATES TO Narcise v. SEPTA, et al., Williams v. SEPTA, et al., Stanbach v. SEPTA, et al.**

**MASTER FILE NO. 86-2229, No. 87-1190, No. 87-1258, No. 87-3227**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

***2000 U.S. Dist. LEXIS 2529***

**March 7, 2000, Decided**
**March 8, 2000, Filed**

**PRIOR HISTORY:** [*1] Original Opinion of October 21, 1992, Reported at: *1992 U.S. Dist. LEXIS 18433; 1992 U.S. Dist. LEXIS 18430.*

**DISPOSITION:** Plaintiffs' Motion for Reconsideration GRANTED in part and DENIED in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs filed a motion for reconsideration of the court's order excluding the testimony of plaintiff's expert witnesses.

**OVERVIEW:** Plaintiffs initially filed an action alleging that they had suffered from a variety of severe and unusual illnesses as a result of their exposure to polychlorinated biphenyls, used in the transformers of train cars which the plaintiffs serviced and maintained in the Paoli Railroad Yard. Plaintiffs filed a motion for reconsideration of the instant court's order excluding the testimony of plaintiff's expert witnesses. The court held that neither the "substantial factor" test under common law nor the Federal Employers' Liability Act ("FELA"), *45 U.S.C.S. § 51,* standard of causation lowered the burden of admissibility with respect to expert testimony. The court further held that one doctor's opinions regarding bodily injury would be excluded, where the doctor failed to explain on a plaintiff-by-plaintiff, disease-by-disease basis why her opinion is reliable and why she ruled out alternative causes.

**OUTCOME:** Plaintiffs' motion for reconsideration of order excluding medical witnesses' testimony granted in part and denied in part. One doctor's testimony regarding personal injury opinions and medical monitoring opinion was denied. The second doctor's testimony was denied only as to his recalculation of American Medical Laboratory tests and his back calculations.

**LexisNexis(R) Headnotes**

***Civil Procedure > Relief From Judgment***
[HN1] The purpose of a motion of reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. Accordingly, a district court will grant a party's motion for reconsideration in any of three situations: (1) the availability of new evidence not previously available, (2) an intervening change in controlling law, or (3) the need to correct a clear error of law or to prevent manifest injustice.

***Torts > Causation***
[HN2] Even under the substantial factor test, plaintiffs must prove that defendants' actions were a cause of plaintiffs' injuries before the burden switches to defendant to show that the injuries would have occurred even absent any action by the defendant.

***Torts > Causation***
***Evidence > Witnesses > Expert Testimony***
[HN3] If the medical expert's opinion on causation has a factual basis and supporting scientific theory that is reliable, it should be admitted. However, where a

defendant points to a plausible alternative cause and the doctor offers no explanation for why he or she has concluded that was not the sole cause, that doctor's methodology is unreliable.

*Evidence > Witnesses > Expert Testimony*
[HN4] If drawing a particular conclusion requires specialized knowledge, expert testimony is required.

*Evidence > Witnesses > Expert Testimony*
[HN5] Like the "substantial factor" standard, the Federal Employers' Liability Act, *45 U.S.C.S. § 51,* causation standard does not lower the burden of admissibility.

*Evidence > Witnesses > Expert Testimony*
[HN6] In reviewing the reliability of a physician's testimony the Third Circuit has stated the following: Performance of physical examinations, taking of medical histories, and employment of reliable laboratory tests all provide significant evidence of a reliable differential diagnosis, and their absence makes it much less likely that a differential diagnosis is reliable. Sometimes differential diagnosis can be reliable with less than full information.

*Evidence > Witnesses > Expert Testimony*
[HN7] In reviewing the reliability of a physician's testimony the Third Circuit has stated the following: A physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted.

*Evidence > Witnesses > Expert Testimony*
[HN8] In reviewing the reliability of a physician's testimony the Third Circuit has stated the following: Evaluation of the patient's medical records, like performance of a physical examination, is a reliable method of concluding that a patient is ill even in the absence of a physical examination. Generally, a doctor only needs one reliable source of information showing that the plaintiff is ill and either a physical examination or medical records will suffice -- but the doctor does need at least one of these sources.

*Evidence > Witnesses > Expert Testimony*
[HN9] In reviewing the reliability of a physician's testimony the Third Circuit has stated the following: Where physicians engaged in few of the standard procedures of differential diagnosis, they had to offer a good explanation as to why their conclusion remained reliable. Where they did employ such standard techniques, they still had to offer such an explanation if the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' actions.

*Evidence > Witnesses > Expert Testimony*
[HN10] The opinion of a doctor who has engaged in few standard diagnostic techniques should be excluded unless the doctor offers a good justification for his or her conclusion.

