# EXHIBIT 4

LEXSEE 2001 US DIST LEXIS 23416

**MIKOHN GAMING CORP., Plaintiff, v. ACRES GAMING, INC., Defendant,**

**Case No.: CV-S-97-1383-EJW (LRL) (Base File), Case No.: CV-S-98-1462-EJW (LRL) (Base File)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

*2001 U.S. Dist. LEXIS 23416*

**August 1, 2001, Decided**
**August 2, 2001, Received and Filed; August 3, 2001, Entered and Served**

**DISPOSITION:** [*1] Plaintiff's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial denied. Defendant's Motion to Amend Judgment, for an Accounting of Sales, for Entry of Permanent Injunction Regarding plaintiff's MoneyTime System, and for an Award of Prejudgment Interest granted. Permanent injunction stayed pending resolution of any appeals.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After a jury found that the plaintiff infringer infringed upon the patents of the defendant assignee, and awarded $ 1,500,000 in damages to the assignee, the infringer filed a renewed motion for judgment as a matter of law and motion for a new trial. The assignee filed motions for prejudgment interest, accounting of sales, and a permanent injunction.

**OVERVIEW:** The patents at issue related to the assignee's system of networked gaming devices designed to provide various promotional bonuses. The infringer listed several claim limitations upon which it argued the assignee failed to prove that the infringer infringed. The court held that there was sufficient evidence presented at trial to support the jury's verdict as to each of these claim limitations. The court reasoned that the infringer had not cited evidence that greatly outweighed the expert testimony. The court also reasoned that the authorities cited by the infringer warning against applying the doctrine of equivalents too broadly were inapplicable to the facts of this case. The infringer also argued that the verdict was against the weight of the evidence, the verdict was excessive, and the court rendered judgment without due consideration of the infringer's affirmative defense of inequitable conduct. The court held that the verdict of infringement was not against the clear weight of the evidence. Finally, the court concluded that the infringer should pay prejudgment interest at the rate of 4.78 percent compounded annually.

**OUTCOME:** The infringer's motions were denied. The motions of the assignee for prejudgment interest and accounting of sales were granted.

**LexisNexis(R) Headnotes**

***Copyright Law > Civil Infringement Actions > Jurisdiction & Venue > Federal Court Jurisdiction***
***Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview***
[HN1] See *28 U.S.C.S. § 1338*(a).

***Civil Procedure > Trials > Judgment as Matter of Law***
[HN2] See Fed. R. Civ. P. 50(a)(1).

***Civil Procedure > Trials > Judgment as Matter of Law***
[HN3] Where a party has made a motion for judgment as a matter of law at the close of evidence, and that motion was denied and the case sent to the jury, the moving party may renew its motion after verdict. Fed. R. Civ. P. 50(b).

***Civil Procedure > Trials > Judgment as Matter of Law***
[HN4] In the context of a motion for judgment as a matter of law, in order to determine whether a legally sufficient basis in fact exists, the trial court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to

the non-mover, must not determine the credibility of witnesses, and must not substitute its choice for that of the jury.

***Civil Procedure > Relief From Judgment > Motions for New Trial***
[HN5] A motion for a new trial falls under Fed. R. Civ. P. 59, which provides a new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. Fed. R. Civ. P. 59(a). The standard set by case law is that a verdict may be set aside and new trial granted, when the verdict is contrary to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice.

***Civil Procedure > Pleading & Practice > Motion Practice Generally > Content & Format of Motions***
[HN6] In ruling upon a motion, a court relies upon the entire record in this case, and not simply upon the few examples of testimony or exhibits.

***Patent Law > Infringement Actions > Burdens of Proof***
[HN7] The standard applied to patent infringement is a preponderance of the evidence. Preponderance of the evidence means the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it.

***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
[HN8] The general rule is that unless the literal language or physical constraints of the process claim dictate otherwise, the steps of the claim have no required order of performance.

***Civil Procedure > Jury Trials > Province of Court & Jury***
[HN9] It is within the province of the jury to determine the credibility of a witness and the weight to be given his testimony; the jury is not required to accept testimony as true, even if it is uncontradicted.

***Civil Procedure > Jury Trials > Province of Court & Jury***
[HN10] A court must not substitute its choice for that of the jury.

***Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview***
[HN11] Under the doctrine of equivalents, if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.

***Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview***
[HN12] Finding infringement under the doctrine of equivalents despite a difference in the location of the bonus payout table does not allow the doctrine such broad play as to effectively eliminate that element in its entirety. Nor does it conflict with the definitional and public-notice functions of the statutory claiming requirement.

***Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview***
[HN13] It is important to ensure that the doctrine of equivalents, even as to an individual element, is not given such broad play as to effectively eliminate that element entirely.

***Civil Procedure > Trials > Judgment as Matter of Law***
[HN14] Conflicting evidence is insufficient to support judgment as a matter of law. In analyzing a motion for judgment as a matter of law, the trial court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, must not determine the credibility of witnesses, and must not substitute its choice for that of the jury between conflicting elements in the evidence. The court will not substitute its judgment for that of the jury.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
***Patent Law > Inequitable Conduct > Burdens of Proof***
[HN15] A defendant asserting an inequitable conduct defense must demonstrate by clear and convincing evidence that the applicant or his attorney failed to disclose material information to the U.S. Patent and Trademark Office (PTO), and that the applicant or his attorney did so with intent to deceive the PTO.

***Civil Procedure > Relief From Judgment > Motions for New Trial***
[HN16] A new trial is not necessary to prevent a miscarriage of justice.

***Patent Law > Remedies > Collateral Assessments > Prejudgment Interest***
***Patent Law > Remedies > Damages > Reasonable Royalties***
***Patent Law > Claims & Specifications > Claim Language > General Overview***
[HN17] *35 U.S.C.S. § 284* provides that damages for patent infringement include a reasonable royalty for the

use made of the invention by the infringer, together with interest and costs as fixed by the court.

***Patent Law > Remedies > Collateral Assessments > Prejudgment Interest***
***Patent Law > Remedies > Damages > General Overview***
[HN18] Under *35 U.S.C.S. § 284,* interest shall be fixed by the court. The statute leaves the court some discretion in awarding prejudgment interest.

***Patent Law > Remedies > Equitable Relief > Accountings***
***Patent Law > Remedies > Damages > General Overview***
[HN19] Accountings appear to be standard practice after judgment in patent actions.

***Civil Procedure > Entry of Judgments > Stay of Proceedings & Supersedeas***
***Patent Law > Remedies > Equitable Relief > Accountings***
***Patent Law > Remedies > Damages > General Overview***
[HN20] See Fed. R. Civ. P. 62(a).

***Patent Law > Remedies > Damages > General Overview***
[HN21] An accounting of profits for the purpose of recovering lost profits is an equitable remedy.

***Patent Law > Remedies > Damages > General Overview***
[HN22] Reasonable royalty damages are not simply lost profits.

***Patent Law > Remedies > Equitable Relief > Accountings***
***Patent Law > Remedies > Damages > General Overview***
[HN23] *35 U.S.C.S. § 284* does not specifically provide for an accounting as a remedy separate from damages. It states only that the patent owner is entitled to damages adequate to compensate for the infringement.

***Patent Law > Remedies > Damages > General Overview***
[HN24] The damages awarded the patent holder must be adequate to compensate for the infringement, *35 U.S.C.S. § 284,* which means full compensation for any damages the patent owner suffered as a result of the infringement.

***Patent Law > Ownership > Patents as Property***
***Patent Law > Infringement Actions > Exclusive Rights > Manufacture, Sale & Use***
***Patent Law > Remedies > Equitable Relief > Injunctions***
[HN25] Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's rights to exclude others from use of his property. *35 U.S.C.S. § 261.* It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it.

**COUNSEL:** Steven E. Shapiro, George M. Borkowski and Nicole L. Harris, Mitchell Silberberg & Knupp LLP, Los Angeles, CA, for Mikohn Gaming Corporation.

Adam R. Segal, Schreck Brignone & Godfrey, Las Vegas, NV, for Mikohn Gaming Corporation.

Jerry A. Riedinger, Michael D. Broaddus and Katrina R. Kelly, Perkins Coie LLP, Seattle, WA, for Acres Gaming, Inc.

Eric R. Olsen, Gordon & Silver, Ltd., Las Vegas, NV, for Acres Gaming, Inc.

**JUDGES:** Evan J. Wallach, Judge.

**OPINIONBY:** Evan J. Wallach

**OPINION:**

**I**

**INTRODUCTION**

The court has before it Mikohn Gaming Corporation's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial (# 512) ("Mikohn's Motion"), Acres Gaming Inc.'s Motion to Amend Judgment [*2] and for an Award of Prejudgment Interest (# 514) ("Acres's Motion for Prejudgment Interest"), Acres Gaming Inc.'s Motion to Amend Judgment and for an Accounting of Sales (# 514) ("Acres's Motion for an Accounting of Sales"), and Acres Gaming's Motion for Entry of a Permanent Injunction Regarding Mikohn's MoneyTime System (# 513) ("Acres's Motion for a Permanent Injunction"). For the reasons discussed below, Mikohn's Motion is denied, and Acres's Motions for Prejudgment Interest, an Accounting of Sales and a Permanent Injunction are granted.

**II**

**BACKGROUND**

Several prior opinions have been issued in these cases. Familiarity with those prior opinions is presumed.

