# EXHIBIT 1

manager for me.
**Q. And in your position as account manager at PolyOne, what are your responsibilities?**
A. To call on existing customers, to develop opportunities at new customers, to report information to my superiors, to my boss.
**Q. How do you report information to your superiors?**
A. I usually report on a weekly basis to my superiors on a weekly report. And then I communicate verbally with them, as well, as needed.
**Q. Do you communicate by memorandum?**
A. E-mails, yes.
**Q. E-mails?**
A. Fax, Audix.
**Q. What is Audix?**
A. A telephone communication message system.
**Q. But, is it part of your job responsibility to accurately communicate information to your superiors?**
A. Yes.
**Q. Are you appearing here today pursuant to a subpoena?**
A. Yes.
**Q. You mentioned earlier that part of your job responsibility was to pass information along to your**





**superiors?**
A. Yes.
**Q. Would information that you would pass along include discussions with representatives from Fiber Composites?**
A. Yes, from the standpoint that I would summarize a meeting, or if there was -- or action items that needed to be followed up on, I would communicate those in writing, typically, yes.
**Q. And in writing, would you use e-mail or hard copy memos or both?**
A. Both, I would say.
**Q. Both, okay. And was it your practice to accurately pass that information along to your superiors?**
A. I don't understand "accurately." I'm not sure what you are asking.
**Q. If you had a meeting and you determined that there was a particular action item, would you accurately describe the action item in the communication to your supervisors?**
A. I'm not sure how to answer that question. I am not sure I understand exactly what you are looking for.
**Q. Would you pass information along close in**





**time to the conversation you had with Fiber Composites' representatives?**
A. I would say typically within, you know, a week or so, yes.
**Q. Okay. And when you would pass this information along, was your memory of the conversation generally fresh in your mind?**
A. Yes, because typically I was taking notes of some sort and referring to those when I would communicate with my customers. That is a typical way that I would handle the meeting.
**Q. And would you keep those notes in your business file?**
A. Not always. If I had sent an e-mail, I may throw them out after I put them down in black and white and sent them via the e-mail system.
**Q. When you passed information along to your superiors, would you try to be accurate based on your memory?**
A. I would try to be accurate, yes, I would say that's --
**Q. What was your business practice to keep others at PolyOne up-to-date with developments involving Fiber Composites?**
A. It is my practice to keep my superiors





updated on all of my accounts, including Fiber Composites.
**Q. And did you direct the team working on the Fiber Composites' account to keep other members of the team up-to-date?**
A. No, if you are asking if I asked other people to keep their superiors involved, no. I would send it to the appropriate parties, and that was the extent.
**Q. Did other members of the Fiber Composites' account team send you updates with regard to the Fiber Composites' account?**
A. I did receive e-mails from other PolyOne employees regarding Fiber Composites.
**Q. Are you familiar with Fiber Composites?**
A. Yes, they are a customer of mine.
**Q. Who are they?**
A. They are a customer of mine located in North Carolina.
**Q. And do you know what they do?**
A. Yes, I know that they extrude PVC and other products.
**Q. Do you know what products that use PVC?**
A. I understand they used the PVC in a railing system.
**Q. When did you first learn about Fiber**

**Composites?**
A. I am not sure of the exact date, but I was sent an e-mail from my boss indicating that this account was buying PVC compound, and I believe it was in February of 2000.
**Q. And what was your first contact with somebody from Fiber Composites?**
A. My first contact was a telephone call to Jim Przybylinski to introduce myself.
**Q. And did you place that call?**
A. I did.
**Q. And when you contacted Mr. Przybylinski, were you marketing PVC to Fiber Composites at that time?**
A. When I called Mr. Przybylinski to introduce myself, we talked about the fact that PolyOne does offer PVC companies to the market, yes.
**Q. Were you exclusively interested in supplying PVC to fiber composites?**
A. Yes.
**Q. All right. I am showing you what has been marked as Exhibit 6, which is Trial Exhibit 249.**
**Can you turn to that, please?**
A. Yes.
**Q. Do you recognize this document?**
A. Yes.