*Evidence > Witnesses > Expert Testimony*
[HN11] Even under Federal Employers' Liability Act, *45 U.S.C.S. § 51,* to render an admissible opinion, a medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages.

*Civil Procedure > Entry of Judgments*
[HN12] Before final judgment, the trial court may revisit issues previously decided when there has been an intervening change in the controlling law or when new evidence has become available.

*Evidence > Witnesses > Expert Testimony*
[HN13] The objective of Daubert's gatekeeping requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

**COUNSEL:** For MABEL BROWN, PLAINTIFF (86-CV-2229): HAROLD E. KOHN, MARTIN J. D'URSO, KOHN, SAVETT, KLEIN & GRAF, P.C., PHILADELPHIA, PA USA.

For HELEN V. NARCISE, PLAINTIFF (87-CV-1190): LAURI SUSSMAN SIEGEL, ZARWIN & BAUM, P.C., PHILA, PA USA.

For HELEN V. NARCISE, PLAINTIFF (87-CV-1190): JOSEPH C. KOHN, KOHN, SAVETT, KLEIN & GRAF, P.C., PHILADELPHIA, PA USA.

For ANDRE WILLIAMS, SR., PLAINTIFF (87-CV-1258): HAROLD E. KOHN, JOSEPH C. KOHN, JEANNE P. WROBLESKI, KOHN, SAVETT, KLEIN & GRAF, P.C., PHILADELPHIA, PA USA.

For CHARLES W. STANBACK, SUSANNA STANBACH, PLAINTIFFS (87-CV-3227): ARNOLD E. COHEN, KLEHR, HARRISON, HARVEY, BRANZBURG, ELLERS & WEIR, PHILA., PA.

For CHARLES W. STANBACK, SUSANNA STANBACH, PLAINTIFFS (87-CV-3227): CHARLOTTE E. THOMAS, WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP, PHILADELPHIA, PA USA.

**JUDGES:** ROBERT F. KELLY, J.

**OPINIONBY:** ROBERT F. KELLY

**OPINION: MEMORANDUM**

R.F. KELLY, J.

MARCH 7, 2000

Plaintiffs have filed a Motion for Reconsideration of this Court's Order excluding the testimony of Drs. Jannette Sherman and Ian C.T. Nisbet. Plaintiffs initially filed this action alleging that they have suffered from a variety of severe and unusual illnesses as a result of their exposure to polychlorinated biphenyls ("PCBs"), used in the transformers of train cars which these Plaintiffs serviced and maintained in the Paoli Railroad Yard. Plaintiffs' present motion is based on the Third Circuit's review of the aforesaid Order in the context of the residents' cases in *In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir. 1994)* ("Paoli II"), cert. denied sub nom., *513 U.S. 1190 (1995)*. Because no final order of judgment had been entered in the worker cases, the Third Circuit did not specifically review this Court's decision [*2] to preclude the opinions of Drs. Sherman and Nisbet with respect to these Plaintiffs. However, according to Plaintiffs, Paoli II is readily applicable to the worker cases and compels that the exclusion of all testimony by Drs. Sherman and Nisbet be reconsidered and reversed. For the following reasons, Plaintiffs' motion is granted in part and denied in part.

## I. STANDARD

"The [HN1] United States Court of Appeals for the Third Circuit has held that 'the purpose of a motion of reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.'" *Cohen v. Austin, 869 F. Supp. 320, 321 (E.D. Pa. 1994)* (citing *Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)*, cert. denied, *476 U.S. 1171, 90 L. Ed. 2d 982, 106 S. Ct. 2895 (1986))*. Accordingly, a district court will grant a party's motion for reconsideration in any of three situations: (1) the availability of new evidence not previously available, (2) an intervening change in controlling law, or (3) the need to correct a clear error of law or to prevent manifest injustice. *Dodge v. Susquehanna Univ., 796 F. Supp. 829, 830 (M.D. Pa. 1992).* [*3] In this case, Plaintiffs contend that reconsideration is warranted to correct a clear error of law and to prevent manifest injustice.

## II. PENNSYLVANIA COMMON LAW STANDARD OF CAUSATION

Plaintiffs examine the admissibility of Dr. Sherman's testimony in light of both the Pennsylvania common law standard of causation and the Federal Employers' Liability Act ("FELA"), *45 U.S.C. § 51*, standard of causation. Plaintiffs first state that, under Pennsylvania common law, they "need only demonstrate that exposure to a toxic chemical was a 'substantial factor' in causing their illness." Pls.' Mem. at 9. Thus, Plaintiffs argue that "an expert is not required to 'disprove or discredit[] every possible cause other than the one espoused by him,'" id. (citing Paoli II at 760 n.32), and that "it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows defendant's conduct to have been a substantial cause of the harm to plaintiff." Id. at 10 (citing Paoli II at 760 n.31).