United States Patent Number *5,655,961* (" *'961* patent") was issued on August 12, 1997, and United

States Patent Number *5,836,817* (" *'817* patent") was issued on November 17, 1998, to inventors John F. Acres, Alec Ginsburg, and David Wiebenson. Acres Gaming, Inc. ("Acres") is the assignee. Both patents relate to Acres's system of networked gaming devices designed to provide various promotional bonuses. The abstracts in the patents are identical:

> A system for monitoring and configuring gaming devices interconnected [*3] over a high-speed network is disclosed. The system can support a file server, one or more floor controllers, one or more pit terminals, and other terminals all interconnected over the network. Each gaming device includes an electronic module which allows the gaming device to communicate with a floor controller over a current loop network. The electronic module includes a player tracking module and a data communication node. The player tracking module includes a card reader for detecting a player tracking card inserted therein which identities the player. The data communication node communicates with both the floor controller and the gaming device. The data communication node communicates with the gaming device over a serial interface through which the data communication node transmits reconfiguration commands. The gaming device reconfigures its payout schedule responsive to the reconfiguration commands to provide a variety of promotional bonuses such as multiple jackpot bonuses, mystery jackpot bonuses, progressive jackpot bonuses, or player specific bonuses.

At the conclusion of the trial in this case, the jury found that Mikohn infringed upon both patents and awarded $ 1,500,000 [*4] in damages to Acres. Special Verdict Form, (# 506) (March 27, 2001). The verdict was entered as the judgment of this court. Judgment in a Civil Case (# 507) (March 29, 2001).

At the close of Acres's case in chief and at the end of trial, Mikohn moved for judgment as a matter of law that it did not infringe upon the patents. Transcript of Trial, March 14-27, 2001 ("Tr.") at 730:22-24; Tr. at 1649:20-24. The motions were denied. Tr. at 743:11-12; Tr. at 1652:22 - 1653:3. Mikohn renews its motion here.

**III**

**JURISDICTION AND STANDARD OF REVIEW**

This consolidated case was brought under *35 U.S.C. § 271* (1994), Infringement of patent. This court has jurisdiction pursuant to *28 U.S.C. § 1338*(a), which provides:

> [HN1] The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . . Such jurisdiction shall be exclusive of the courts of the states in patent. . . .

*28 U.S.C. § 1338*(a) (1994).

A motion for judgment as a matter of law is governed by Fed. R. Civ. P. at 50, which states:

> [HN2] If during a trial by jury a party has been fully [*5] heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

*Fed. R. Civ. P. 50(a)(1)*. [HN3] Where, as here, a party has made a motion for judgment as a matter of law at the close of evidence, and that motion was denied and the case sent to the jury, the moving party may renew its motion after verdict. See *Fed. R. Civ. P. 50(b)*.

[HN4] "In order to determine whether a legally sufficient basis [for the jury to find for Acres] in fact exists, 'the trial court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, must not determine the credibility of witnesses, and must not substitute its choice for that of the jury.'" *Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1269 (Fed. Cir. 1999)* (quoting *Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893, 221 U.S.P.Q. 669, 672 (Fed. Cir. 1984))*. [*6]

[HN5] A motion for a new trial falls under *Fed. R. Civ. P. 59*, which provides "[a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of

the United States . . ." *Fed. R. Civ. P. 59(a)*. The standard set by case law is that a "verdict may be set aside and new trial granted, when the verdict is contrary to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice." *Moist Cold Refrigerator Co. v. Lou Johnson Co., 249 F.2d 246, 251 (9th Cir. 1957)* (quotations omitted); accord *Pacific Employers Ins. Co. v. P.B. Hoidale Co., Inc, 804 F. Supp 137, 141 (D. Kan. 1992).*

**IV**

**ANALYSIS**

**A**

**Mikohn's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial is Denied**

Mikohn renews its Rule 50(b) Motion "on the grounds that Mikohn does not infringe the *'817* and *'961* patents as a matter of law" and presents supporting argument on several specific [*7] claim limitations. Mikohn's Motion at 2, 5-24. Mikohn also moves for a new trial pursuant to Rule 59 arguing that "the verdict was against the weight of the evidence, the verdict was excessive and this Court rendered judgment without due consideration of Mikohn's affirmative defense of inequitable conduct." Id. at 2.

**1. The Jury's Verdict of Infringement Is Supported by Evidence Adduced at Trial**

Mikohn lists several claim limitations upon which it argues Acres failed to prove Mikohn infringes. Sufficient evidence was presented at trial to support the jury's verdict as to each of these claim limitations. The court will address each of Mikohn's contentions in turn and will cite to evidence in the record which supports the jury's verdict. "The Court notes specifically, however, that [HN6] in ruling upon this motion, it relies upon the entire record in this case, and not simply upon the few examples of testimony or exhibits it here tenders." *Braun Inc. v. Dynamics Corp. of Am., 775 F. Supp 33, 35 (D. Conn. 1991)*, rev'd in part (on other grounds) *975 F.2d 815 (Fed. Cir. 1992).*

**a. Sufficient Evidence was Presented at Trial to Support the Jury's [*8] Finding that the MoneyTime System Performs the Step of "Selecting a Plurality of the Gaming Devices"**

Mikohn claims that "Acres failed to prove that the MoneyTime system performed that step of 'selecting a plurality of the gaming devices' as recited in each asserted claim of the *'817* patent." Mikohn's Motion at 5. It argues that Acres's expert Dr. Bertram admitted that his construction of the claim limitation "rendered the limitation . . . superfluous". Id. at 6. Therefore, it claims, his construction is "completely at odds with a proper construction of the claim language . . . [and] Acres failed to establish this limitation is met by the MoneyTime system." Id. at 7. The relevant portion of Dr. Bertram's testimony is as follows:

> Mr. Shapiro: And you indicated that interconnected/wiring gaming machines or slot machines to a host computer performs the step of selecting a plurality of the gaming devices. Is that correct?
> Dr. Bertram: That's correct.
> Mr. Shapiro: So whenever you interconnect gaming devices to a host computer, don't you select a plurality or don't you -- aren't you going to be putting those together? I mean, isn't that going to be any time your [sic] [*9] on the network, don't you have to interconnect a group of machines to the host computer?
> Dr. Bertram: It sounds pretty general but I would agree.
> Mr. Shapiro: And whoever decides to build the system has to determine what gaming devices to wire into the system. Is that right?
> Dr. Bertram: That's true.
> Mr. Shapiro: So would you agree with me that based on your statement that connecting gaming machines to a network, to create a network to a host computer, really renders this element or this limitation, selecting a plurality of the gaming devices, completely superfluous, doesn't? It [sic] Because any time that you connect a set of gaming devices to a host computer, you're going to have to pick out what you're going to interconnect in there and connect it?
> Dr. Bertram: Well, I didn't write the claim. I mean, it's descriptive of what it's doing. It's a method.
> Mr. Shapiro: So you agree, then, in how you're stating this claim is or how you're applying it to the Money Time system renders this element, this limitation of selecting a plurality of the gaming devices, superfluous? Because you are always going to have that when you create a computer network of gaming devices; isn't that [*10] true?
> Dr. Bertram: I would agree with that.

Tr. at p. 392:23 - 394:3.

However, Dr. Bertram also testified that his interpretation of the claim language was that it means "selecting more than one machine to participate in whatever -- whatever it is you're trying to accomplish", Tr. at 459:7-8, and that he "never thought it was superfluous", id. at 459:21.

Specific evidence regarding the MoneyTime system and how it operates was presented by other experts. Mikohn's expert, Mr. Olsen, testified that the Superlink software, which manages the MoneyTime system, is capable of managing several different controllers, some of which may be MoneyTime controllers, but some of which may also be progressive or mystery controllers. Tr. 975:4-8, 21-25. He stated that Superlink has "configuration and setup functions and it has reporting functions." Id. at 1083:2-3.

Mr. Olsen testified about a screen in the Superlink software referred to as the "Machine ID" screen. This screen was shown to the jury as part of the demonstration of the MoneyTime system. It contains a list of all gaming devices connected to the controller. Next to each device is a check box referred to by Mr. Olsen as [*11] the "active box". Mr. Olsen stated that "the active box needs to because checked . . . to correspond to each one of the machines that should be connected to the . . . Money Time controller." Id. at 704:25 - 705:3. When specifically asked, he agreed that it would be an "improper set-up for the system" if the active box was not checked. Id. at 705:4-6.

Acres's expert Dr. Kelly also testified as to the Machine ID screen, and he discussed the operation of the software relating to it. He testified:

> This is one of the screens that's used to configure the system. And you'll see here that there's actually listed 32 machines. This corresponds to 32 gaming machines that are on one link of -- of this system. And there's a name associated with each one of these 32 machines.
>
> And, also, there's a check box right there (indicating). Now if that check box is marked so if you move your mouse over and you clicked at that location, then that would mean that this machine is selected. But if you go over and you click this box to clear that "X" mark then that would mean that this machine is not selected. Now, so you have 32 here on the screen and the user would select some of these and -- [*12] and unselect, deselect, others.
>
> Now, what that does inside the software is it prepares a message. And then when the user presses the Send Status button over here (indicating) that message is packaged up and it's sent off to the main computer that controls the other gaming devices called a DCU.
>
> Now, I should point out that this feature of ending this message can be enabled in the software or it can be disabled. And there's a special flag in there. If that flag is set to true, then the message would be enabled; it would be sent. If the message -- if that flag is set to false, then the message would be constructed, but it wouldn't actually be sent.
>
> Now, the software that -- that was provided to the by Mikohn, that flag is set to false.
>
> * * *

Mr. Broaddus: If the flag were set to true, would selecting and deselecting gaming devices on the machine ID screen be effective to enable or disable the gaming devices from the Money Time system?
Dr. Kelly: Yes, I believe so. That appears to be the purpose of the screen.