**Q. Where have you seen this document before?**
A. I have a copy of this document in my file. And I gave these documents to Jim Przybylinski at Fiber Composites.
**Q. And the copy that you gave to Mr. Przybylinski, is that copy identical to this document?**
A. Yes. And when I gave this to Mr. Przybylinski, it was not signed, obviously.
**Q. And how did you provide this document to Mr. Przybylinski?**
A. I was told that in order to sell the dry blend compound to Fiber Composites for their application, we would need to have these documents signed by Mr. Przybylinski.
**Q. Who told you that?**
A. My boss, Jim Pajer.
**Q. And did Mr. Pajer explain to you why PolyOne needed these documents to be signed?**
A. Mr. Pajer explained to me that PolyOne needed to inform the customer of patents in an effort to -- in an effort to make sure that the customer was aware that they needed to research the patents.
**Q. Had you, prior to sending Exhibit 6 to Mr. Przybylinski, been involved with or had discussions with Fiber Composites representatives about the Andersen**





**patents?**
A. I spoke with Mr. Przybylinski about the fact that we were aware that there were patents. PolyOne was aware that there were patents. And before I was able to sample him with any materials, he would need to sign these documents.
**Q. Do you remember when you had that conversation with Mr. Przybylinski?**
A. I don't recall exactly, no.
**Q. Would it have been close in time to October 5th of 2000?**
A. I believe that is correct, yes.
**Q. And when you sent Exhibit 6 to Mr. Przybylinski, do you remember the date you sent the document to him?**
A. As I recall, I actually handed the document to him during a sales call. I believe in the documentation there is an overview of that call that shows the exact date.
**Q. And this was a -- was this a visit to Fiber Composites' facility in North Carolina?**
A. Yes.
**Q. Who was present at the meeting?**
A. To the best of my recollection it would have been Jim Przybylinski and myself.





**Q. And during that meeting, did you have discussions of the Andersen Patents?**
A. No.
**Q. When you received this document, did you believe Mr. Przybylinski had signed it?**
A. I did.
**Q. Did PolyOne in fact provide samples of its PVC powder to Fiber Composites?**
A. Yes, we did.
**Q. And you mentioned that PolyOne did not charge for these samples?**
A. Correct.
**Q. Why was that?**
A. I had the authority to send in samples to customers at no charge, one, possibly two gaylords, in order to interest them in trying the sample, approving it and then moving forward to grow the business there.
**Q. What is a gaylord?**
A. It as 1,200-pound box. The dry blend ones are 1,200 pounds. They have different sizes.
**Q. And do you have the authority to send three samples in order to develop a business relationship?**
A. In order to -- yes, to get -- to assist the customer and allow them to run the product, because usually as they run a product it takes their production

time. So, this is a way to help compensate them for the production time by sending them a no charge sample.
**Q. At the time that samples were sent to Fiber Composites, at the time you authorized samples to be sent to Fiber Composites, did you believe Fiber Composites was an up and coming account?**
A. Yes, for PolyOne.
**Q. For PolyOne. And did you continue to believe that in 2001?**
A. I continued to call on the account, yes, yes.
**Q. Did you continue to believe that to this day?**
A. I continue to call on that account.
**Q. I am showing you what has been marked as Exhibit number 9, which is Plaintiffs' Trial Exhibit 254. Take a minute to review that.**
A. Okay.
**Q. Do you recognize this document?**
A. Yes.
**Q. Where have you seen this document before?**
A. This is an e-mail I sent to Jim Pajer and Roman Hawrylko. And it is a document from my files.
**Q. Is this document printed off the PolyOne e-mail system?**
A. Yes.
**Q. And PolyOne has an e-mail system?**





A. Yes.
**Q. Was this document printed by you?**
A. Yes.
**Q. And the handwriting, the handwritten notes on 34, are those yours?**
A. Yes.
**Q. Does Exhibit 9, does Plaintiff's 254 contain multiple e-mails?**
A. It does.
**Q. And did you type, did you personally type one of those e-mails?**
A. Yes.
**Q. What is the portion of Exhibit 9 that you personally typed?**
A. The first section that starts with the name Roman and ends with, I believe this will be Gary Sadowski's account.
**Q. And do you remember the date on which you typed this e-mail?**
A. No. Unfortunately, the date does not appear on this e-mail.
**Q. Do you remember, were you replying to another e-mail when you typed this e-mail?**
A. Yes.
**Q. And what e-mail was that?**





A. The e-mail below it from Jim Pajer dated Tuesday, February 15th, 2000.
**Q. Do you remember receiving that e-mail?**
A. Yes.
**Q. And do you remember replying to that e-mail?**
A. Yes, I recall replying to the e-mail, yes.
**Q. Approximately -- what was the date of your response?**
A. I don't know. I don't recall.
**Q. If you look at page 34, the portion of the e-mail where it says "I met with James Przybylinski today."**
A. Yes.
**Q. Do you remember that meeting?**
A. That was my very first meeting. So, I do vaguely remember the meeting.
**Q. Do you remember the date?**
A. No.
**Q. Do you remember the month?**
A. No.
**Q. Do you remember if it was during the year 2000?**
A. Yes.
**Q. Do you remember if it was before June of 2000?**