Plaintiffs are not completely accurate. In this regard, the Third Circuit specifically stated: "We do not think that the 'substantial factor' [*4] standard lowers the burden of admissibility here." *Paoli II, 35 F.3d at 760 n.31.* The Third Circuit further noted that:

> If plaintiffs' experts failed to rule out alternative causes, it means that these alternative causes may have been the sole causes of plaintiffs' injuries -- PCBs may not have played any role at all and certainly may not have been sufficient to bring about the plaintiffs' injuries. Testimony that PCBs increased the risk that plaintiffs would contract the injuries that they contracted does not show that PCBs were a substantial factor in those injuries. Moreover, testimony that plaintiffs' exposure to PCBs makes it likely that PCBs were a substantial factor in plaintiffs' injuries cannot reliably establish that PCBs were in fact a substantial factor unless the expert thought about the possibility that other potential causes of those injuries were in fact the *sole* cause of those injuries. [HN2] Even under the substantial factor test, plaintiffs must prove that defendants' actions *were* a cause of plaintiffs' injuries before the burden switches to defendant to show that the injuries would have occurred even absent any action by the defendant. [*5]

Id. Thus, "if [HN3] the medical expert's 'opinion on causation has a factual basis and supporting scientific theory' that is reliable, it should be admitted." *Heller v. Shaw Indus., Inc., 167 F.3d 146, 157 (3d Cir. 1999)* (citing *Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 809 (3d Cir. 1997))*. However, "'where a defendant points to a plausible alternative cause and the doctor offers no explanation for why he or she has concluded that was not the sole cause, that doctor's methodology is unreliable.'" *Heller, 167 F.3d at 156* (citing *Paoli II, 35 F.3d at 759 n.27)*.

**III. FELA CAUSATION STANDARD**

Plaintiffs next state that the FELA causation standard permits a finding of liability if a defendant's actions "played any part, even the slightest, in producing the [plaintiffs'] injury." Pls.' Mem. at 10 (citing *Rogers v. Missouri P.R. Co., 352 U.S. 500, 507, 1 L. Ed. 2d 493, 77 S. Ct. 443 (1957))*. Thus, according to Plaintiffs, expert testimony may not even be required in a FELA case to establish that exposure to a toxic chemical may have actionably contributed to a worker's illness. [*6] Pls.' Mem. at 11 (citing *Ulfik v. Metro-Northern Commuter R.R., 77 F.3d 54, 59-60 (2d Cir. 1996); Harbin v. Burlington N.R. Co., 921 F.2d 129, 132 (7th Cir. 1990))*.

However, Defendants convincingly argue that the FELA causation standard is irrelevant. Defendants first point out that Plaintiffs' contention "that expert testimony is unnecessary does not mean that it can be admitted even if unreliable." Defs.' Opp'n Mem. at 6. Next, Defendants argue that the two cases cited by Plaintiffs do not justify dispensing with expert testimony in this case. Defendants state that in the plaintiff in the Harbin case did present expert proof of causation and that the Seventh Circuit actually held that the plaintiff did not also need expert proof of the defendant's negligence. As for Ulfik, Defendants argue that the particular causal relationship alleged there (dizziness, headache, and nausea after exposure to paint fumes) was held to be a "non-technical matter" by the court and could be decided by a jury without expert testimony. Furthermore, Defendants submit that the Third Circuit has already recognized that the alleged causal connection between PCBs and [*7] human illness is sufficiently esoteric to require expert testimony. *Paoli II, 35 F.3d at 767-70* (upholding summary judgment against plaintiffs who presented no admissible expert proof of causation). Moreover, Defendants correctly assert that "the FELA causation standard does not make that subject any less esoteric." Defs.' Opp'n Mem. at 7 (citing *Claar v. Burlington N.R.R., 29 F.3d 499, 504 (9th Cir. 1994));* see also *Moody v. Maine Cent. R. Co., 823 F.2d 693, 695 (1st Cir. 1987)* (if [HN4] drawing a particular conclusion requires specialized knowledge, expert testimony is required) (citing W.P. Keeton, *The Law of Torts* 269 (5th ed. 1984)). Thus, this Court concludes that, [HN5] like the "substantial factor" standard, the FELA causation standard does not lower the burden of admissibility here.