Id. at 521:7 - 523:1.

A jury could reasonably infer from this expert testimony that from the Machine ID screen, the operator can "select[] a plurality of the [*13] gaming devices." [HN7] The standard applied to infringement is a preponderance of the evidence. See *SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1123 (Fed. Cir. 1985).* Preponderance of the evidence "means the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it." *Hale v. Dep't of Transp., Fed. Aviation Admin., 772 F.2d 882, 885 (Fed. Cir. 1985).* Mikohn has not cited evidence that greatly outweighs this expert testimony or which demonstrates that a reasonable jury could not find that the MoneyTime system performs this step. The evidence presented at trial was legally sufficient for the jury to find under the preponderance of the evidence standard that the Mikohn MoneyTime system performs the function of "selecting a plurality of the gaming devices."

**b. The Jury Heard Sufficient Evidence to Support its Finding That the MoneyTime System Performs the Steps of "Issuing a Command over the Network Including Data Establishing Criteria to Cause a Bonus to Be Paid from the Pool via One of**

**Said Selected Gaming Devices Upon the Occurrence of a Predetermined Event" and "Providing Data Establishing [*14] Criteria to Cause a Bonus to Be Paid From the Pool via One of Said Selected Gaming Devices Upon the Occurrence of a Predetermined Event"**

Mikohn argues that:

> [The] MoneyTime system does not perform the steps of "issuing a command over the network including data establishing criteria to cause a bonus to be paid from the pool via one of said selected gaming devices upon the occurrence of a predetermined event" and "storing the command in a memory connected to a controller associated with only one of the gaming devices" as recited in claims 1 and 21 of the *'817* patent. It also does not perform the steps of "providing data establishing criteria to cause a bonus to be paid from the pool via one of said selected gaming devices upon the occurrence of a predetermined event" and "storing the data in a memory connected to a controller associated with only one of the gaming devices" as recited in claims 24 and 29 of the *'817* patent.

Mikohn's Motion at 7-8 (emphasis in original).

Mikohn presents no argument as to the claim limitations "storing the command in a memory connected to a controller associated with only one of the gaming devices" and "storing [*15] the data in a memory connected to a controller associated with only one of the gaming devices". Therefore, the court will confine its analysis to the two remaining limitations, both of which contain the phrase "data establishing criteria" and one of which uses the term "command".

This court held "data establishing criteria" to mean information that sets up "one or more standards, rules or tests to determine whether a bonus is paid." Court's Opinion of July 27, 2000 at 7; see Report and Recommendation of May 25, 2000 (Findings of Fact & Conclusions of Law Re: Claim Construction) ("Magistrate Judge's Report") at P 74. It held that the term "command" as used in the patent claims is a "reconfiguration command", Magistrate Judge's Report at P 73, and that a "reconfiguration command" is "a command that rearranges the previous configuration of the gaming device so that the gaming device pays out extra money it would not have paid in its previous configuration", id. at P 71.

Expert testimony supports the jury's finding that the MoneyTime system performs the functions described in these claim limitations. Dr. Kelly's testimony is the most descriptive. He testified that MoneyTime's [*16] "Enter Mystery Pay Mode" command is the command issued over the network that includes data establishing criteria to cause a bonus to be paid from the pool. Tr. at 524:1-9. In describing how the mystery pay command operates, Dr. Kelly testified that it sets the mystery pay bit which is "the rule that says when that bit is set this gaming device is to be the one to actually pay a bonus." Id. at 524:10-24. Dr. Kelly also testified that the mystery pay command that sets the mystery pay bit is a reconfiguration command "because it causes the gaming device to make a payment that it wouldn't have made in its previous is configuration." Id. at 525:2-8.

Mikohn's expert Mr. Olsen, who designed the MoneyTime system and was the director of engineering for Mikohn when it was built, id. at 692:15-20, stated that Dr. Kelly's reports and explanations of how the "code sections operated" were "accurate", id. at 825:10-15. While Mr. Olsen stated that he did not "always agree with [Dr. Kelly's] conclusions", he specifically testified that he agreed with Dr. Kelly's description of the mystery pay protocol. Id. at 924:25 - 925:6.

Mikohn contends that the mystery pay bit "is not itself [*17] information that establishes a rule." Mikohn's Motion at 8. Instead, since the gaming device is preprogrammed to pay or not pay a bonus depending on what information is contained in the mystery pay bit, the mystery pay bit itself is "nothing more than the answer to the rule." Id. at 9 (footnotes omitted). Mikohn presented this theory to the jury in its closing statement. Tr. at 1767:21 - 1769:4. It was for the jury to evaluate the evidence and draw inferences from it. *Odetics, Inc., 185 F.3d at 1269.* The jury did so and found that the MoneyTime system does perform the function of sending a command including data establishing criteria. Sufficient evidence was presented for the jury to reasonably conclude that the MoneyTime system's mystery pay command containing the mystery pay bit satisfies the claim limitations "issuing a command over the network including data establishing criteria to cause a bonus to be paid from the pool via one of said selected gaming devices upon the occurrence of a predetermined event" and "providing data establishing criteria to cause a bonus to be paid from the pool via one of said selected gaming devices upon the occurrence of a predetermined [*18] event".

**c. Sufficient Evidence was Presented at Trial to Support the Jury's Finding that the MoneyTime**

**System Performs the Step of "Transmitting Data Indicative of Gaming Device Activity from the Gaming Device to the Controller"**

Mikohn asserts that the following limitations of claim 1 of the *'817* patent must be performed in order:

> 1. A method of operating gaming devices interconnected by a computer network to a host computer comprising:
> . . .
>
> > issuing a command over a network including data establishing criteria to cause a bonus to be paid from the pool via one of said selected gaming devices upon the occurrence of a predetermined event; storing the command in a memory connected to a controller associated with only one of the gaming devices; transmitting data indicative of gaming device activity from the gaming device to the controller; transmitting a pay command from the controller to the gaming device upon the occurrence of the predetermined event;
> > . . .

*'817* Patent, col. 38, ll. 27-45; see Mikohn's Motion at 9-11. Mikohn contends that this claim "requires that the controller associated with the gaming device track gaming device activity between [*19] the immediately preceding and immediately following steps in the process." Mikohn's Motion at 9. To support its claim that the steps must be performed in the order in which they appear in the patent claim, Mikohn quotes a portion of the prosecution history of the *'817* patent. The portion emphasized by Mikohn is the following statement made by Acres;

> None of the prior art of record discloses a system in which a machine is placed into a bonus mode by transmitting a command over a network to a controller associated with a gaming device and thereafter paying the bonus via the gaming device responsive to a second command from the controller. This facilitates selecting groups of devices over a network for participation in one or more bonus promotions without requiring network communication for each transaction at the gaming device.

Mikohn's Motion at 10-11 (emphasis added in Motion) (quoting Prosecution History of *'817* Patent, Paper No. 10, pp. 6-7). Mikohn presents no argument as to how this portion of the prosecution history supports its contention.

[HN8] "The general rule is that unless the literal language or physical constraints of the process claim dictate otherwise, [*20] the steps of the claim have no required order of performance." *Depuy Orthopaedics v. Androphy, 2000 U.S. Dist. LEXIS 661, 53 U.S.P.Q.2d 1941, 1957 (N.D. Ill. 2000)* (citations omitted); see *Vaupel Textilemaschinen Kg V. Meccanica Euro Italia S.p.A., 944 F.2d 870, 880 (Fed. Cir. 1991)* ("There is no specific language, nor any intimation whatsoever in Marowsky's claim 1 that the cutting step takes place *before* the take-off roll or breast plate.").

Nothing in the claim language indicates that these steps must be performed in a certain order. There are no chronological terms such as "before", "after", "next" or "then." In addition, there is no indication that physical constraints require the steps to be performed in a certain order. See *Depuy, 53 U.S.P.Q.2d at 1958* (stating that although "claim 1 lacks any express terms that grammatically require the flexion gap to be determined before the resection of the distal femur", physical constraints required a specific order.).

The prosecution history cited by Mikohn does not require a conclusion that the steps must be performed in the order written. It supports a contention that the command [*21] including data establishing criteria must be issued over the network and stored in a memory connected to a controller prior to the transmission of a pay command and payment of the bonus. However, that is not Mikohn's contention here. The cited prosecution history does not reference transmission of "data indicative of gaming device activity," and it does not support Mikohn's claim that this must occur between the command including data establishing criteria and the pay command.

This is not a case like Depuy, where the court found that the literal language of the claim did not require a specific order of steps, but the prosecution history and physical constraints made it clear that a specific order

was required. n1 *Depuy, 53 U.S.P.Q.2d at 1957-58.* In Depuy the patented method was physically impossible to perform unless a specific order was followed. The prosecution history only made that physical impossibility clear. See id. The statements made by Acres in the prosecution history do not clearly state that the limitations must be performed in a certain order, and there has been so allegation that a specific order is required by physical constraints. The prosecution [*22] history therefore does not support inserting an order requirement where none exists in the literal claim language.