A. Yes.
**Q. Where was it held?**
A. At Fiber Composites.
**Q. Who was present at that meeting?**
A. Jim Przybylinski and myself.
**Q. Was this a follow-up meeting to Mr. Pajer's initial contact with Fiber Composites?**
A. I don't know that Mr. Pajer had an initial conversation or contact with Fiber Composites.
**Q. Was this meeting the first face-to-face contact between PolyOne and Fiber Composites, as far as you know?**
A. I can only state it was the first face-to-face meeting I had with Fiber Composites.
**Q. At the meeting you had with Mr. Przybylinski, was there any discussion of the Andersen patent portfolio relating to thermoplastic composites?**
A. I don't recall.
**Q. When you typed this e-mail, did you intend to memorialize the meeting with Mr. Przybylinski?**
A. The purpose of this e-mail was to inform Roman Hawrylko, who was our scientist and technical expert for the Dry Blend Group of the details that I had learned about the requirements of Fiber Composites. For instance, what type of equipment they had, things of

A Okay.
**Q Do you recognize these 3 documents?**
A Yes.
**Q Can you tell me what they are?**
A Three documents, I've got two.
**Q Oh, you don't have the cover page?**
A I've got a cover page.
**Q It looks like it's a fax cover from Kimberly Alanis to you?**
A Yes, that's a document -- yes, that's the cover page for the fax.
**Q And did you receive this?**
A Yes.
**Q Do you remember receiving it as you sit here today?**
A Do I remember what?
**Q As you sit here today in 2002, do you have a recollection of receiving this?**
A Yes.
**Q Looking at the last page --**
A Yes.
**Q It's the PolyOne 10 document?**
A Right.
**Q Is that your signature?**
A Yes, it is.
**Q Do you have any pause to question that you signed**





**this on 10-6-2000?**
A No, I do not.
**Q All right. PolyOne was a vendor of Fiber Composites?**
A A potential vendor at the time of the document.
**Q All right. This was correspondence exchanged in part of the work that you were doing looking at a potential relationship?**
A Yes, it was.
**Q And looking at the paragraph there, it's the third paragraph in. It states, "One company that has several U.S. patents covering PVC and wood fiber mixtures is Andersen Corporation of Bayport, Minnesota." Do you recall looking at the paragraph that starts with that sentence?**
A Yes, I do.
**Q And then at the end it talks about second to the last sentence, "We encourage you to convey this information to others in your organization."**
A Yes.
**Q Did you do that?**
A No.
**Q Why not?**
A I didn't see any reason to.
**Q And did you go on to their website that's listed in**





**this document and take a look at any of the Andersen patents?**
A No, did not.
**Q Why not?**
A I didn't have any reason to in my mind at the time.
**Q And today, do you wish you would have taken a look at the Andersen patents after receiving this on 10-6?**
A I'm not sure.
MS. THORSON: That's the end of the third deposition.
Andersen calls it's fourth witness by deposition, James D. Pajer.
BY MS. THORSON:
**Q Hello, Mr. Pajer. Could you please state your full name?**
A It's James D Pajer.
**Q I'm showing you what has previously been marked as Exhibit Number 16.**
A Okay.
**Q Which counsel should all have a copy of. Have you seen Exhibit Number 16 before?**
A No.
**Q If you could turn to page 3?**
A Okay.





**Q If you could review the various topics. Are you prepared to testify as to the topics listed?**
A Yes.
**Q Did you meet with anyone in preparation for your deposition here today?**
A Yes.
**Q Who is that?**
A Mr. Ban.
**Q When was that meeting?**
A Yesterday.
**Q Are you aware that a subpoena was served on PolyOne one for the production of documents?**
A Yes, I am.
**Q I'm showing you a group of documents with the cover letter from Mr. Ban dated February 15, 2002. Are you generally familiar with these documents? Just generally?**
A Yes.
**Q I'm showing you a set of documents with a cover letter date of February 21, 2002. Are you generally familiar with those documents?**
A Some of them, yes.
**Q Have you reviewed the documents I have just presented to you in preparation for your deposition?**
A I don't believe I've seen all of them.

**your phone conversation with Mr. Przbylinski?**
A Yes, I am.
**Q Do you remember how soon after receiving that information or after having a discussion with Mr. Przbylinski you drafted this e-mail? You can answer that question.**
A Oh, I can answer it? It would have been either the same day or a couple of days after our conversation.
**Q And if you look at the individuals that you sent this e-mail to?**
A Yes.
**Q Who are these people generally, to the extent you can categorize them?**
A Sales within the company within PolyOne, technical, technical service, general manager of our business unit and credit.
**Q Why did you send this e-mail to those individuals?**
A It was to report on this lead and to request that Kim follow-up, Kim Alanis who would be the salesperson for that geography, and as it says in there to our credit department to get some feedback as to credit status of the company. Any time that we are considering doing business with someone, it's prudent to see how their credit is.
**Q Was it your standard practice to report on a lead**