**IV. ADMISSIBILITY OF DR. SHERMAN'S BODILY INJURY OPINIONS**

In reviewing the reliability of a physician's testimony the Third Circuit has stated the following:

1. "Performance [HN6] of physical examinations, taking of medical histories, and employment of reliable laboratory tests all provide significant evidence of a reliable differential diagnosis, [*8] and . . . their absence makes it much less likely that a differential diagnosis is reliable." *Paoli II, 35 F.3d at 758;*

2. "Sometimes differential diagnosis can be reliable with less than full information . . . ." *Id. at 759;*

[HN7] 3. "[A] physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted." *Id. at 762;*

4. "Evaluation [HN8] of the patient's medical records, like performance of a physical examination, is a reliable method of concluding that a patient is ill even in the absence of a physical examination. . . . Generally, a doctor only needs one reliable source of information showing that the plaintiff is ill and either a physical examination or medical records will suffice -- but the doctor does need at least one of these sources." Id.; and

5. "Where [ [HN9] physicians] engaged in few of the standard procedures of differential diagnosis, they had to offer a good explanation as to why [*9] their conclusion remained reliable. Where they did employ such standard techniques, they still had to offer such an explanation if the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' actions." Id.

Based on the above, the Third Circuit set forth the following guidelines for reviewing Dr. Sherman's testimony:

> Where Dr. Sherman . . . offered an opinion as to the source of a party's illness, the district court abused its

> discretion in excluding that opinion under Rule 702 unless either (1) Dr. Sherman . . . engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes and the doctor offered no good explanation as to why . . . her conclusion remained reliable, or (2) the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' actions and Dr. Sherman . . . offered no reasonable explanation as to why . . . she still believed that the defendants' actions were a substantial factor in bringing about that illness.

*Id. at 760.* Thus, the Third Circuit concluded that "the [HN10] opinion of a doctor who has engaged in few standard diagnostic [*10] techniques should be excluded unless the doctor offers a good justification for his or her conclusion . . . ." *Paoli II, 35 F.3d at 761.*

Here, Plaintiffs argue that Dr. Sherman evaluated all three worker plaintiffs' medical histories, completed a physical examination of the only surviving worker, studied the literature, and considered alternative causes before reaching her opinions. In addition, Plaintiffs argue that Dr. Sherman considered and rejected several non-PCB causes for Plaintiffs' injuries about which the Defendants questioned her. However, "Paoli II makes clear that Rule 702 requires Dr. Sherman to explain on a plaintiff-by-plaintiff, disease-by-disease basis why her opinion is reliable and why she ruled out alternative causes." Defs.' Opp'n Mem. at 8; see also *Paoli II, 35 F.3d at 764* (concluding that the exclusion of Dr. Sherman's testimony will not be upheld without examining her testimony concerning particular plaintiffs). Specifically, the Third Circuit stated:

> Applying the Daubert analysis . . . , unless Dr. Sherman presented a good explanation for why she could reasonably testify that the illnesses of the plaintiffs [*11] whom she did not examine were caused by PCBs, the district court was within its discretion in excluding Dr. Sherman's testimony. With respect to those plaintiffs whom Dr. Sherman did examine, we conclude that she employed a sufficient number of standard diagnostic techniques that the district court should have presumed that her testimony was reliable. Thus, Dr. Sherman's testimony is admissible with respect to these plaintiffs unless the defendants pointed to particular potential alternative causes and she was unable to explain why she thought these alternatives had not caused the plaintiffs' illnesses.

*Paoli II, 35 F.3d at 764-65.* Next, this Court will apply the above analysis to Dr. Sherman's opinions regarding the Plaintiffs in the instant actions.

## V. DR. SHERMAN'S OPINIONS REGARDING THE WORKERS' PERSONAL INJURIES

### A. John Narcise

According to Dr. Sherman, Mr. Narcise had (1) cancer, (2) chronic obstructive pulmonary disease, (3) diabetes, and (4) pancytopenia. In her deposition, Dr. Sherman stated that those conditions "are reflective of those adverse effects that have been shown in animals and other human beings following [*12] exposure to components found in dielectric fluids . . . ." (Sherman Dep., dated 5/20/92, at 370-71.) However, as Defendants point out, Dr. Sherman did not examine Mr. Narcise, take a history of him, or perform any laboratory tests on him, but, instead, bases her opinions solely on a review of Mr. Narcise's medical records. Thus, as stated above, unless Dr. Sherman presented a good explanation for why she could reasonably testify that the illnesses of Mr. Narcise were caused by PCBs, this Court was within its discretion in excluding Dr. Sherman's testimony. *Paoli II, 35 F.3d at 764-65.*

In this regard, Defendants argue that nowhere does Dr. Sherman address herself to Mr. Narcise's particular case and explain how or why she determined that cigarette smoking was not the **sole** cause of his cancer or Chronic Obstructive Pulmonary Disease ("COPD"). (Sherman Dep., dated 5/20/92, at 376-78, 383-85.) Similarly, Defendants argue that Dr. Sherman has made no attempt to explain how or why she ruled out obesity or other factors besides PCBs as possible causes of Mr. Narcise's diabetes. As for Mr. Narcise's pancytopenia, the depression of all blood counts, Defendants argue [*13] that Dr. Cassileth noted that such a condition was most likely a side-effect of Mr. Narcise's anti-convulsant medication which he was given to control seizures related to his brain tumor.