> n1 In that case the patent was titled "Triplanar knee resection method." *Depuy, 53 U.S.P.Q.2d at 1943.* The claims of the patent "generally relate to a method for cutting the bones that form the knee in a triplanar fashion in order to shape the patient's tibia and femur for a prosthesis." Id. The other patent at issue was a set of instruments to be used by a surgeon in performing this method. As to the prosecution history, the court noted that
>
> > plaintiff in the Amendment represented to the examiner that the plain language of claim 1 requires that:
> >
> > > 1) the flexion gap must be determined in order for the slot to be spaced correctly; and
> > > 2) the slot must be spaced correctly in order to resect the distal femur.
>
> Id. at 1958. Therefore in Depuy it was clear that the slot must exist before the step of resecting can occur, and that accordingly the steps must be performed in order.

[*23]

Even under Mikohn's proposed construction, the evidence presented by Acres is sufficient for the jury to find infringement. Mikohn claims that the smart interface board of the MoneyTime system "does not track gaming device activity between what [sic] sending 'the polling command' and the 'pay command'". Mikohn's Motion at 9. However, evidence was presented that tends to indicate that the MoneyTime system's "Mystery Pay Ready Response" contains data indicating gaming device activity and that it occurs between storing the command including data establishing criteria in a memory and transmitting the pay command to the gaming device. Dr. Kelly testified as follows:

> Mr. Broaddus: Now, Dr. Kelly, in the claim language, "transmitting data indicative of gaming device activity from the gaming device to the controller," what, in your opinion, is the gaming device activity that's being transmitted?
> Dr. Kelly: Well, what I identified was one of these messages here . . . this Mystery Pay Ready. Response (indicating) is data indicating the -- as it says there, "data indicating gaming device activity."
> Mr. Broaddus: I see. Is that data transmitted to be an indication of gaming device [*24] activity? Is that data transmitted after the mystery pay command has been stored in the SIB controller?
> Dr. Kelly: Yes, it is.
> Mr. Broaddus: And is the data indicative of gaming device activity transmitted before the mystery pay command is transmitted from the controller to the gaming device?
> Dr. Kelly: Yes, it is. Right in that sequence as -- as I showed you there.
> Mr. Broaddus: So in sequence of time, those steps are performed sequentially?
> Dr. Kelly: That is correct.

Tr. 528:10 - 529:6.

This testimony supports a finding of infringement even under Mikohn's proposed construction. Mikohn points to no contradictory evidence in the record.

The steps of claim 1 of the *'817* patent need not be performed in a specific order. Even if such a requirement did exist, the evidence presented at trial is sufficient to support the jury's finding of infringement.

**d. Sufficient Evidence was Presented at Trial to Support the Jury's Finding that the MoneyTime System Contains a "Bonus Payout Table"**

The Magistrate Judge construed "bonus payout table" to mean a table "that associates specific bonus payouts with specific winning combinations on a gaming device." Magistrate Judge's [*25] Report at P 46. n2 Mikohn contends that Acres failed to prove Mikohn infringes upon the *'961* patent because the MoneyTime system does not contain a "bonus payout table" as that term is used in claim 1. Mikohn's Motion at 12-15.

n2 The jury was instructed that this was the meaning of "bonus payout table." Agreed Jury Instructions at 15.

In support of its argument, Mikohn quotes testimony of Dr. Bertram, Acres's expert, in which he discussed the MoneyTime system's weighted pay table. Mikohn's counsel stated, and Dr. Bertram agreed, that "the way [that table] would work then is once the system determines that a particular gaming device is to be paid, then it references this table, the weighted pay table, and there's a 50.4 percent chance of a $ 5 award, a 25 percent chance of getting a $ 10 award, a 12.5 percent chance of getting a $ 25 award, on and on". Tr. 378:1-7. Dr. Bertram then responded to Mikohn's counsel's question "is this 50.4 percent a winning combination of any sort?", by stating "No." Id. at [*26] 378:11-12. Mikohn concludes that Dr. Bertram admitted that MoneyTime's weighted pay table is not a bonus payout table. Mikohn's Motion at 15.

However, the jury heard Dr. Bertram specifically testify that the weighted pay table is a bonus payout table.

> Mr. Shapiro: [referring to an illustration of the MoneyTime system's weighted pay table] And I think as I understood your testimony, you said that's a bonus payout table. Is that correct?
> Dr. Bertram: That's quoting directly from the Mikohn specification brochures but it certainly looks like a pay table to me.
> Mr. Shapiro: I didn't ask if it was a pay table, sir, but is it a bonus payout table? You were relating it to, I think, a specific claim, in the *'961* patent.
> Dr. Bertram: Well, I think it is a bonus payout table.

Tr. at 374:23 - 375:5 (emphasis added).

The jury also heard testimony from Mikohn's expert Mr. Olsen, who stated that where in the MoneyTime system the term "bonus pay table" is used, he "prefer[s] the terminology 'weighted pay-table.'" Id. at 858:11-13. He also testified as follows:

> Mr. Riedinger: Now, there is a bonus payout table in the MoneyTime system; isn't there?
> Mr. Olsen: [*27] Well, it's been called a "bonus pay table." And I've also characterized it as a weighted pay table.

Id. at 951:10-13. This expert testimony supports an inference that the MoneyTime system's weighted pay table is a bonus payout table.

Mikohn also argues that "as admitted by Dr. Bertram, even the MoneyTime controller's determination to award a bonus is not based on a 'winning combination on a gaming device.'" Mikohn's Motion at 15 (citations omitted). Mikohn apparently relies on the Magistrate Judge's statement that "the definition of a 'payout table' as a table that relates payout to game outcome is repeatedly and consistently used in relevant literature", Magistrate Judge's Report at P 40, when it argues that "Acres . . . does not dispute that the MoneyTime controller's determination to award a bonus is not based on a 'winning combination on a gaming device'", Reply Memorandum of Mikohn Gaming Corporation in Support of Its Renewed Motion for Judgment as a Matter of Law and Motion for New Trial ("Mikohn's Reply") at 13, and cites Dr. Bertram's testimony with a parenthetical quote reading, "The bonus awards are not related to the outcome of the game", Mikohn's Motion at [*28] 15 (quoting Tr. at 327:14 - 328:3).

However, the Magistrate Judge did not hold that a bonus payout table associates game outcome with bonus payouts, but rather that it associates winning combinations to bonus payouts. The Magistrate Judge did not define winning combinations as game outcome, nor did he state that game outcome was necessarily specific characters on a slot machine reel in a specific order. Nowhere in the prior opinions of this court has the term "winning combinations" as used by the Magistrate Judge been defined.

At trial, Acres argued that a "winning combination on a gaming device" can be a series of events that lead to payment of a bonus, such as the player becoming eligible, the player's gaming device being selected and a bonus award amount being chosen from the bonus payout table. See Tr. at 327:14-24 (Dr. Bertram). Dr. Bertram's expert testimony supports this interpretation. See id. at 465:22 - 466:1 ("I don't see any reference to a winning combination being a set of symbols on the base game. And I interpret that to mean in this case the combination of events that have to occur that correspond to the winning bonus amount that is awarded to the machine. [*29] ").

Mikohn presents no evidence that contradicts Acres's argument and Dr. Bertram's interpretation. The jury was not given an instruction on the meaning of "winning combinations", and it is the province of the jury to weigh the evidence presented at trial. *U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 703-04 (Fed. Cir. 1988)* ("The evaluation of all the evidence . . . and

the inferences to be drawn from the evidence, was for the jury to determine."); see *Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 183 (Fed. Cir. 1994)* [HN9] ("It is within the province of the jury to determine the credibility of a witness and the weight to be given his testimony; the jury is not required to accept testimony as true, even if it is uncontradicted."). [HN10] The court must not "'substitute its choice for that of the jury.'" *Odetics, Inc., 185 F.3d at 1269* (quoting *Perkin-Elmer Corp., 732 F.2d at 893, 221 U.S.P.Q. at 672)* (citations omitted). The evidence heard by the jury is sufficient to support its finding that the MoneyTime system contains a "bonus payout table" as that term has been construed in this case.

**e**

**Sufficient** [*30] **Evidence was Presented at Trial to Support the Jury's Finding that the Bonus Payout Table in the MoneyTime System is "in the Gaming Device"**

Mikohn argues that as a matter of law the MoneyTime system does not infringe upon claim 1 of the *'961* patent because MoneyTime does not include the step of "activating a bonus payout table in a gaming device". Mikohn's Motion at 15-16. As stated above, the jury could reasonably find that the MoneyTime system's weighted pay table is a bonus payout table. Mikohn contends that the weighted pay table does not reside in the gaming device, and that therefore MoneyTime cannot infringe either literally or under the doctrine of equivalents.

Mikohn relies on Dr. Bertram's testimony that MoneyTime's weighted pay table is located on the controller, and not in the individual gaming devices. Tr. at 379:17 - 380:8; Mikohn's Motion at 15. However, Dr. Bertram also testified that the bonus payout table is located in the MoneyTime controller, but that "when it comes time . . . to pay a bonus to a particular machine, . . . it will randomly select an amount from the table and, uh, then it will take that part of the pay table and copy it to the gaming machine. [*31] " Tr. at 325:1-6. Mikohn does not now dispute this testimony and did not do so at trial. Therefore it was reasonable for the jury to conclude that the MoneyTime system does indeed copy a portion of its weighted pay table into the individual gaming devices when they are to pay bonuses which results in the bonus payout table residing in the gaming device. This supports a finding of literal infringement.