**to other individuals within PolyOne?**
A As is relevant, yes.
**Q And you felt that this information regarding Fiber Composites was relevant?**
A Yes, certainly.
**Q When you drafted this e-mail, did you intend to accurately memorialize your conversation with Mr. Przbylinski?**
A Yes.
**Q Did you have any reason to doubt the accuracy of the information you received from Mr. Przbylinski?**
A No.
**Q The phone call during which you received the information reflected in this e-mail, did you make that phone call in the ordinary course of business?**
A Yes, I did.
**Q Do you see where the e-mail states right below the reference to Condea Vista that using less than 30 percent allows him to avoid violation of the Andersen patent?**
A Yes.
**Q Who is the "he" in that sentence?**
A Mr. Przbylinski.
**Q Where did you learn the information in that sentence?**





A From our phone conversation on that day.
**Q Was it Mr. Przbylinski who brought up the topic of the Andersen patent?**
A Quite frankly, I don't know. Had he not brought it up, I probably would have.
**Q You were familiar with the Andersen wood flour PVC or wood flour or wood fiber PVC patent prior to February of 2000?**
A I was generally aware that the patents existed and that they covered wood flour content, and I was concerned that anyone I would talk to as a potential customer might not be aware of those patents.
**Q Did Mr. Przbylinski relate to you the 30 percent number?**
A We talked about that number as it's reflected here, and as it says here, he told me that he was using less than 30 percent. So there would not be a problem with his violating the patent. That was my understanding.
**Q And did you have any reason to doubt Mr. Przbylinski's statement?**
A No, I did not. I just took it at face value.
**Q Turning your attention to Exhibit 17 which is Plaintiff's Exhibit 252, do you recognize this document?**
A Yes. It looks like the same document as 9.
**Q Is this another copy of the same e-mail contained**





**that we were just discussing with exhibit the?**
A Yes.
**Q Was this e-mail retrieved from your e-mail system at PolyOne?**
A Yes.
**Q Okay. I'm showing you what has previously been marked as Exhibit Number 6. You already have a copy, do you recognize this document?**
A Yes, I do.
**Q Where have you seen this document before?**
A Could you be more specific?
**Q What was the first time you saw this document?**
A I'm going to ask for a clarification on one point for that.
**Q Yes?**
A Are you talking about this document specifically signed by Fiber Composites or it's general form?
**Q Let's start with this document specifically signed by Fiber Composites?**
A Okay. I saw it in the time frame as it's dated here, October 6 of 2000.
**Q Are you referring to PolyOne 10 based upon the number in the right-hand corner?**
A Yes.
**Q What is PolyOne 10?**

**Q But you never picked the phone up and called them and asked them about it?**
A At that point I was already a licensor.
**Q I understand. But you still never picked the phone up and asked Andersen about their patent?**
A No, I did not, no.
**Q You knew who Andersen was?**
A Yes.
**Q You were in the lumber business?**
A I own a lot of Andersen windows. I know who Andersen is.
**Q It's not as if you didn't know how to get ahold of them?**
A I don't think knowing the corporate name tells you how to get ahold of person in the corporation but --
**Q You could have figured that out?**
A I'm sure I'm skilled enough to figure that out at the time.
**Q Now, in the Strandex license agreement, they have several obligations to you, correct?**
A Yes, sir.
**Q I mean, here I've got page 2 of the agreement up here. If you'd pull that up, Mr. Mancosh. You know among one of the things that -- that's covered by**





**this is licensor rights, you've got certain rights under this patent here, which is the Strandex patent, right?**
A Yes, sir, it is.
**Q And that's Exhibit 1, which you have up there, correct?**
A Yes, I do.
**Q And we'll talk about that in a few minutes perhaps. Then later on down here, Strandex has to provide you with a lot of know-how, correct?**
A Yes.
**Q And there's a list of a substantial amount of know-how that they are to provide you, right?**
A Yes.
**Q Including obviously the invention records and things of that nature but also pilot plant designs, production plant designs, production specifications, raw material specifications, you know, and production techniques, processes and methods -- in fact, that was a really important part, right?**
A It was, yes.
**Q And in fact, these production techniques, processes and methods, over the course of your dealings with Strandex you were a little frustrated that weren't providing you the support that you**





**needed, weren't you?**
A Yes, I was real frustrated with Strandex.
**Q You had hoped they would provide you more technical input on this stuff?**
A I would have hoped, yes, that they would had more professional availability.
**Q And ultimately I think you testified that you terminated the relationship with them, at least in part or substantial part because they didn't follow through on this aspect of the deal?**
A I discontinued paying them royalties because I did not feel that they were meeting their end of the bargain.
**Q They hadn't lived up on their promise to provide you know-how?**
A That is correct.
**Q Now, if you turn to page 11 of this, there's a provision in here that covers patent infringement, right? I've got page 11 and it's paragraph 14 on page 11?**
A Okay. Yes, thank you.
**Q So there is a provision that was put in this agreement that specifically talked about patent infringement, correct?**
A Yes.