In response, Plaintiffs argue that whether Dr. Sherman accurately rejected smoking as the primary cause of Mr. Narcise's brain tumor is a question of fact for the jury. Pls.' Recons. Mot. at 13 (citing *Paoli II, 35 F.3d at 746* ("Daubert requires the judge's admissibility decision to focus not on the expert's conclusions but on his or her principles and methodology.")). In addition,

Plaintiffs argue that Defendants' contention that Dr. Sherman failed to consider alternative causes to Mr. Narcise's other health problems has no merit because : (1) the FELA standard of causation only requires PCBs to play the slightest role in contributing to their illnesses, (2) the "substantial factor" standard of causation does not require the expert's opinion to disprove or discredit every possible cause other than the one espoused by her, (3) Dr. Sherman was required to review the plaintiff's medical records, not defendant's commentary on such records, and (4) Dr. Sherman considered alternative [*14] causes for Mr. Narcise's illnesses.

Again, Plaintiffs are inaccurate. As already stated above, both the FELA and "substantial factor" standards of causation fail to lower the burden of admissibility here. Indeed, Dr. Sherman's consideration of alternative causes for Mr. Narcise's illnesses does not in and of itself make her opinion reliable where "the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' actions and Dr. Sherman . . . offered no reasonable explanation as to why . . . she still believed that the defendants' actions were a substantial factor in bringing about that illness." Paoli II at 760. Thus, Dr. Sherman's review of Mr. Narcise's medical records does not excuse Plaintiffs' expert from explaining why obesity was not the sole cause of Mr. Narcise's diabetes, nor why smoking was not the sole cause of Mr. Narcise's cancer or COPD.

**B. Charles Stanbach**

With respect to Charles Stanbach, who died from a tumor located at the junction of his stomach and esophagus, Dr. Sherman opines that Mr. Stanbach's exposure to PCBs was a significant contributing factor in causing his stomach cancer. (Sherman Dep., dated 5/20/92, at [*15] 388.) As with Mr. Narcise, Dr. Sherman bases her opinion solely on her evaluation of Mr. Stanbach's medical records. Therefore, unless Dr. Sherman presented a good explanation for why she could reasonably testify that the illnesses of Mr. Stanbach were caused by PCBs, this court was within its discretion in excluding Dr. Sherman's testimony. Paoli II at 764-65.

Here, Defendants point out that, after examining Mr. Stanbach's medical records, Dr. Cassileth observed that the cancer from which Stanbach suffered "is not an uncommon tumor. There are known epidemiological associations with this kind of cancer, including alcohol ingestion, cigarette smoking, and iron deficiency." (Cassileth Report at 8.) While the parties do not dispute that Dr. Sherman did offer an explanation for why she does not believe smoking caused Mr. Stanbach's cancer, see Paoli II at 764 ("She specifically considered Charles Stanbach's smoking as a possible cause of his esophageal cancer before ruling it out based on when he had stopped smoking and the types of changes he had in his cells."), Defendants argue that Dr. Sherman provides no explanation as to why she rules out other possible causes. Defendants [*16] further argue that Dr. Sherman never ascertained Mr. Stanbach's drinking or dietary history. (Sherman Dep., dated 6/19/92, at 1014.) Moreover, Defendants assert that Dr. Sherman has little, if any, expertise in the subject of gastro-esophageal cancer. *Paoli II, 35 F.3d at 765* ("In analyzing the adequacy of Dr. Sherman's explanations, we will weigh in the balance Dr. Sherman's somewhat dubious expertise -- a factor we have deemed important under the Supreme Court's flexible Daubert inquiry."); see also Sherman Dep., dated 5/20/92, at 389-90, 400-01. Based on the above, this Court's conclusion that Dr. Sherman's opinion is unreliable and inadmissible under Rule 702 remains unchanged.