Dr. Bertram also testified that locating the bonus payout table in the controller was not substantially different from locating it in the gaming device. In fact, he said, "from a system point of view, there's no different [sic] at all." Id. at 325:12-13. In response to the question, "Does the payout table in the [controller] perform substantially the same function as having a bonus payout table in the gaming device?" he answered, "It would be exactly the same function. There would be no difference." Id. at 325:20-24. This testimony supports a finding of infringement under the doctrine of equivalents. See *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 608, 94 L. Ed. 1097, 70 S. Ct. 854 (1950)* ("[HN11] If two devices do the same work in substantially [*32] the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.") (citations and quotations omitted).

Mikohn argues that Dr. Bertram's testimony cannot support a finding of infringement under the doctrine of equivalents because such a finding would eliminate a claim limitation entirely. Mikohn's Motion at 22. It cites a string of cases in support of its contention and argues that since the MoneyTime system has only two basic elements, the host computer and gaming devices, a finding of infringement under the doctrine of equivalents would "render the limitation 'in a gaming device' completely meaningless." Id. at 23.

The authorities Mikohn cites in support of this argument are distinguishable. For example, Mikohn relies on a parenthetical quote from *Phonometrics, Inc. v. Northern Telecom, 133 F.3d 1459 (Fed. Cir. 1998),* which states, "we conclude there can be no equivalent infringement, for one of the functions claims in the '463 patent is completely absent from the accused devices". Mikohn's Motion at 22 (quoting *Phonometrics, 133 F.3d at 1467).* The patent at issue in Phonometrics [*33] was a computer device designed to track length and cost of long distance telephone calls. *Phonometrics, 133 F.3d at 1463.* The claim at issue required that

> if the call is still in progress when the initial call interval has expired, the "incremental charge data" is transferred to the call cost register means and displayed there "substantially instantaneously." Additional incremental charges are transferred to the call cost register means "substantially instantaneously" upon the passage of additional call intervals. This process of transferring successive interval costs continues throughout the duration of the call.

*Id. at 1465.* The patentholder conceded that the allegedly infringing devices were not capable of providing cost information during the call. Based upon this element being completely missing from the allegedly

infringing devices, the court "concluded there can be no equivalent infringement, for one of the functions claimed in the '463 patent is completely absent from the accused devices." *Id. at 1467* (citations omitted).

That is not this case. The location of the bonus payout table is not a function of the [*34] patented device. [HN12] Finding infringement under the doctrine of equivalents despite a difference in the location of the bonus payout table does not "allow[] [the doctrine] such broad play as to effectively eliminate that element in its entirety." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997).* Nor does it "conflict[] with the definitional and public-notice functions of the statutory claiming requirement." Id.

The other cases cited by Mikohn are similarly inapposite. In Pennwalt, n3 the expert upon whose testimony the patentholder relied in pursuing its claim under the doctrine of equivalents stated in his report that the accused devices were "functionally equivalent" to the "invention." *Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 936 (Fed. Cir. 1987).* However, he also stated that "the new designs could be totally equivalent to those they replaced, although the components and methods used differed significantly." Id. (emphasis added). In addition, at trial he testified that "the accused devices performed 'some' of the same type of operations but 'in a different way' [*35] from the claimed invention." *Id. at 937.* Clearly such testimony does not support a finding that the devices "work in substantially the same way, and accomplish substantially the same result". See *Graver Tank, 339 U.S. at 608.* However, that is not the case here, as illustrated by the testimony of Dr. Bertram quoted above.

n3 Mikohn cites to this case with no parenthetical. It is cited to support Mikohn's statement that "the doctrine of equivalents cannot be given such broad play that a limitation is eliminated entirely." Mikohn's Motion at 22.

In a parenthetical, Mikohn quotes Warner-Jenkinson in which the Supreme Court stated that "[HN13] it is important to ensure that the doctrine [of equivalents], even as to an individual element, is not given such broad play as to effectively eliminate that element entirely." Mikohn's Motion at 22 (quoting *Warner-Jenkinson, 520 U.S. at 29).* Warner-Jenkinson dealt with a petitioner who argued that the doctrine of equivalents [*36] "did not survive the 1952 revision of the Patent Act". *Warner-Jenkinson, 520 U.S. at 25.* The Supreme Court's statements quoted by Mikohn were made in setting the law, but not in application. n4 The statement does not give specific guidance applicable here, and as the court stated above, the holding that the MoneyTime system infringes on Acres's patents despite the bonus payout table being located on the controller rather than in a gaming device does not effectively eliminate any element of the claims.

n4 A more complete picture of the Court's discussion can be achieved by a more complete quote:

> We do, however, share the concern of the dissenters below that the doctrine of equivalents, as it has come to be applied since Graver Tank, has taken on a life of its own, unbounded by the patent claims. There can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement . . . . Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety. So long as the doctrine of equivalents does not encroach beyond the limits just described, or beyond related limits to be discussed infra . . . we are confident that the doctrine will not vitiate the central functions of the patent claims themselves.

*Warner-Jenkinson, 520 U.S. at 29* (emphasis added).

[*37]

Finally, Mikohn quotes *DeMarini Sports v. Worth, Inc., 239 F.3d 1314 (Fed. Cir. 2001)* for the proposition that "the question of insubstantiality of the differences is inapplicable if a claim limitation is totally missing from the accused device." Mikohn's Motion at 22 (quoting *DeMarini, 239 F.3d at 1332).* In DeMarini, the device at issue was a softball bat. *DeMarini, 239 F.3d at 1318.*

The court found that the accused device did not infringe under the doctrine of equivalents because

> the claims, as properly construed, require an insert contained within a bat frame comprised of a handle portion, a tapered portion, and an impact portion. The EST bat does not have such a configuration, instead having an exterior shell in which the insert that is positioned within the shell has a handle and extends beyond the shell.

*Id. at 1333.* The court stated that this difference between the devices "involved a clear difference between the structure of the alleged infringing product and the invention as it has been defined by the limitations of the claims, as drafted." *Id. at 1335.* Again, that is [*38] not the case here. The location of the bonus payout table is not an important structural aspect of the patented system. Upholding a finding of infringement under the doctrine of equivalents would not eviscerate the purpose of the doctrine. Furthermore, the court does not need to rely on the doctrine in this case, as a finding of infringement under the theory of literal infringement is supported by the evidence.

The authorities cited by Mikohn warning against applying the doctrine of equivalents too broadly are inapplicable to the facts of this case. The evidence produced at trial is sufficient to support the jury's verdict under both literal infringement and the doctrine of equivalents.

**f. Sufficient Evidence was Presented at Trial to Support the Jury's Finding that the MoneyTime System Performs the Function of "Paying the Gaming Device in Accordance with Both Payout Tables After Each Game for So Long as the Bonus Payout Table is Activated"**

Mikohn's final claim is that the MoneyTime system does not perform the function of "paying the gaming device in accordance with both payout tables after each game so long as the bonus payout table remains activated" as required by claim [*39] 1 of the *'961* patent. Mikohn's Motion at 16; *'961* Pat. at col. 38, ll. 14-16. It argues that "the operations recited by Claim 1 are completely different than the operations of the MoneyTime system" because "the weighted pay table in the network controller of the MoneyTime system is not referenced by any of the gaming devices" nor is it "referenced '**after each game**'". Id. (emphasis in original).

Trial testimony supports the jury's finding that the MoneyTime system does perform this function. Dr. Bertram testified that after each game the gaming device will pay in accordance with its standard payout table and will pay a bonus if appropriate. He said:

> The machine plays like a normal slot machine so it a [sic -- its] normal pay table is in use. It can pay from the normal pay table. And at the end of the game, if it has been selected to be a bonus winner, it will then pay the amount that has been randomly selected from the bonus payout table and pay that amount. So both pay tables are in use.

Tr. at 328:6-11; see also id. at 389:1-5 ("The gaming device . . . doesn't know whether it's going to receive the bonus amount until the game is over. And then it looks [*40] to see if it's supposed to pay a bonus amount."); id. at 386:3-7 ("At the end of the regular game on the machine, it accesses its normal pay table and pays that amount, whether it's zero or whether it's a non-zero value. And then at the end of that regular game it will find out if it's supposed to pay the bonus amount.")

Mikohn cites other excerpts of Dr. Bertram's testimony to support its position. However, [HN14] conflicting evidence is insufficient to support judgment as a matter of law. In analyzing a motion for judgment as a matter of law, "the trial court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, must not determine the credibility of witnesses, and must not substitute its choice for that of the jury between conflicting elements in the evidence," *Perkin-Elmer Corp., 732 F.2d at 893, 221 U.S.P.Q. at 672* (citations omitted); see also *Odetics, Inc., 185 F.3d at 1269* (applying Parkin-Elmer Corp. to a motion for judgment as a matter of law). The court will not substitute its judgment for that of the jury. The testimony of Dr. Bertram is sufficient to support [*41] the jury's finding that the MoneyTime system performs the function of "paying the gaming device in accordance with both payout tables after each game so long as the bonus payout table remains activated".

**2. Mikohn Has Failed to Establish That it Is Entitled to a New Trial**

Mikohn also requests a new trial. It states that "the verdict was against the weight of the evidence, the verdict was excessive and this Court rendered judgment without due consideration of Mikohn's affirmative defense of inequitable conduct." Mikohn's Motion at 2.