**Q Right. Now, but there was not just one provision in there, there's two provision that talk about patent infringement, correct?**
A That is correct 14 and 15.
**Q And 15?**
A That is correct.
**Q Now, well, I want to talk about this just for a second. 14 is concerned with infringement of somebody else of the Strandex patent, right?**
A If such patent is infringed by a third party.
**Q By a third party?**
A Yes.
**Q So that provision is concerned with, let's say if Trex was infringing the Strandex license, that scenario would fall under paragraph 14?**
A Yes, that's my understanding.
**Q And now 15 addresses a different infringement scenario, right?**
A Yes, sir.
**Q 15 addresses the scenario that if you're making a product using the Strandex process and it infringes, you look to paragraph 15 as to how to deal with that situation, right?**
A Paragraph 15 states that they would be responsible for that, yes.

level. So the grading is fairly steep.
**Q Now, you were in the courtroom and heard the testimony of Mr. Koenig, yesterday. Correct?**
A Yes.
**Q Andersen has a highly successful commercial product that is a wood plastic composite that they market as Fibrex, are you aware of that?**
A Yes.
**Q And are you aware of Fibrex before you walked into the courtroom today or yesterday?**
A Yes, I was.
**Q And Andersen hasn't had any of the nature of the problems that you've had, and they're making a product that has 40 percent wood fiber?**
A Yes. That's what they report.
**Q Do you -- I mean this lawsuit has been going on and you are out there in the industry and you can't point to a document or a single customer complaint about a swelling on a Andersen Fibrex Renewal window, can you?**
A No, I can't. I think there's a reason for it, but I can't do it.
**Q Now, you learned at least something about patents in 1997 when you signed the Strandex license agreement, correct?**
A I learned about that patent.





**Q I'm sorry?**
A I learned about that patent, yes, sir.
**Q And you learned about that there was at least if you hadn't known about some concept of patent infringement, you certainly learned about patent infringement when you looked at that agreement?**
A Well, yes, I mean I had a very general understanding of it, yes.
**Q There were two specific paragraphs in that agreement regarding patent infringement?**
A Yes.
**Q One of which was the possibility of patent infringement by your company?**
A That is correct, yes.
**Q I'm going to hand you what has been marked as Plaintiff's Exhibit 181. That document -- it's hard to see on the screen here, but it's a Fibrex -- or excuse me, it's a Fiberon document. Correct?**
A Yes.
**Q And if we go to this page which is the third page in the document, it's more clearly that you can see that it's Fiber Composites LLC; right?**
A Yes.
**Q And this guide has been, if we look at this area right here, "has been put together to provide you with**





**in-depth technical sales and company information on Fiber Composites, and it's premier wood composite lines, Fibron decking, and fiber rail professional series"; is that right, sir?**
A Yes.
**Q So it's a lot of information in this document. Correct?**
A Yes, this is a sales-oriented informational document.
**Q Would you go to page 24 of the brochure.**
A Of this document?
**Q Of that document. It's the page numbers that are in the center.**
A Okay. Are you referring to -- I'm sorry.
**Q I've got it up here the same page that you see up here. The one with the heading that says, "Patented two-piece bracket kits secure rails quickly and attractively."**
A Yes.
**Q You were selling a patented bracket kit?**
A Yes.
**Q And where did that patent -- do you know who held that patent?**
A Our supplier holds that patent.
**Q And who was the supplier?**





A American Way is the name of the supplier.
**Q All right. And the bracket kits that they sold you were patented?**
A That's what they represent, yes.
**Q And you were authorized to sell them on your behalf?**
A No, we weren't authorized. We transacted them as a normal vendor. We didn't seek authorization or have authorization.
**Q Right. If you buy a product from somebody who holds a patent on it, you have the right to turn around and use it and sell it yourself. That's fine. I'm not saying there's anything wrong with that?**
A We just bought and sold the bracket.
**Q Right. And you decided that marketing it as a patented piece would provide some sales advantage?**
A Someone in my company did. I didn't write this, but...
**Q Jim Przbylinski works for you?**
A Yes, he does.
**Q Was he the first employee that you hired at Fiber Composites?**
A Yes.
**Q He work for you today?**
A Yes, he does.

chemicals to me and many other people and senior vice president of marketing. But before that, Jim was a plastics person starting out early on with shell plastics, running both compounding facilities and injection moding facilities, and that was the majority of his career except for those ten years before he came to me. He deviated from plastics due to some personal situations that required him to stay in a particular area of the country. And as I was beginning to form up this business, he returned with me, if you would, to the industry, but he did so essentially after being out of it for ten years.