**C. Andre Williams**

At her deposition, "Dr. Sherman testified that exposure to PCBs caused plaintiff Andre Williams to develop (1) 'lesions over his back which . . . looked very much like chloracne lesions'; and (2) 'polychondritis affecting his eyes, his ears [and] his heart.'" Defs.' Supp. Mem. Regarding Exclusion of the Opinions of Janette Sherman, M.D. at 15 (citing Sherman Dep. at 477). However, unlike Narcise and Stanbach, Dr. Sherman did examine and take a history [*17] from Mr. Williams. Thus, Dr. Sherman's testimony is admissible with respect to Mr. Williams unless the defendants pointed to particular potential alternative causes and she was unable to explain why she thought these alternatives had not caused the plaintiffs' illnesses.

Defendants first argue that Dr. Sherman's opinion that PCB-related chloracne is a "possible" diagnosis is on its face too speculative to qualify as "scientific knowledge" under Rule 702. Defendants cite *Paoli II, 35 F.3d at 760 n.29,* where "the Third Circuit recognized that 'there may . . . be circumstances in which a doctor conducts a physical examination but this is insufficient to create a reliable differential diagnosis in the absence of the additional data' that testing procedures would provide." Defs.' Supp. Mem. at 16. Thus, Defendants argue that, "without performing a biopsy, her opinion is at best 'only a hypothesis which [she has] yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing.'" Defs.' Supp. Mem. at 16 (quoting *Paoli II, 35 F.3d at 764);* see also *Mayhew v. Bell S.S. Co., 917 F.2d 961, 963 (6th Cir. 1990)* (holding [*18] [HN11] that even under FELA, to render an admissible opinion, "a medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages.").

Next, Defendants argue that Dr. Sherman's opinion is inadmissible on the alternative grounds that she failed to explain why she ruled out eczematoid dermatitis as a possible sole cause of the skin lesions she noted on Mr. Williams, as Dr. Phillips, a Professor of Medicine at the University of Pennsylvania School of Medicine in the Allergy and Immunology Section, reported. In addition, the Third Circuit noted, "Dr. Sherman admitted she was not an expert in dermatology, and she demonstrated little knowledge about chloracne." *35 F.3d at 767.*

Likewise, with respect to Mr. Williams' polychondritis, Dr. Sherman has not provided any explanation as to why she believes Mr. Williams' condition is caused by PCBs and not medications. (Sherman Dep., dated 5/20/92, at 478-80.) According to Defendants, the only data Dr. Sherman cites to support her opinion are the immunological testing results from Antibody Assay Laboratories, [*19] see id. at 490-94, which this Court (affirmed by the Third Circuit) has held to be inadmissible and unreliable as a basis for expert opinion. See *Paoli II, 35 F.3d at 754.*

In response, Plaintiffs argue that the admissibility of Dr. Sherman's opinion does not depend upon her "disproving or discrediting" every speculative cause articulated by a defense witness. See *id. at 761 n.32.* However, the Third Circuit, in Paoli II, held that "if plaintiff's experts failed to rule out alternative causes, it means that these alternative causes may have been the sole causes of plaintiff's injuries -- PCBs may not have played any role at all and certainly may not have been sufficient to bring about the plaintiffs' injuries." *Id. at 760 n.31.* Thus, Dr. Sherman's opinion on causation should remain excluded because she failed to rule out alternative causes. *Id. at 760.*

## VI. DR. SHERMAN'S MEDICAL MONITORING OPINIONS

On October 20, 1995, this Court denied Defendants' Motion *In Limine* to Exclude the Medical Monitoring Opinion Testimony of Dr. Sherman at the related trial of the residential plaintiffs. With serious [*20] misgivings about the admissibility of such testimony, this Court determined that the most expeditious and practical way of handling the matter was for the case to go to trial and leave the jury to decide the value of Dr. Sherman's testimony, especially in light of the unique history of this case. Now, with the added experience of the residential trial, along with the opportunity to reflect on the applicable law, this Court will revisit the arguments made by the parties in order to decide the present motion. n1

n1 Defendants remind this Court that there has been no final judgment as to Mr. Williams' case, nor was his case before the Court of Appeals in Paoli II. Furthermore, Defendants submit that this Court is free to revisit its opinion excluding Dr. Sherman's medical monitoring opinion to base the exclusion of that opinion on grounds different from those that supported the 1992 exclusion Order. *NL Indus., Inc. v. Commercial Union Ins. Co., 65 F.3d 314, 324 n.8 (3d Cir. 1995)* [HN12] (before final judgment, trial court may revisit issues previously decided "when there has been an intervening change in the controlling law [or] when new evidence has become available . . . .").