The verdict of infringement is not against the clear weight of the evidence. See *Moist Cold Refrigerator Co., 249 F.2d at 251* (A "verdict may be set aside and new trial granted, when the verdict is contrary to the clear weight of the evidence . . ."). Mikohn does not present separate argument as to why the verdict is against the clear weight of the evidence; it merely references its arguments presented in support of its Motion for Judgment as a Matter of Law. Mikohn's Motion at 25 ("As demonstrated above, the great weight of the evidence demonstrated that Mikohn does not infringe . . ."). As the court has concluded, evidence sufficient [*42] to support the jury's verdict was presented as to each of the individual claim limitations attacked by Mikohn. The verdict was not against the clear weight of that evidence.

Mikohn claims in its introduction to its Motion that one ground upon which the court should grant a new trial is that the verdict was excessive. Id. at 2. However, Mikohn presents no argument or evidence on this claim. Therefore the court will not address it. n5

n5 See Nevada Local Rule 7-2(d) ("The failure of a moving party to file points and authorities in support of the motion shall constitute a consent to the denial of the motion.").

Mikohn also claims that "this Court rendered judgment against Mikohn without due consideration of its inequitable conduct defense." Id. at 26. After the close of evidence and outside the presence of the jury, the court heard the testimony of John Acres on the matter of inequitable conduct. At the conclusion of his testimony, the court stated that it would "permit [the] parties to brief this [*43] thing and submit it to the court." Tr. 1913:19-20. After several days of trial during which the parties were preparing motions in the evenings to be submitted and argued in the mornings, the court stated that it would "like to give [the parties] the leisure of doing briefing in something less than overnight fashion." Id. 1913:23-25. Therefore, it said, "If the jury comes in tomorrow, I'll hear oral argument over the telephone, if necessary. Take the night off." Id. 1914:4-5.

The court explained what was required of the parties in their briefs. "I will want briefs that specifically -- and this is a reason to wait, too -- specifically tie the legal arguments to evidence, both testimony and documentary evidence you provide. So use the daily from this testimony of Mr. Acres as well." Id. 1915:6-9. The fact that briefs were required to be filed and the content requirements of those briefs were clear.

No briefs on inequitable conduct were submitted by either party following trial. Mikohn bears the burden of proving inequitable conduct, as it is its defense. *Mentor H/S, Inc. v. Medical Device Alliance, Inc., 244 F.3d 1365, 1377 (Fed. Cir. 2001)* ("[HN15] A defendant [*44] asserting an inequitable conduct defense must demonstrate by clear and convincing evidence that the applicant or his attorney failed to disclose material information to the PTO, and that the applicant or his attorney did so with intent to deceive the PTO."). Mikohn, therefore, bears the burden of submitting the first brief. Failure to submit briefs as ordered by the court constitutes a waiver of the defense and the party's right to argument on the defense. See Local Rule 7-2(d) ("The failure of a moving party to file points and authorities in support of the motion shall constitute a consent to the denial of the motion."); see also *Hartford Mining Co. v. Home Lumber & Coal Co., 61 Nev. 1, 107 P.2d 128, 129 (Nev. 1940)* (failure to file briefs constitutes waiver of right to oral argument).

Mikohn's Motion for a New Trial is denied. n6

n6 [HN16] A new trial is not "necessary to prevent a miscarriage of justice." See *Moist Cold Refrigerator Co., 249 F.2d at 251.* Mikohn has not argued the point and the court sees no such necessity.

[*45]

**B. Acres's Motion for Prejudgment Interest is Granted**

Acres moves "pursuant to *Federal Rule of Civil Procedure 59(e)*, for an Order amending the Judgment against [Mikohn] to include prejudgment interest from June 1999 to March 2001." Acres's Motion for Prejudgment Interest at 2. Mikohn opposes the Motion on the grounds that Acres waived its right to prejudgment interest and that the rate requested is excessive. Mikohn Gaming Corporation's Opposition to Motion for Award of Prejudgment Interest ("Mikohn's Opposition to Acres's Motion for Prejudgment Interest") at 2. For the reasons set forth below, Acres's Motion for Prejudgment Interest is granted.

**1. Acres Did Not Waive its Right to Prejudgment Interest Because Interest Is Provided for in *35 U.S.C. § 284* and Is Necessary to Fully Compensate Acres for the Infringement**

Mikohn argues that "Acres waived any claim for prejudgment interest in the pre-trial order." Id. However, interest is provided for by statute. [HN17] *35 U.S.C. § 284* provides that damages for patent infringement include "a reasonable royalty for the use made of the invention by the infringer, together with [*46] interest

and costs as fixed by the court". *35 U.S.C. § 284* (1994) (emphasis added).

In addition, the Supreme Court has spoken directly to this issue. In *General Motors Corp. v. Devex Corp, 461 U.S. 648, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983),* the Court said:

> The standard governing the award of prejudgment interest under § 284 should be consistent with Congress' overriding purpose of affording patent owners complete compensation. In light of that purpose, we conclude that prejudgment interest should ordinarily be awarded. In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into as reasonable royalty agreement. . . .
>
> . . .
>
> We do not construe § 284 as requiring the award of prejudgment interest whenever infringement is found. [HN18] That provision states that interest shall be "fixed by the court," and in our view it leaves the court some discretion in awarding prejudgment interest. For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has [*47] been responsible for undue delay in prosecuting the lawsuit. There may be other circumstances in which it may be appropriate not to award prejudgment interest. We need not delineate those circumstances in this case. We hold only that prejudgment interest should be awarded under § 284 absent some justification for withholding such an award.

*General Motors Corp. v. Devex Corp, 461 U.S. 648, 655-657, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983)* (emphasis added) (footnotes omitted).

In this case there have been no accusations that Acres has been responsible for delaying the action, and Mikohn has failed to provide any other justification for withholding prejudgment interest. The only authorities Mikohn cites in support of its waiver argument are not on point and are not binding.

Mikohn cites two cases in which the plaintiff had moved for an accounting n7 and one non-patent prejudgment interest case n8 that was not governed by *35 U.S.C. § 284.* None of those authorities discuss awarding prejudgment interest in a patent case where the damages statute provides for interest and where the Supreme Court has stated that interest should ordinarily [*48] be awarded absent a justification for withholding it. Based upon *35 U.S.C. § 284* and Devex, Acres's Motion for Prejudgment Interest is granted.

n7 *Braintree Labs., Inc. v. Nephro-Tech, Inc., 81 F. Supp. 2d 1122, 1140 (D. Kan. 2000)* and *Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188 (5th Cir. 1998).*

n8 *Lindy Invs., LP v. Shakertown Corp., 209 F.3d 802 (5th Cir. 2000).*

**2. Acres's Requested Rate of Interest is Not Excessive**

Acres argues that the rate of prejudgment interest should be "the rate Mikohn would have been charged to borrow money; calculated as the prime rate plus 150 basis points." Acres's Motion for Prejudgment Interest at 4. Mikohn argues that this rate is excessive and that a more reasonable rate would be based on 3-month U.S. Treasury Bill rates. Mikohn's Opposition to Acres's Motion for Prejudgment Interest at 2. Both arguments are based on the parties' respective experts and their reports.

The parties [*49] cite prejudgment interest cases that all agree that the rate of interest imposed is discretionary. Of the Federal Circuit patent cases cited, the most helpful is *Bio-Rad Labs., Inc. v. Nicolet Instruction Corp., 807 F.2d 964 (Fed. Cir. 1986),* in which the court said that the

> rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court. In exercising that discretion, however, the district court must be guided by the purpose of prejudgment interest, which is "to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement."

*Bio-Rad Labs., Inc. v. Nicolet Instruction Corp., 807 F.2d 964, 969 (Fed. Cir. 1986)* (quoting *Devex, 461 U.S.*

*at 655)* (citations omitted). See also *Allen Archery, Inc. v. Browning Manuf. Co., 898 F.2d 787, 791 (Fed. Cir. 1990)* ("The rationale of Devex is that 'in the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been had [*50] the infringer entered into a reasonable royalty agreement.' *461 U.S. at 655, 103 S. Ct. at 2062.* It would be inconsistent with that rationale to require that, in order to award prejudgment interest, the district court first would have to consider and determine what use the patentee would have made of the royalty payments it should have received."); *Laitram Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997)* ("As to the choice of prejudgment interest rate, the district court, in exercises of its discretion, awarded prejudgment interest and set the rate at the U.S. Treasury bill rate, compounded annually. The court held that this rate would 'adequately compensate plaintiff for the lost use of its royalties,' Slip opinion at 11. The district court found that there was no evidence that Laitram borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded as a result of NEC's infringement. Nor has Laitram shown clear error in any of those findings. We hold therefore that there was no abuse of discretion in the district court's choice of prejudgment interest rate. [*51] "); *Studiengesellschaft Kohle v. Dart Indus., Inc., 862 F.2d 1564, 1579-80 (Fed. Cir. 1988)* (rejecting argument that plaintiff must show it is entitled to rate higher than commercial rate and stating that the case upon which defendant relied "did not establish any 'rule' requiring what Dart calls an 'affirmative demonstration,' i.e., proof of borrowing at or above prime, for a plaintiff to be entitled to an award of prejudgment interest at the prime rate. Nor do we intend to establish any rule that prejudgment interest at the prime rate should be awarded as a matter of course in every case. Simply put, the question of the rate at which such an award should be made is a matter left to the sound discretion of the trier of fact . . . .").