**Q And perhaps I should have been a little clearer when I meant he had industry experience. He came out of a private enterprise or industry as opposed to academia?**

A Oh, that is correct, yes, sir.

**Q He's someone that was in the business world for many years?**

A Yes, that is correct.

**Q Mr. Mancosh, I'm going to show you what has been marked and admitted as Exhibit 249. Exhibit 249 is a fax sent by Mr. Przbylinski to a Kimberly Alanis on Fiber Composites stationery. Correct?**

A Yes.

**Q And if we go to the third page of this exhibit, we**





**see that Mr. Przbylinski has and you recognize the signature, right?**

A Oh, yes.

**Q And that's his signature?**

A That's definitely his signature, no doubt about it?

**Q And his title is COO that stands for chief operating officer; is that correct?**

A Yes.

**Q And that's basically the person in charge of the day-to-day operations of the company?**

A Yes, sir.

**Q And he sent this letter, or excuse me, this acknowledgement to PolyOne. And you saw this yesterday, I assume, during the deposition testimony yesterday afternoon?**

A Yes, he signed this form. It was a PolyOne form that he signed.

**Q Did Fiber Composites ever end up doing business with PolyOne?**

A I honestly don't know.

**Q And here this document he signs as a chief operating officer of Fiber Composites says, "To customers of PolyOne's PVC compound designed for accepting wood fibers;" do you see that?**

A Oh, yes, I'm sorry. Thank you.





**Q And it goes on to stay that "PolyOne sells a PVC compound which is suitable for mixing wood fibers into the compound to make a PVC wood fiber composite, correct?**

A Yes.

**Q And in fact at the time, that's what Fiber Composites was making with respect to it's railings and posts?**

A Yes.

**Q A PVC wood fiber composite?**

A That is correct.

**Q And then it goes on to state, "As a customer of this compound, you should be aware that several U.S. patents exist which cover various mixtures of PVC and wood fibers as well as end-use particle contained in the mixture?"**

A Yes.

**Q Then it goes on, and I won't read all of this, but the next paragraph talks about "it's been an active area of patents for the past five years and new patents likely to issue, and there's a recommendation that before you introduce a product containing PVC and wood fibers, that you consult an experienced patent attorney to make sure that your particular product does not infringe an existing patent;" do you see that?**

A Yes.





**Q And to your knowledge did Mr. Przbylinski ever consult a patent attorney to see if the PVC wood composite product that Fiber Composites was making infringed any existing patent?**

A To my knowledge, he did not.

**Q And then it goes on to state specifically "One company that has several U.S. patents covering PVC and wood fiber mixture is Andersen Corporation of Bayport Minnesota." It says, "they have other patents pending, and there may be other patents issued other Andersen," and then it says, "a full text may be available from the patent office," and it gives a website. Do you see that?**

A Yes.

**Q To your knowledge, did Mr. Przbylinski ever investigate any patents on wood fiber composites by going to the web address given to him by PolyOne?**

A I have no knowledge of Mr. Przbylinski ever going to that website.

**Q Then it goes on in the next paragraph, and says that "PolyOne believes that it's compound as provided does not infringe on any existing patents. However, it's used with wood flour." And that's what you use PVC with, right, wood flour?**

A Yes, we do.

**Q "Could result in a compound or end-user article that does infringe upon existing or future patents belonging to others." And it goes on, and it says, "It's your responsibility to conduct the necessary patent investigation to assure that you have not infringed upon any patents;" are you aware if Mr. Przbylinski ever conducted such an investigation?**
A I am not aware of any investigation that Mr. Przbylinski conducted.
**Q And then of course it says, "please sign below and acknowledge." And he did so?**
A Yes.
MR. SCHUTZ: Thank you. I don't have any further questions at this time
THE COURT: Any redirect?
MR. SKENYON: Yes, Your Honor.
THE COURT: How is your water situation?
THE WITNESS: I'm pretty good. Thank you.
REDIRECT EXAMINATION
BY MR. SKENYON:
**Q Mr. Mancosh, have you ever seen anything quite like that PolyOne document before?**
A No, I have not.
**Q Have you ever -- has it ever come to your attention that some company that wants to supply you product is**