[*21]

Andre Williams is the only living worker plaintiff; therefore, he is the only FELA plaintiff pursuing a claim for medical monitoring. Here, Plaintiffs contend that the Third Circuit's finding that Dr. Sherman's medical monitoring "passes Daubert muster" along with this Court's recent denial of a related motion *in limine* warrant reconsideration of this Court's earlier ruling with respect to Mr. William's case. However, in Paoli II, the court observed that Dr. Sherman's methodology in formulating her monitoring opinion was very much open to Rule 702 challenge. Thus, the substance of Plaintiffs' experts' medical monitoring program had not been addressed by Defendants in prior proceedings. See *Paoli II, 35 F.3d at 789* ("It may be true that failure to analyze the specificity or sensitivity of a particular test sometimes constitutes a methodological flaw that renders a doctor's opinion that that test is a useful diagnostic technique unreliable and hence inadmissible. But the defendants fail to point to evidence in the record suggesting that an analysis of specificity and sensitivity is necessary . . . ."). Defendants now do make those arguments as to Dr. Sherman's [*22] monitoring opinion for Mr. Williams and, as set forth below, have provided a record that amply supports the exclusion of that opinion. Defs.' Supp. Mem. at 22.

The purpose for medical monitoring or screening is early detection and treatment of disease. However, monitoring should not be conducted if early detection and the prospect for successful treatment are not available for the disease. (Guzelian Decl. at P 6.) This risk/benefit approach is consistent with one of the fundamental principles of medical science -- "Above all, do no harm." (Herzstein Decl. at P 4.)

As Defendants' experts, Dr. Guzelian and Dr. Herzstein, point out, the medical monitoring process itself entails substantial health risks. Not only do the testing procedures themselves have the potential to cause

significant injuries, but a positive result triggers an increasingly invasive series of medical procedures which are necessary to confirm the initial result. n2 In addition, there are emotional risks to a patient's health -- a false test result will either provide false reassurance to the patient of the absence of a disease or, in the alternative, cause great anxiety and behavioral changes that often accompany [*23] a patient labeled with a disease. (Herzstein Decl. at P 4.)

n2 In those cases in which the positive result turns out to be a "false positive" -- that is, the condition indicated by the test was not actually present -- the resulting cascade of medical intervention is totally unnecessary and potentially harmful. (Herzstein Decl. P 4.) According to Drs. Guzelian and Herzstein, reliable medical methodology is designed to minimize the possibility of such errors -- false test results and the resulting harms to the patient -- in the screening process.

Thus, like any medical intervention, the physician must first establish that the probable usefulness of those tests outweighs the attendant risks prior to subjecting a healthy person to screening tests. n3 Such a risk/benefit analysis determines whether a screening test for an asymptomatic patient is justified. (Guzelian Decl. at P 7.) This analysis requires : (1) determining whether a screening test is capable of detecting the disease in question (the "target condition") [*24] early enough to improve the patient's clinical outcome (Guzelian Decl. P 6; Herzstein Decl. PP 5-6), (2) determining whether the test is sufficiently accurate, measured by its sensitivity and specificity, to be a useful means of looking for the target disease, taking into account the test's accuracy and predictive power, (Guzelian Decl. P 8; Herzstein Decl. PP 5, 7), and (3) determining the likelihood that the test under consideration will find what she is looking for in the person or group being screened (Guzelian Decl. PP 9-11; Herzstein Decl. PP 5, 8). In addition, the physician must consider the individual patient's health status before prescribing screening tests for a perceived risk of future disease. (Herzstein Decl. at P 9.)

n3 "The methodology for making this determination has now been set forth in a number of widely recognized and authoritative sources, including the Report of the U.S. Preventive Services Task Force, Guide to Clinical Preventive Services (1989) and the criteria issued by the U.S. Agency for Toxic Substances and Disease Registry (ATSDR) to determine the propriety of medical monitoring under CERCLA." Defs.' Mot. *In Limine* to Exclude Dr. Sherman's Medical Monitoring Opinion, filed October 2, 1995 before the related residential trial, at 9.

[*25]

Defendants point to several deficiencies in Dr. Sherman's methodology in formulating her opinion that an extensive battery of periodic screening tests is required. n4 Such deficiencies include the following:

1. Dr. Sherman proposes tests that have no known medical benefit in the treatment of any condition and there is no recognized medical purpose in performing such tests on asymptomatic persons. (Guzelian Dec. at P 14; Herzstein Dec. at P 12);

2. Dr. Sherman has not considered or analyzed the accuracy of the tests. In this regard, she has failed to appreciate or apply in substance the concepts of "sensitivity" and "specificity." Thus, she failed to determine whether any of the components of her protocol are likely to be accurate in detecting the conditions she believes may be caused by Plaintiff's exposure. (Guzelian Dec. at P 14; Herzstein Dec. at P 13); and