In sum, the rate of prejudgment interest appears to be discretionary, and the court is to be guided by the principle that the award should place Acres in as good a position as it would have been in had the infringement not taken place. Therefore, in keeping with the policy stated in Bio-Rad Lab., and following Mikohn's uncontested evidence of the average Treasury Bill rate for August 1997 through June 1999, Mikohn shall pay prejudgment [*52] interest at the rate of 4.78% compounded annually.

**C. Acres's Motion for An Accounting of Sales is Granted**

Acres moves "pursuant to *Federal Rule of Civil Procedure 59(e)*, for an Order allowing amendment of the Judgment and for an accounting of [Mikohn's] sales from July 1999 forward, on the grounds that the damages for patent infringement awarded to Acres do not include reasonable royalty on Mikohn's Moneytime revenues obtained from infringing Acres' patents after June 1999." Acres's Motion for an Accounting of Sales at 1-2. Mikohn opposes the Motion on the grounds that Acres waived its right to an accounting and that any accounting would be speculative. Mikohn Gaming Corporation's Opposition to Motion for Accounting ("Mikohn's Opposition to Acres's Motion for an Accounting of Sales") at 2. For the reasons set forth below, Acres's Motion for an Accounting of Sales is granted.

**1. Accounting is a Standard Practice in Patent Cases**

The parties have not cited to, nor has the court located, any cases discussing the policy behind granting an accounting after judgment in patent actions. However, [HN19] accountings appear to be standard practice, based upon the authorities presented. [*53] See *Padco, Inc. v. Newell Cos., Inc., 1988 U.S. Dist. LEXIS 17384, 1988 WL 187504,* *2 (E.D. Wis. 1988) (plaintiff "is entitled to an accounting from defendants . . . for an award of defendants' profits from sales of infringing products from March 31, 1987 to the date of injunction . . . ."); *Whelan Assoc., Inc. v. Jaslow Dental Lab., Inc., 609 F. Supp. 1325, 1327 (E.D. Penn. 1985)* ("Plaintiff's motion seek a further accounting for the . . . licenses sold after the last day of the trial . . . . The plaintiff is entitled to such an accounting . . . . This additional accounting is proper if my prior determination as to liability is correct."); *Technology for Energy Corp. v. Computational Sys., Inc., 1992 WL 535791,* *36 (E.D. Tenn. 1992) ("The jury's verdict included damages through November 30, 1991. The judgment . . . will be amended to direct an accounting for infringement damages . . . for the period December 1, 1991, through the date of entry of an injunction prohibiting further infringement of the patent . . . ."). The court finds no reason to depart from this practice.

Furthermore, *Federal Rule of Civil Procedure 62(a)* makes clear that Congress contemplated [*54] accountings in patent actions. That rule provides that [HN20] "a judgment or order directing an accounting in an action for infringement of letters patent" shall not be stayed pending appeal. *Fed. R. Civ. P. 62(a)*. Although the substance of the rule is not relevant to this Motion, Congress's provision regarding accounting in patent actions evidences its intent that accountings will at times be ordered. Given that evidence of intent and the apparently standard practice of ordering accountings, the court finds it proper to order an accounting in this case.

**2. Acres Did Not Waive Its Right To An Accounting Because In the Pre-Trial Order It Stated That One Issue Was The Amount of Damages Owed Acres By Mikohn For Infringement of its Patents**

The Pretrial Order states that one of the issues for trial was the "amount of damages, attorneys' fees and costs" Acres is entitled to as a result of Mikohn's infringement. Pretrial Order at 4, ll. 17-18. Mikohn argues that Acres waived its claim to an accounting by failing to request it in the pretrial order. Mikohn's Opposition to Acres's Motion for an Accounting at 2. The fact that Acres did not separately state that it was seeking an accounting [*55] is of no consequence.

[HN21] An accounting of profits for the purpose of recovering lost profits is an equitable remedy, and if Acres sought this remedy it needed to request it in the Complaint. See *Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 561 (9th Cir. 1992)* (stating asset freeze is "an equitable provisional remedy designed to secure the availability of Reebok's equitable right to an accounting of Betech's profits" where plaintiff sought lost profits under Lanham Act); *Fed. R. Civ. P. 16(c)* (Pretrial order "control[s] the subsequent course of the action"). What Acres seeks here, however, is evidence from which to calculate the reasonable royalty damages it did seek in its Complaint and in the Pretrial Order.

[HN22] Reasonable royalty damages are not simply lost profits. As the jury instructions stated, a reasonable royalty is "the royalty that would have resulted from a hypothetical negotiation between Acres and a company on the position of Mikohn taking place at the time that the infringement began" and can be based upon any of thirteen factors, including the "established profitability of the product made under the patent", but not the infringer's profits. [*56] Agreed Jury Instructions at 68-70; see *Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp 1116 (S.D.N.Y. 1970).* Therefore, the accounting Acres seeks is not for the purpose of disgorgement of profits, but is evidence of a reasonable royalty for the purpose of calculating the damages Acres sought when it filed suit against Mikohn, which are damages for the entire period of infringement.

Since Mikohn provided Acres and both parties' experts with data current through June 1999 from which to calculate a reasonable royalty, the experts' testimony as to a reasonable royalty up to that date was presented at trial. The jury was instructed that its damage award should include only a reasonable royalty through June 1999, consisted with the evidence presented. See Agreed Jury Instructions at 67 ("the amount of damages that Mikohn must pay Acres' for infringing Acres' patent may not be less than a reasonable royalty"); Tr. at 1930:18 - 1930:25 (jury asked if Acres's expert's damages calculations would be brought forward from June 1999 and the court instructed the jury that the court would decide that issue). Acres seeks only to extend that damage award to cover [*57] the full period of infringement. It does not seek a separate remedy of an accounting for recovery of lost profits. Therefore, its failure to specifically state in its complain that it sought an accounting is irrelevant.

Mikohn's waiver argument on this Motion is identical to its waiver argument in opposition to Acres's Motion for Prejudgment Interest. It states that "Acres waived any claim for prejudgment interest [sic an accounting] in the pre-trial order." Mikohn's Opposition to Acres's Motion for an Accounting at 2. It then presents a string cite of three cases and does not present argument as to how those cases apply here. The cases Mikohn cites are not on point and are not binding.

In Braintree Lab., Inc. v. Nephro-Tech., Inc., the District of Kansas denied a motion for an accounting because the plaintiff had not included a request for an accounting in its complaint or in the pretrial order. *Braintree Labs., Inc. v. Nephro-Tech. Inc., 81 F. Supp. 2d 1122, 1140 (D.Kan. 2000).* The jury had awarded the plaintiff lost profits as opposed to a reasonable royalty. See *id. at 1139* ("This case is unlike the situation in which the fact-finder has [*58] awarded damages based on a reasonable royalty. . . . It is not just a matter of extrapolating damages from the jury's lost profits award . . . ."). The court stated that it "considers a request for an accounting to be a significant claim for relief and not a mere clerical exercise which would routinely and readily follow from a verdict in plaintiff's favor." *Id. at 1140.* However, the plaintiff was not seeking to extend a reasonable royalty damage award to the present date but rather to supplement a lost profit award by obtaining "an order from this court directing defendants to disgorge the amount of profits on the basis of the percentage of damages awarded by the jury to plaintiff." Id.

The Braintree court acknowledged that its case differed from a reasonable royalty case when it stated that

> This case is unlike the situation in which the fact-finder has awarded damages based on a reasonable royalty. If the damages awarded were based on a reasonable royalty in this case, the court could, after an accounting, simply reference the reasonable royalty percentage decided upon by the jury and apply that to any sales revealed by the accounting.

[*59] Id.

Here Acres moved the court for an accounting because the jury's award "does not include reasonable royalty on Mikohn's MoneyTime revenues obtained from infringing Acres' parents after June 1999." Acres's Motion for an Accounting at 2. In order to fulfill the mandate of *35 U.S.C. § 284* that the damage award shall not be "less than a reasonable royalty for the use made of the invention by the infringer", it is necessary for Acres to be provided with information to calculate a reasonable royalty for the entire period of infringement.

In addition, in denying the plaintiff's motion, the Braintree court relied more heavily on the fact that it would be impossible to tell how much of the defendant's profits came from infringing sales than it did on the fact that the claim was not in the complaint or the pretrial order. See *Braintree, 81 F. Supp. 2d at 1140.* Mikohn does not contend that this would be the case here.

Furthermore, the District Court in Braintree based its holding on a 10th Circuit case that stated that "the pretrial order supersedes the pleadings and controls the subsequent course of litigation". Id. (quoting *Hullman v. Board of Trustees of Pratt Community College, 950 F.2d 665, 667 (10th Cir. 1991)).* [*60] Hullman is a civil rights case in which a college dean challenged his termination. The statement cited in Braintree was made in regard to a claim that the plaintiff advanced for the first time in response to defendant's motion for summary judgment. *Hullman, 950 F.2d at 666.* The plaintiff had filed suit against the college alleging his termination was in retaliation for his protest over a reassignment which he considered to be a demotion. Id. Then, in response to defendant's motion for summary judgment, he argued that his termination was in retaliation for his criticism of college's financial policies and practices. Id. That is not this case. Acres's claim for damages was advanced from the beginning of this case. At no time was its claim for damages divided into two periods, one pre-June 1999 and one post-June 1999, nor was there any question that Acres sought damages for the entire period of infringement.