**warning you about your use of that product because other companies have patents?**
A I have never seen anything like this, no.
**Q Do you know if there is any connection between PolyOne and Andersen?**
A I do not personally know that.
**Q In connection with some of the questions that Mr. Schutz just asked you, let's go back to when you were looking to develop Fiber Composites as a company here.**
A Yes.
**Q You knew that there were -- what decking products did you know were in the marketplace, composite decking products?**
A There were only really only three products in the marketplace that I am aware of from '96 and '97. One of them was Trex which is a pretty unattractive wood composite. The other was called Choice Deck. And it's made by AERT and Company West, and it was frankly less attractive then Trex, extremely unattractive. One was made by Crane plastics which was a fairly nice looking composite, but it was hollow. It wasn't a solid board. It was actually an engineering design that had legs.
THE COURT: Was that other one more unattractive or less? Didn't hear your words.
THE WITNESS: The first product Trex was





unattractive.
THE COURT: But then the second one?
THE WITNESS: The second one was even more unattractive, was extremely unattractive from AERT?
And the Crane product actually looked pretty good, but it required a lot of complexity and installation due to the way it was designed, and thus I thought it was not a terrific entry. Those were the three products I was aware of.
**Q What were the two products you were looking to make as a composite?**
A I was looking to make a decking product and a railing product as a composite.
**Q Okay. At the time you were doing that, you were looking around in the industry. Was Andersen selling any composite decking or composite railing products?**
A I saw absolutely no products from Andersen in the marketplace.
**Q How about thereafter in 1998? Did you see any composite decking or railing products from Andersen?**
A I saw no products from Andersen.
**Q How about 1999?**
A I don't recall seeing products from Andersen.
**Q How about railing products of composite material from Andersen at any time?**





A I am not aware that Andersen has ever produced railing products from composites.
**Q The testimony, Mr. Koenig's testimony, I think, was that they were making some decking product, composite decking product 2000-2002, do you know anything about that product?**
A I do know that they made a decking product that was sold at Home Depot for a brief period in the Midwest.
**Q It wasn't sold at Home Depot throughout the United States?**
A No, it was a very localized effort with a particular Home Depot distribution center out in this general area of the country. It was a test. Depot termed it as a "test market" for their product.
**Q Is it still in the Home Depot stores today?**
A No, it is not.
**Q Go back when you were trying to figure out how to set up Fiber Composites, was -- let me change that. In the time frame you started out in Fiber Composites, did you ever have any reason to look at Andersen as being a source of technical advancement in this area, decking and railing?**
A I was not aware of anything that Andersen was doing in this area when I was looking for products and technology.

a patent case, because it is the claims that define the patent owner's rights under the law. That is, the claims define what the patent owner may exclude others from doing during the term of the patent. The claims of the patent are numbered sentences at the end of the patent.

Claims are usually divided into steps or parts called limitations. For example, the claim that covers the invention of a table may recite, the tabletop, four legs and glue to secure the legs to the tabletop. The tabletop, legs, and glue, are each a separate limitation of the claim.

The claims of a patent serve two purposes. First, they set out the boundaries of the invention covered by the patent. And second, they provide notice to the public of those boundaries. Thus, when the validity of a patent is challenged, it is the patent claims that are at issue. In reaching your determination with respect to invalidity, consider each claim separately.

It is my job as a judge to determine what patent claims mean and to instruct you about that meaning. And you have to accept the meanings I give you and use them when you decide whether or not the asserted claims of these two patents are invalid.





Before I instruct you about the meaning of the words and the claims, I am going to explain to you the different types of claims that are at issue in the case.

There are two different types of claims in the two patents -- excuse me. The first is called an independent claim. An independent claim doesn't refer to any other claim of the patent, and it is read separately to determine its scope.

Claims 1 and 22 are the independent claims of the '553 Patent. Claim 1 is the only independent claim of the '027 Patent. You know this because these claims mention no other claim.

Accordingly, the words of these claims are read by themselves in order to determine what the claims cover. A dependent claim, on the other hand, refers to at least one other claim in the patent and thus incorporates whatever the other claim says.

Accordingly, to determine what a dependent claim covers, you have to read both the dependent claim and the claim or claims to which it refers. Claims 2, 3, 4, 5 and 6 of the '553 Patent and Claims 2, 3, 4, 5, 6 and 9 of the '027 Patent are dependent claims.

For example, the words of Claims 1 and 2 must be read together in order to determine what the





dependent claim, Claim 2 covers. Each claim of a patent represents a legally separate invention.

Claim elements or limitations are words and phrases in a claim that describe the claimed invention. So, now I have instructed you as to the types of claims in this case, and I am next going to define the meaning of some of the words used by the claims at issue here.

You must use, as I said before, the definitions I provide you in your consideration of the invalidity issues. I instruct you that composite structural member as found in Claims 1, 2 and 3 of the '553 Patent, and Claims 1, 2 and 3 of the '027 Patent means a polymer and wood article having load-bearing capability, which can be obtained through a direct extrusion process or made from a composite material without a particular form.