3. Dr. Sherman has not considered the prevalence of the target diseases. This renders her methodology unreliable, since she is without the capability of comparing the risks and benefits of monitoring in the manner that any reliable medical methodology requires. (Guzelian Dec. at P 14; Herzstein Dec. at P 13.)

n4 Aside from Dr. Sherman's lack of scientific methodology is Defendants' contention that Dr. Sherman's medical monitoring opinion relies on a factual assumption that Plaintiffs were exposed to dioxins and furans, as well as PCBs. Because this Court already determined that all testimony, evidence, and statements to the jury concerning dioxins and furans and the alleged health effects of those substances should be excluded, Defendants convincingly argue that Dr. Sherman's opinion does not "fit" the issues to be tried, since Plaintiffs will be unable to prove at trial that they were in fact exposed to the substances to which Dr. Sherman assumed they had been exposed. See *Joiner v. General Elec. Co., 864 F. Supp. 1310 (N.D. Ga. 1994)*, rev'd, *78 F.3d 524 (11th Cir. 1996)*, rev'd, *522 U.S. 136, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997).*

[*26]

Furthermore, the applicable reliability factors of a Rule 702 analysis point strongly to the inadmissibility of

Dr. Sherman's monitoring opinion. For example, as stated above, by prescribing numerous screening tests without considering the information that is critical to an assessment of their necessity, Dr. Sherman's approach creates a great potential for error in the screening process. In addition, Dr. Sherman's medical monitoring approach is scientifically unsound and not accepted by the medical community. Finally, Dr. Sherman's "somewhat dubious expertise," Paoli II at 765, when viewed in conjunction with the fundamental methodological flaws discussed above, favors ruling her monitoring opinion inadmissible under Rule 702. n5

n5 Another independent basis for excluding Dr. Sherman's medical monitoring opinion is that Plaintiffs may recover only for special monitoring tests made necessary by their alleged exposure to PCBs; however, many of the tests in Dr. Sherman's monitoring protocol are procedures that she would recommend for any person, regardless of alleged chemical exposure. Other tests Dr. Sherman would prescribe only if a plaintiff develops certain symptoms in the future, but she cannot say that it is probable that any plaintiff in fact will ever develop such symptoms.

[*27]

In Paoli II, the Third Circuit Court of Appeals held that this Court "abused its discretion in relying purely on Dr. Sherman's failure to understand certain terms in excluding her testimony on medical monitoring as unreliable." *Paoli II, 35 F.3d at 790.* However, Defendants have now pointed to evidence in the record that shows an analysis of specificity and sensitivity is necessary before concluding that particular screening tests are needed. See *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999)* ("The [HN13] objective of [Daubert's gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). In addition, Defendants have shown, inter alia, how Dr. Sherman has "failed to analyze specificity and sensitivity in substance." *Paoli II, 35 F.3d at 790.* Based on the above, this Court will deny Plaintiffs' motion with respect [*28] to Dr. Sherman's medical monitoring opinion.

**VII. DR. NISBET'S OPINION**

The parties, for the most part, do not dispute that Dr. Nisbet's opinions in the worker cases do not materially differ from his opinions in the residential cases and that the Third Circuit's reversal of the exclusion of the vast majority of his testimony in the residential cases compel that he be permitted to testify, subject to the same parameters, in the workers' cases. See *Paoli II, 35 F.3d at 774, 779.* Here, it is appropriate for this Court to reconsider its Order excluding Dr. Nisbet's opinion in these cases to conform to the holdings of Paoli II. Thus, only Dr. Nisbet's opinions as to his "recalculation of AML lab tests and . . . his back calculations based on the Eco Logic data" remain inadmissible. *Id. at 778.*

Based on the above, Plaintiffs' Motion for Reconsideration of this Court's 1992 Order excluding the testimony of Drs. Sherman and Nisbet in these cases is granted in part and denied in part. An appropriate Order will follow.

**ORDER**

AND NOW, this 7th day of March, 2000, upon consideration of Plaintiffs' Motion for Reconsideration of [*29] this Court's 1992 Order excluding the testimony of Drs. Sherman and Nisbet in the above-captioned matter, and all responses thereto, it is hereby ORDERED that:

1. Plaintiffs' Motion for Reconsideration regarding Dr. Sherman's personal injury opinions is DENIED;

2. Plaintiffs' Motion for Reconsideration regarding Dr. Sherman's medical monitoring opinion is DENIED; and

3. Plaintiffs' Motion for Reconsideration regarding Dr. Nisbet's expert testimony is GRANTED with respect to the vast majority of Dr. Nisbet's expert testimony and DENIED only as to his recalculation of American Medical Laboratory (AML) tests and his back calculations based on the Eco Logic data.

BY THE COURT:

ROBERT F. KELLY, J.