Mikohn also cites to *Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188 (5th Cir. 1998).* That is a trademark case in which the court denied the plaintiff's claim for an accounting and for attorneys' fees, stating that the claims [*61] were not "properly preserved and are therefore waived." *Elvis Presley Enters., 141 F.3d at 205.* This case was governed by the Lanham Act, which applies only to trademark cases. The statute providing for damages under the Lanham Act is *15 U.S.C. § 1117.* The court stated:

> In the Joint Pre-Trial Order signed by the parties' counsel, EPE's [Elvis Presley Enterprises] demand for an accounting of profits is not mentioned, but the Joint Pre-Trial Order does mention EPE's demands for injunctive relief, damages, and attorneys' fees under the Lanham Act, *15 U.S.C. § 1117*(a). Section 1117(a) also provides for the remedy of an accounting of profits and lists it separately from damages. Therefore, EPE's listing of injunctive relief, damages, and attorneys' fees under the Lanham Act in the Joint Pre-Trial Order does not act to preserve its claim for an accounting of profits, and the issue therefore was waived.

*Elvis Presley Enters., 141 F.3d at 206* (emphasis added).

The Lanham Act does not apply in this case. The damages statute applicable here is *35 U.S.C. § 284,* and unlike [*62] *15 U.S.C. § 1117,* [HN23] it does not specifically provide for an accounting as a remedy separate from damages. It states only that the patent owner is entitled to "damages adequate to compensate for the infringement". *35 U.S.C. § 284* (1994). Elvis Presley Enters. does not support Mikohn's claim that Acres's preservation of its "damages" claim does not include preservation of its request for an accounting.

Finally, Mikohn cites to *Lindy Invs., LP v. Shakertown Corp., 209 F.3d 802 (5th Cir. 2000).* The cited statement is in regard to prejudgment interest, is completely inapplicable to Acres's Motion for an Accounting, and is a footnote in which the court cites Elvis Presley Enterprises for the proposition that the plaintiff's claim for prejudgment interest was not properly before the court because it was not in the pretrial order. Lindy Invs. is a contract case not governed by *35 U.S.C. § 284.* It is inapplicable.

None of the authorities cited by Mikohn are binding on this court, and none stand for the proposition that in a case governed by *35 U.S.C. § 284* in which damages [*63] are to be ascertained by a reasonable royalty, a claim for "damages" in the pretrial order does not include a claim for an accounting.

In contrast, binding authority exists that states that [HN24] the damages awarded the patent holder must be "adequate to compensate" for the infringement, *35 U.S.C. § 284,* which means "full compensation for any damages the patent owner suffered as a result of the infringement", *Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341, 1349 (Fed. Cir. 1999)* (internal punctuation omitted) (quoting *Devex, 461 U.S. at 654).*

Damages suffered as a result of infringement include those for the entire period of infringement. The fact that

the damages experts employed by both sides were provided with information covering Mikohn's sales only through June 1999 does not reduce the period for which Mikohn must compensate Acres. To deny the Motion for an Accounting would be to allow Mikohn to evade its obligation to pay damages for the remainder of the period of infringement and would contradict the patent law's purpose of compensating patent holders for the damage suffered due to infringement.

**3. An Accounting Need Not Be Speculative** [*64]

Mikohn argues that "the accounting requested by Acres would be wholly speculative." Mikohn's Opposition to Acres's Motion for an Accounting at 2. In support it cites Braintree. As stated above, the court in Braintree found that it would be impossible to tell how much of the defendant's profits came from infringing sales. See *Braintree, 81 F. Supp. 2d at 1140.* Mikohn does not make that argument about its own sales. Since the MoneyTime system has been found to infringe on Acres's patents, all sales of the MoneyTime system are infringing sales.

Mikohn focuses its argument more on what royalty rate would be applied to award damages based upon the accounting. See Mikohn's Opposition to Acres's Motion for an Accounting at 3. Acres argues that the "evidence of damages presented to the jury was based on a reasonable royalty rate[] of 28%, with slot machines, and 42%, without slot machines", and it was instructed that "the amount of damages must be not less than a reasonable royalty". Acres Gaming, Inc.'s Reply Re: Motion to Amend Judgment and for an Accounting of Sales at 4 (emphasis in original). Since the jury [*65] awarded more than Acres's expert calculated as a reasonable royalty under those rates, Acres argues, "the jury must be presumed to have done its duty and applied at least the reasonable royalty offered by" its expert. Id. at 5. Therefore, it concludes, "the minimum royalty rate proposed by Acres of twenty-eight percent would provide a floor for damages." Id. Mikohn claims that "there is no basis to apply Acres's expert's conclusion as to a reasonable royalty rate". Mikohn's Opposition to Acres's Motion for An Accounting at 3.

The jury awarded more than the royalties calculated by Acres's expert. Consistent with its instructions, it awarded not less than a reasonable royalty. No speculation is required to see that the jury exceeded the rates proposed by Acres's expert. It is therefore well within the ambit of reasonableness to apply those royalty rates in calculating additional damages owed for the period of June 1999 through the end of the period of infringement.

**D**

**Acres's Motion for a Permanent Injunction and Mikohn's Request to Stay the Injunction are Granted**

Acres moves to permanently enjoin Mikohn "from continuing to make, use, sell or offer for sale its MoneyTime [*66] system." Acres's Motion for a Permanent Injunction at 4. As the Federal Circuit has stated:

> [HN25] infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's rights to exclude others from use of his property. *35 U.S.C. § 261.* . . . It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it.

*Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1246-47 (Fed. Cir. 1989)* (citations omitted).

Mikohn has cited no legal authority or factual reasons for denying the injunction. In order to preserve Acres's patent rights and preclude further infringement of the patents at issue, the permanent injunction is granted.

Mikohn argues that "in the event a permanent injunction is issued, based on the strong merits of Mikohn's motion for a judgment as a matter of law, such an injunction should be stayed pursuant to *Rule 62(d) of the Federal Rules of Civil Procedure*". Mikohn Gaming Corporation's Opposition to Motion for Permanent Injunction at 2.

As the court has denied Mikohn's Motion for Judgment as a Matter of [*67] Law, it is not persuaded by Mikohn's written argument that the Motion is strong on its merits. However, based on arguments made at oral argument, the injunction shall be stayed.

At oral argument, Acres requested additional security in the event that the injunction is stayed. The court asked if Acres had reason to believe it would be unable to collect further damages from Mikohn. Acres said that Mikohn had raised red flags in its SEC filings and was seeking additional financing. In arguing against additional security, Mikohn stated that in securing a large damage award, Acres argued to the jury that Mikohn was a large and profitable company.

The court is persuaded by Mikohn's argument as it pertains to both security in the event of a stay and the stay itself. It would be inequitable for Acres to obtain a large damage award at trial by arguing that Mikohn is a large and profitable company, and then to obtain

additional security from Mikohn by way of a claim that a judgment against it may become uncollectable. Mikohn has posted a court-ordered bond in the amount of $ 1,500,000, the amount of the jury's verdict. Certificate of Deposit of Supersedeas and Cost on Appeal Bond (# 540). In [*68] light of Mikohn's apparent size and profitability, this should provide Acres with sufficient security for the verdict and for any additional damages it may suffer during the course of the stay of the injunction. Should Acres be entitled to compensation for any additional damages suffered during the pendency of the stay, it will likely be able to collect those damages from Mikohn.

In addition, Mikohn represented to the court at oral argument that the MoneyTime system is no longer in place in many casinos and that it is no longer a major product for Mikohn. Thus, any damages sustained by Acres over the course of the stay are likely to be minimal. Therefore, Acres's Motion for a Permanent Injunction is granted, and the injunction shall be stayed pending resolution of any appeal taken in this case.

**V**

**CONCLUSION**

For the reasons set forth above, Mikohn Gaming Corporation's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial (# 512) is denied and Acres Gaming Inc.'s Motion to Amend Judgment and for an Award of Prejudgment Interest (# 514), Acres Gaming Inc.'s Motion to Amend Judgment and for an Accounting of Sales (# 514) and Acres Gaming's Motion for Entry of [*69] a Permanent Injunction Regarding Mikohn's MoneyTime System (# 513) are granted. The rate of prejudgment interest is set at 4.78 % compounded annually, and the permanent injunction is stayed pending resolution of any appeals taken in this case.

Evan J. Wallach, Judge

Date: August 1, 2001

New York, New York

ORDER

The court having reviewed the pleadings and papers on file herein, having heard oral argument, and good cause appearing, it is hereby

ORDERED that Mikohn Gaming Corporation's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial (# 512) is denied; and it is further

ORDERED that Acres Gaming Inc.'s Motion to Amend Judgment and for an Award of Prejudgment Interest (# 514) is granted; and it is further

ORDERED that the rate of prejudgment interest is 4.78 % compounded annually; and it is further

ORDERED that Acres Gaming Inc.'s Motion to Amend Judgment and for an Accounting of Sales (# 514) is granted; and it is further

ORDERED that Acres Gaming's Motion for Entry of a Permanent Injunction Regarding Mikohn's MoneyTime System (# 513) is granted; and it is further

ORDERED that the permanent injunction is stayed pending resolution of any appeals [*70] taken in this case.

Evan J. Wallach, Judge

Dated: August 1, 2001

New York, New York