In addition, I instruct you that about 35 to 55 weight percent of wood fiber means that it can not literally have less than 35 percent wood fiber by weight. I also instruct you that about 35 to 65 weight percent of a polymer-comprising vinyl chloride means that it cannot literally have more than 70 percent vinyl chloride by weight.

You might notice that Claim 22 of the '553 Patent, Claim 22 uses the term polymer wood composite





rail. Claim 9 of the '027 Patent uses the term rail. Don't be confused and think that the term rail in those claims specifically refers to a deck rail. The term, of course, in that use could be much broader.

A patent owner may enforce its rights to exclude others from making, using or selling the patented invention by filing a lawsuit for patent infringement. Patent laws provide that any person or business entity which makes, uses, offers to sell or sell without the patent owner's permission any product, apparatus or method legally protected by at least one claim of a patent within the United States before the patent expires infringes the patent.

You must decide whether or not Andersen has proven by clear and convincing evidence that Fiber Composites' infringement was willful.

Willful infringement is established where a plaintiff has proven two things. First, that the defendant was aware of plaintiff's patent; and second, that the defendant made no reasonable good faith basis or had no reasonable good faith basis for concluding that he did not infringe plaintiff's patent.

So, for example, if you find that Andersen has proven that Fiber Composites knew about the '027 and '553 Patents and did not exercise due care to determine

whether or not it was infringing those patents, you may find that Fiber Composites' infringement was willful.

One factor to consider with respect to Fiber Composites' good faith and due care in determining the willfulness at issue is whether Fiber Composites obtained legal advice from an attorney after becoming aware of Andersen's patents.

Another factor in determining whether Andersen has proven Fiber Composites willfully infringed its patents is your assessment of whether or not Fiber Composites copied the product covered by those patents -- and I am talking, of course, about the '027 and '553 Patent claims -- or whether Fiber Composites as a competitor of Andersen tried to match Andersen's product with a functionally competitive product, but did not set out to copy it, even if patent infringement ultimately is found.

I'm now going to instruct you on the rules you must follow in deciding whether Fiber Composites has proven that certain claims of the '027 and '553 Patents are invalid. To prove invalidity of any patent claim, Fiber Composites must persuade you by clear and convincing evidence that the claim is invalid.

Instructions regarding each of the Fiber Composites' invalidity defenses follows now. Only a





valid patent may be infringed. For a patent to be valid, the invention claimed in the patent has to be new, useful and nonobvious. You know that. A patent cannot take away from people their right to use what was known or would have been obvious when the invention was made.

The terms new, useful and nonobvious have special meanings under the patent laws. The invention claimed in a patent must also be adequately described. In return for the right to exclude others from making, using, selling, or offering for sale the claimed invention, the patent owner must provide the public with a complete description in the patent of the invention and how to make and use it.

Fiber Composites has challenged the validity of the asserted claims of the two patents on a number of grounds. I remind you that the law presumes in the absence of clear and convincing evidence to the contrary, that the Patent Office acted correctly in issuing a patent, and that each claim of the patent is valid. However, once the validity of a patent has been put at issue, it becomes the responsibility of the jury to review what the Patent Office has done consistent with these instructions of law.

Fiber Composites, the party challenging the





validity of the patents bears the burden of proving by clear and convincing evidence that each of the asserted claims in the '027 and '553 Patents is invalid.

I will now explain each of Fiber Composites' grounds for invalidity in detail. In making your determination as to invalidity, you should consider each claim separately.

Prior art is prior work of others that is patented or described in a printed publication before the invention of the applicant. In this case, Fiber Composites relies on the Modern Plastics article, the Hopperdietzel Patent and the Baumann Patent as prior art.

Now, new. You know that to be patentable a patent has to be new. If it is not new, i.e., if somebody else already has made the same invention, we say that it was anticipated by the prior art. An invention that is anticipated by the prior art is not entitled to patent protection.

The party challenging the validity of a patent must prove anticipation by clear and convincing evidence. In order for a patent claim to be anticipated by the prior art, each and every limitation of the claim must be present within a single item, single item of prior art.





You may not find that the prior art anticipates a patent claim by combining two or more items of prior art. A printed publication or patent will not be an anticipation unless it contains a description of the invention covered by the patent claims that is sufficiently detailed to teach a skilled person how to make and use the invention without undue experimentation.

That means that a person skilled in the field of the invention regarding the printed publication or patent would be able to make and use the invention using only the amount of experimentation that is appropriate for the complexity of the field of the invention and for the level of expertise and knowledge of persons skilled in that field.

Additional references may be relied upon to show that one skilled in the art could make and use what is disclosed in the prior art reference relied on for anticipation.

In deciding whether or not a single item of prior art anticipates a patent claim, you should consider that which is expressly stated or present in the item of prior art, and also that which is inherently present. Something is inherent in an item of prior art if it is always present in the prior art or always