UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ANDERSEN CORPORATION,<br>Plaintiff,<br><br>v.<br><br>FIBER COMPOSITES, LLC,<br>Defendant. | CIV NO. 00-CV-2548 (JNE/JGL) |

**FIBER COMPOSITES, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE ISSUES OF INFRINGEMENT AND VALIDITY**

This memorandum supports the renewed motion brought by Defendant Fiber Composites, LLC ("Fiber Composites") for judgment as a matter of law that the patents asserted at trial are invalid and not infringed pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.

As demonstrated below, the Court's construction of the claims of United States Patents 5,486,553 and 5,539,027 ("the '553 patent" and "the '027 patent") asserted at trial by Plaintiff Andersen Corporation ("Andersen"), was erroneous. Properly construed, the claims of these patents, like those of the other four patents originally asserted by Andersen ("the Group I patents"), are limited to material made from pellets. So construed, these claims, like those of the Group I patents, are not infringed by any of Fiber Composites' products. In addition, the jury's findings on invalidity are not supported by sufficient evidence in the record. Instead, the evidence at trial demonstrated that the '553 and '027 patents are invalid under both 35 U.S.C. § 102 and 35 U.S.C. §

112. Accordingly, the Court should enter judgment as a matter of law in favor of Fiber Composites on these issues.

## I. Background

On May 12, 2005, the Court entered judgment in this matter in favor of Andersen, in part, and in favor of Fiber Composites, in part. The Court's judgment referenced the jury's special verdict form, which (a) found that Fiber Composites' uncontested infringement was not willful, (b) found that the asserted claims of the '553 and '027 patents were not proven invalid; and (c) awarded reasonable royalty damages to Andersen. Fiber Composites timely moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure at the close of Andersen's case-in-chief. (April 7, 2005 Trans. at 575.)

### A. Construction of the Claims of the '553 and '027 Patents and Fiber Composites Admitted Infringement Thereof

The Court previously construed the four Group I patents asserted by Andersen (the '607, '611, '334, and '612 patents, which the Court ruled Fiber Composites did not infringe) as requiring "pelletizing," but did not construe the Group II patents asserted by Andersen (the '553 and '027 patents, which Fiber Composites admitted infringing) to have this same requirement. (*See generally* Claim Construction Order, Docket No. 105.) The Court should do so now, because the specifications of the '553 and '027 patents, as well as their prosecution history, limit the claims to pellets or pelletizing.

**1. The ’553 and ’027 Patent Specifications**

The specifications of the two Group II patents are very similar to those of the Group I patents. They include a nearly identical statement about the unsuccessful attempts of the prior art to make suitable structural parts to replace wood (Exhibit 1, col. 1, line 64 to col. 2, line 7; Exhibit 2, col. 2, lines 1-11), and both patents also clearly state in their summary of the invention section that the successful manufacture of the composite composition requires intimate mixing of the polymer and wood fiber, aligning the fibers and controlling the moisture content (Exhibit 1, col. 2, lines 59-63; Exhibit 2, col. 3, lines 3-7). Both specifications actually describe only one way to accomplish all this, and that is by first pelletizing the composite material (Exhibit 1, col. 5, lines 18-27, col. 5, line 64 to col. 7, line 29; Exhibit 2, col. 5, line 64 to col. 7, line 28). Once again, the pelletizing method is not only disclosed in detail in both specifications, but it is the only method actually disclosed for making the structural parts from the composite composition (Exhibit 1, col. 8, lines 34-62; Exhibit 2, col. 8, lines 38-60).

Further, the ’553 and ’027 patent specifications not only include the tables of the Group I patents relating to the supposedly improved properties of the pellets, but they also include additional tables relating to the pellet (e.g., new Table II). And both the ’553 and ’027 patents have the same statement found in the Group I patents at their end, which is that the superior properties of the structural part are due in large part to the pellet (Exhibit 1, col. 10, lines 31-47; Exhibit 2, col. 10, lines 26-43).

In addition, the prosecution history of the ’553 and ’027 patents limited all the claims to creating solid pellets or solid linear extrudates from which the pellets are made.

### 2. The Common Prosecution

The ’553 and ’027 patents are both based on an original application, Serial No. 938,365, filed August 31, 1992. When it was originally filed, that application had 26 claims. Claim 1 originally read as follows:

> 1. A polymer wood composite structural member, suitable for use as a replacement for a wood structural member, which composite structural member comprises a composite member with a modulus of greater than 500,000, and a coefficient of thermal expansion less than 3x10-5 in/in-°F and which composite member comprises about 35 to 65 wt-% of a polymer comprising vinyl chloride and about 35 to 55 wt-% of wood fiber.

(Exhibit 3 at 36.) The other independent claims 18, 20, 23 and 26 were similar. None of the original 26 claims included any mention of pellets, the linear extrudate used to make the pellets, or pelletizing.

Original claim 1 was rejected as anticipated under 35 U.S.C. § 102(b) by several different prior art references including Miani U.S. Patent No. 4,915,764, which discloses a polymer and wood composite that is directly extruded into the ultimate structural member. This same reference was also cited as part of the basis for an obviousness rejection applied to all the claims (Exhibit 4 at 6.)

In response to this rejection, Andersen amended claim 1 to read as follows with the new language in italics:

> Claim 1 (Amended) A polymer wood composite structural member, suitable for use as a replacement for a wood structural member, which composite structural member comprises a composite member with a Youngs modulus of greater than 500,000, and a coefficient of thermal expansion less than 3x10-5 in/in-°F and which composite member comprises about 35 to 65 wt-% of a polymer comprising vinyl chloride and about 35 to 55 wt-% of wood fiber *having an aspect ratio of at least about 2*.

(Exhibit 5 at 2 (emphasis added).)

Similar amendments were made to all the other independent claims. None of the amended claims included any specific reference to pellets, the linear extrudate from which the pellets are made, or the pelletizing process. Nevertheless, Andersen clearly interpreted the claims as being so limited, because Andersen then argued the following to try to overcome the anticipation rejection based on Miani:

> Reconsideration is respectfully requested of the rejection of Claims 1-6 under 35 U.S.C. § 102(b) as allegedly being anticipated by Beshay, US Patent 5,008,310; Miani, US Patent 4,915,764; Natov et al., US Patent 4,594,372; Fujita et al., US Patent 4,737,532; Hopperdietzel, US Patent 4,851,458; and Goettler, US Patent 4,376,144.
>
> ***
>
> A careful look at the references cited by the Examiner show clear distinguishable differences in the composites prepared from that of Applicants' invention. Therefore, none of the prior art references would place the presently claimed invention in possession of the public. This is the requirement for anticipation.
>
> ***
>
> In the Miani composite, the organic filler which can be wood pulp is notably pre-mixed with the liquid polymer and then subsequently more polymer is added. Thus, there appears to be a prior coating of the wood powder with a plastic material. Furthermore, the composite is directly extruded and kept hot during the entire operation. Post extrusion milling is also required to obtain a final useful shape. This type of composite is not the composite taught in the present invention. In contrast, the presently claimed composite is prepared by mixing the melted polymer and wood pulp, forming pelletized material, cooled, then extruded. This affords a smooth structural member without any evidence of polyvinyl chloride degradation. (See page 9, line 24-25 and page 14, line 21 et seq.).

(Exhibit 5 at 6, 7, 8.)

In short, even though neither original claim 1, nor amended claim 1, ever mentioned pellets, Andersen told the Patent Office that these claims did not cover direct extrusion of the structural member from a composite. Rather, Andersen said that the word "composite" in the claims required a step whereby the polymer and wood fiber were first pelletized into solid form and then the solid pellets were used to extrude the structural member. Further, Andersen then attributed important results to this pelletizing process to further distinguish the direct extrusion Miani reference. As a result of this argument, the examiner withdrew Miani as a reference.

As discussed next, this is not the only time Andersen told the Patent Office that the claimed invention of the Group II patents involved pellets, even though none of the claims of those applications were ever expressly so limited.

### 3. The '553 Patent Prosecution

The original application referred to above is the parent of continuation application Serial No. 224,399, filed April 7, 1994, which became the '553 patent (Exhibit 1). In the continuation application that became the '553 patent, original claim 1 and claim 26 (which became claim 22 in the issued patent) were amended as a result of a rejection. The claims are very similar, and claim 1, as amended, read as follows:

> 1. (Amended) A polymer wood composite structural member, suitable for use as a replacement for a wood structural member, which thermoplastic composite structural member comprises a composite member with a Youngs modulus of greater than 500,000, and a coefficient of thermal expansion less than 3x10-5 in/in-°F and which composite member comprises a continuous organic phase comprising about 35 to 65 wt-% of a polymer comprising vinyl chloride and, dispersed in the continuous phase, about 35 to 55 wt-% of wood fiber having an aspect ratio of at least about 2.

(Exhibit 6 at 2, 4.)

Claim 26 read as follows:

> 26. (Amended) A polymer wood composite rail, suitable for use as a replacement for a wood rail, which composite rail comprises an elongated thermoplastic extrudate having a Youngs modulus of greater than 7.5x105, and a coefficient of thermal expansion between 1.5 and 3.0x10-5 in/in-°F and which composite member comprises a continuous organic phase comprising about 36 to 65 wt-% of a polymer comprising vinyl chloride and, dispersed in the continuous phase, about 35 to 55 wt-% of wood fiber having an aspect ratio of at least about 2.

(*Id*. at __.)

While both claims contained language associated only with the pelletizing process in the specification (e.g., "dispersed in the continuous phase"), neither claim expressly mentioned the word pellet or pelletizing. Nevertheless, in the accompanying explanation of its claimed invention, Andersen said the following:

> The claims have been amended to recite that the composite structural member is thermoplastic. Support for this amendment is found at page 9, line 21 through page 10, line 3. The use of a thermoplastic polyvinyl chloride and wood fiber in a composite pellet used in the thermoplastic process to form the structural member would result in a thermoplastic composite member. The claims have been amended to recite that the composite member comprises a continuous organic phase comprising a polymer of vinyl chloride and dispersed in the continuous organic phase wood fiber. Support for this amendment is found at page 15, lines 1 through 10.

(*Id*. at 4.)

The support referred to in the quoted argument above is in the portion of the specification that refers to the pellet manufacture (Exhibit 5, col. 6, lines 1-19). In short,

Andersen expressly defined the claim term "composite member" as being something made from the pellets.

#### 4. The '027 Patent Prosecution

The '027 patent (Exhibit 2) was based on a continuation application Serial No. 326,472 filed October 20, 1999, and it is a continuation of the application which resulted in the '553 patent. The same claim terms "composite structural member" and "composite member" appear in the '027 patent claims.

#### 5. Fiber Composites' Admitted Infringement of the '553 and '027 Patents

Given the Court's claim construction of the Group II patents, Fiber Composites admitted that the asserted claims were literally infringed by its railing parts made prior to January 1, 2001 that were made with more than 30% wood fiber content. If the '553 and '027 patents were construed to require pelletizing, however, Fiber Composites would not infringe because it is undisputed that Fiber Composites did not (and does not) utilize that method of extrusion.

### B. The Validity of the '553 and '027 Patents

#### 1. The Evidence Presented at Trial Demonstrated that the Claims Are Overbroad.

##### a. The Young's Modulus Has No Upper Boundary.

Claim 1 of '553 patent and claim 1 of '027 patent both specify "a Young's modulus of greater than 500,000." (*See* Exs. 1, 2.) In other words, the claims do not specify an upper limit for the Young's modulus value. Yet the first named inventor of the patent, Michael J. Deaner, testified at trial that, in the experiments leading to this

invention, the inventors did not obtain results with a modulus of more than 1.1 to 1.2 million:

> Q. The claim, itself, however, does not put an upper limit on modulus, though?
> A. The claim does not.
> Q. . . . [A]s a practical matter, if you look through your book, your examples there in your book, I didn't see anything in the examples that were higher than 1.1 million, is that correct? And there is only very few of those.
> A. That is correct.
> Q. Is that about right?
> A. That is correct.
> Q. If we go back to the table, that is the modulus table. . . .
> Again, you reported some values, here of the modulus values you attained in testing, true?
> A. True.
> Q. For each of those percentages – and the highest one I see is about 1.1 million, a little over 1.1 million?
> A. Yes.
> Q. So, in testing for this invention, not much gets above 1.1 million, true?
> A. True.
> Q. In your claim, it is 500,000 and above?
> A. That is what the claim says. . .
>
> ***
>
> Q. So, the claim, itself, doesn't say where the upper boundary of the Young's modulus is. Is it 1.5, is it 2? Is this something that gives you 2.1, 2.3?
> A. It would be dependent on the wood fiber that you are using.
> Q. But, my point is here that in all of your experiments and of all your experiments of people working with you, you didn't actually get to anything that was much above 1.2, correct?
> A. That is correct.

(April 6, 2005 Trans. at 316-17, 319.)

This testimony was uncontested at trial.

**b. The Coefficient of Thermal Expansion Has No Lower Boundary.**

Claim 1 of ‘553 patent and claim 1 of ‘027 patent also both specify “a coefficient of thermal expansion less than $3x10^{-5}$in/in-$^{o}$F.” (*See* Exs. 1, 2.) In other words, the claims do not have a lower limit on the coefficient of thermal expansion. Yet Mr. Deaner testified that, in the experimentation and testing leading to this invention, the coefficient never got below about 1 times 10 to the fifth:

> Q. . . . If you would go back to Claim 1, again, the ’027 Patent. Okay, and let’s deal with the coefficient of thermal expansion.
>
> ***
>
> Q. But, in terms of what you claimed as your invention, you didn’t set a lower limit on it, did you?
> A. There is not a lower limit specified in the claim.
> Q. And in terms of your investigation and your experimentation and your research, you never got below, I think, about 1 times 10 to the fifth? In fact, I think that has given you some benefit of the doubt, true?
> A. True.

(April 6, 2005 Trans. at 320-21.)

Like his testimony on the Young’s modulus value, Mr. Deaner’s testimony on the coefficient of thermal expansion also stands uncontroverted.

**c. The Aspect Ratio Has No Upper Boundary.**

Finally, in addition to specifying “a Young’s modulus of greater than 500,000” and “a coefficient of thermal expansion less than $3x10^{-5}$in/in-$^{o}$F,” claim 1 of the ‘553 patent also specifies “wood fiber having an aspect ratio of at least about 2.” (*See* Ex. 1.) Thus, like the modulus and thermal expansion limitations, this limitation also lacks a boundary, here an upper one. Yet Mr. Deaner’s trial testimony was that that the biggest

aspect ratio used in the development was around 10 and that there was no successful composition with an aspect ration of 20 or more:

> Q. One of the other things that is in that claim is aspect ratio of the wood fiber being at least about 2, do you see that?
> A. I see it.
> Q. And there is no upper limit on that either in the claim?
> A. There is no limit in the claim. . .
> Q. And in terms of your development of the product here, at least up until the time the application was filed, isn't it true that the biggest aspect ratio you used was maybe about 5 or 10?
> A. Probably closer to 10.
> Q. So you never used an aspect ratio of wood fiber that was 20 or 25?
> A. It's not talked about in the specification. During the first year, we may have.
> Q. Do you recall doing that?
> A. I can't tell you for sure that we did. At one point during the research we did.
> Q. Can you recall whether or not there was any successful compounding of this composite material using a wood fiber that had an aspect ratio of 20 or more?
> A. I don't recall a successful of 20 or more.
> Q. But the claim, as we look at it, covers 2 and up, and perhaps as high as 20 or 30 or even more than that?
> A. Yes.

(April 6, 2005 Trans. at 323-24.)

This evidence, just like that concerning both the Young's modulus and the coefficient of thermal expansion, was not rebutted by Andersen at trial.

### 2. The Evidence Presented at Trial Demonstrated that the Modern Plastics Article Disclosed All of the Limitations of the Asserted Independent Claims of the '553 and '027 Patents and that the Modern Plastics Article Is Enabled.

Fiber Composites' expert, Doctor Mohini Sain, testified that all of the limitations in the asserted claims of the '553 and '027 patents are present in the Modern Plastics article. (April 7, 2005 Trans. at 680-82; *see also id*. at 688-90, April 8, 2005 Trans. at

736-59.) Likewise, Andersen's expert, Professor John Simonsen, also testified that all of the limitations in the asserted independent claims of the '553 and '027 patents are present in the Modern Plastics article. (April 8, 2005 Trans. at 900-10.) When asked, "I gather you're not contesting that the Modern Plastics article discloses the elements that are in those claim charts," Simonsen answered, "I think if you make some reasonable assumptions, then yes." (*Id.* at 900.) After some initial equivocation, Simonsen went on to testify that all elements were present, claim by claim. (*Id.* at 901-10.) Andersen did not contest this evidence with any contrary evidence. Nor did Andersen's attorneys even argue to the contrary during closing. In fact, Andersen's attorney conceded,

> And Fiber Composites' counsel with great flair and drama took a red pen and made check marks on the list saying "everything is disclosed here." And Professor Simonsen said, "in that chart, it's got those words in that chart." Yeah, big flair with check marks.

(*Id.* at 1053.)

Simonsen's testimony also showed that the Modern Plastics article is enabled. Although Simonsen superficially testified that Modern Plastics was not enabled (April 8, 2005 Trans. at 901), the actual substance of his testimony does not support that conclusion. Specifically, as brought out at trial, Simonsen testified at his deposition taken in 2002 that he could made the composite disclosed by Modern Plastics "with a little effort." (*Id.* at 922-24.) Moreover, he admitted that he had not studied the history of extrusion. (*Id.* at 924-26.) Thus, he could not competently testify about what one of

ordinary skill knew at the relevant time.[1] Simonsen also testified that one of ordinary skill in the art in 1974 could easily find an extruder. (*Id*. at 944-45.)

Finally, Simonsen's testimony also showed that the "teaching" provided by the specifications of the '553 and '027 patents is no more detailed than that provided by the Modern Plastics reference. Indeed, the teaching detail that is provided by those patents has to do with the first step of extruding pellets, not the second step of extruding the profile. (*Id*. at 917-21, 941-43.) Thus, if Deaner's testimony shows that Modern Plastics is not enabled because of the lack of detail in what is disclosed, his testimony would show that the '553 and '027 patents are not enabled either.

## II. Argument

### A. The Court Should Rule as a Matter of Law that the '553 and '027 Patents Are Not Infringed Because the Patents Are Limited to Material Made From Pellets.

The Court correctly ruled that the Group I patents asserted by Andersen in this suit required "pelletizing." The Court should now rule that the Group II patents—the '553 and '027—require the same. For this reason, the Court should further rule that Fiber Composites does not infringe these patents.

It is appropriate for the court to revisit claim construction at this time. A district court may always revisit claim construction issues in the context of deciding post-trial motions when objections have been preserved, as they have been here. *See, e.g.*, *Medtronic, Inc. v. Advanced Cardiovascular Sys.*, 248 F.3d 1303, 1308-09 (Fed. Cir.

[1] In fact, Simonsen testified that he was not an expert in this field, until the mid-1990s. (*Id.* at 925.)

2001) ("Medtronic conceded that there could be no infringement under this construction and it did not oppose Defendants' Rule 50(a) motion for judgment as a matter of law ('JMOL'). The district court granted the motion in a detailed opinion explaining its claim construction.").

First, given the specifications of the '553 and '027 patents, as discussed above, their claims cannot cover a product made by a direct extrusion process. Not only is there a complete absence of any such disclosure in the specifications, but these patents actually teach that the only way to achieve the desired result is by pelletizing first. As the Federal Circuit has said with respect to this situation, "[this] is not just the preferred embodiment, it is the only one described." *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.2d 766, 770 (1996).

Further, the prosecution history of these patents constitutes a complete disclaimer of any composite used to directly extrude a final part. Thus, these claims cannot cover a structural element that is directly extruded from such material. As the Federal Circuit has held, "Unambiguous intrinsic evidence in turn provides sufficient input to the rules of claim construction, in particular in this case, the rule that explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim." *Spectrum Int'l, Inc. v. Sterilie Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998); *see also Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ('The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.'); *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) (stating that

the prosecution history, which includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant," limits the interpretation of the claims "so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance").

Finally, as a matter of law, not only are the statements in the prosecution of the parent applications binding in terms of claim construction of the '027 patent claims, but as they involve the same claim terms, the term must be interpreted in the same way as in the earlier '553 patent. *See Abtox, Inc. v. Exitron Corp.*, 131 F.3d 1009, 1010 (1997) ("To properly construe the claims, the district court needed only to focus on the meaning of the claim language 'gas-confining chamber,' as interpreted in light of the specification and the parent application. In this context, there is a proper connection between the microwave and the FR claims. In the parent application, both the microwave and RF claims used the term 'gas-confining chamber.' As issued, both sets of claims still use this term. Although these claims have since issued in separate patents, it would be improper to construe this term differently in one patent than another, given their common ancestry."). Thus, the claims of the '027 patent, including the only asserted independent claim, claim 1, which all use the terms "composite structural member" and/or "composite member" term cannot now be asserted to cover anything but the structure made by solid pellets, which is what Andersen told the Patent Office in the original application and how it defined this claim term in the continuation application which became the '553 patent.

For these reasons, Fiber Composites respectfully requests that the Court now rule that the '553 and '027 patents require pelletizing and, accordingly, because Fiber

Composites does not perform this step, further rule that the patents are not infringed as so construed.

### B. The Court Should Rule as a Matter of Law that the ’553 and ’027 Patents Are Invalid.

The standard of review for granting a motion for judgment as a matter of law pursuant to Rule 50(b) is whether there is sufficient evidence to support the jury’s verdict. *See*, *e.g.*, *Frieze v. Boatmen’s Bank*, 950 F.2d 538, 540 (8th Cir. 1991). In accessing the sufficiency of the evidence, the Court should view the evidence in the light most favorable to the prevailing party. *See, e.g.*, *Voegeli v. Lewis*, 568 F.2d 89, 93 (8th Cir. 1977). The Court may set aside the jury’s verdict if the evidence is “susceptible of no reasonable inference” supporting the jury’s conclusion. *White v. Pence*, 961 F.2d 776, 779 (8th Cir. 1992).

The evidence adduced at trial here is not sufficient to support the jury’s findings on invalidity.

#### 1. The Patents Fail to Satisfy 35 U.S.C. § 112.

Because they are overly broad, the claims of the ’553 and ’027 patents do not teach one of ordinary skill how to make the claimed inventions without undo experimentation, do not contain a complete written description of the invention, and do not particularly point out or distinctly claim the invention. *See* 35 U.S.C.§ 112 ¶¶ 1, 2. Consequently, they are invalid.

##### a. The Claims Do Not Satisfy the Written Description Requirement.

There is not an adequate written description in the specification of the ’553 and ’027 patents to support the claims, because of certain claim limitations’ lack of upper and lower boundaries. *See* 35 U.S.C. § 112 ¶ 1 (“*The specification shall contain a written*

*description of the invention*, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." (emphasis added)).

"[T]he description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed." *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989). In other words, the written description requirement must convey to those skilled in the art that the inventor was in possession of the invention. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). "The invention is, for purposes of the 'written description' inquiry, whatever is now claimed." *Id*.

What is claimed by the '553 and '027 patents are composites that their inventors undisputedly did not invent or possess. Indeed, what is claimed by the '553 and '027 patents are composites that their inventors could not even make. Mr. Deaner admitted these facts on the stand. As shown above, Mr. Deaner testified that the patents' inventors did not obtain results in the range—i.e., to infinity and to zero for the Young's Modulus and the coefficient of thermal expansion respectively—actually claimed.

Accordingly, these patent claims are invalid. As the Federal Circuit has explained, "[t]he purpose of [the written description requirement] is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000) (citing *Gosteli*, 872 F.2d at 1012).

The written description of the ’553 and ’027 patent claims cannot serve this purpose because the patents claim subject matter beyond what was actually invented and what the inventors actually contributed to the art. Accordingly, the Court should rule that the patents are invalid.

**b. The Claims Are Not Enabled.**

For the same reason they do not satisfy the patent law’s written description requirement, the overreaching and boundary-lacking claims of the ’553 and ’027 patents are not enabled by the specification because a person of ordinary skill in the pertinent art could not make or use the claimed inventions without undue experimentation. *See* 35 U.S.C. § 112 ¶ 1 (“The specification shall contain a written description of the invention, *and of the manner and process of making and using it*, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.” (emphasis added)); *see also, e.g.*, *White Consol. Indus. v. Vega Servo-Control*, 713 F.2d 788, 791 (Fed. Cir. 1983) (explaining that a disclosure is not enabled if one skilled in the art must conduct unreasonable experimentation). Thus, the claims of the ’553 and ’027 patents are not enabled.

Moreover, even if the Court were to construe the claims to have a practical upper limit of the Young’s modulus and a practical lower limit of the coefficient of thermal expansion based on the understanding of one of skill in the art, as suggested by the Court at the charge conference (April 8, 2005 Trans. at 956), the claims would still not be

enabled, even if such a construction made them no longer indefinite (*see* Part II.B.3 below). This is because the ’553 and ’027 patents only teach how to make and use the invention within certain ranges of the claimed Young’s modulus and coefficient of thermal expansion limitations. Likewise, the examples in the patents still only show a small fraction of the ranges that would be encompassed even if the Court construed the claims to have certain practical boundaries based on the purported knowledge of one of skill in the art. In short, although Mr. Deaner testified that the claims have certain practical limits, the patents themselves do not show how to make and use the inventions even up to those practical limits.

Mr. Deaner testified that it was very difficult, if not impossible, to make composites with those “practical” performance characteristics. (*E.g.*, April 6, 2005 Trans. at 302-03.) Deaner and his colleagues certainly never achieved such results. For example, Deaner explained that the Young’s modulus cannot be greater than about 1.5 million for a composite of plastic and pine because the Young’s modulus for wood is about 1.5 million.[2] (*Id*. at 316-19.) Yet, the highest Young’s modulus that Deaner and his co-inventors actually achieved was about 1.1 to 1.2 million and Deaner agreed that there were “only very few of those.” (*Id*. at 316.) Thus, even if the ’553 and ’027 patent claims were construed to have a “practical” upper limit of the Young’s modulus of about 1.5 million (for pine) or 2.0 million (for any wood species) the patents do not teach how

[2] Deaner initially testified that the Young’s modulus was 1.5 million for wood, but then corrected himself to say that it was actually 1.5 million for Pine, but closer to 2 million for other wood species, such as oak. (*Id*. at 316-19.) Deaner and his co-inventors only worked with pine, however, not oak. (*Id*. at 319.)

to reach these results. Accordingly, they are not enabled, regardless of whether or not the Court also concludes that they are indefinite, as discussed just below.

**c. The Claims Are Indefinite.**

Finally, the ’553 and ’027 patents fail to satisfy the definiteness requirement of section 112 paragraph 2 because the claims do not particularly point out and distinctly claim the invention. *See* 35 U.S.C. § 112, ¶ 2 (“The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.”).

To satisfy this requirement, the claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim. *See Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993). The test for whether a claim meets the definiteness requirement is “whether one skilled in the art would understand the bounds of the claim when read in light of the specification.” *Process Control Corp*. v. *HydReclaim Corp*., 190 F.3d 1350, 1358 n.2 (Fed. Cir. 1999) (internal citations omitted).

That test is not satisfied here, and the claims are, therefore, indefinite and invalid. All of the claims lack upper and lower bounds for two to three claimed limitations. Nothing in the claims or the specification tells anyone, whether of skill in the art or otherwise, where the line is drawn. This is the very definition of the lack of a boundary. No deed written this way could perform the function of clarifying the bounds of a property right. The same is true with the ’553 and ’027 patents.

**2. The Patents Are Anticipated Under 35 U.S.C. § 102.**

As the uncontroverted evidence at trial proved, the Modern Plastics article discloses each and every element of the asserted independent claims of the ’553 and ’027 patents. *See* 35 U.S.C. § 102(a) (“A person shall be entitled to a patent unless . . . the invention was . . . described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent . . . .”). Therefore, the Court should rule that the patents are invalid as anticipated. *See Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 715 (Fed. Cir. 1984).

Andersen’s only argument that the Modern Plastics article does not anticipate the claims of the ’553 and ’027 patents is that this prior art reference is not enabled. As demonstrated, the evidence at trial showed that the reference was in fact enabled. Moreover, Andersen should have had the burden of proving the nonenablement of Modern Plastics and Fiber Composites should not have had the burden of proving enablement. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1385, 1354-55 (Fed. Cir. 2003).

In *Amgen*, the Federal Circuit held that an accused infringer is entitled to the presumption that a prior art patent asserted against a plaintiff in support of an invalidity defense is enabled. *See id.* Although a prior art printed publication was not even at issue in that case, the court also volunteered “that by logical extension, our reasoning here might also apply to prior art printed publications as well.” *Id.* at 1355 n.22 (declining to decide the question since the reference at issue was a prior art patent). This strong

suggestion by the Federal Circuit indicates that Fiber Composites should also have been entitled to the presumption in this case that the Modern Plastics reference is enabled.

Given such a presumption, there is no question that Andersen failed to rebut it at trial and prove that Modern Plastics was not enabled. Andersen's only evidence that this reference was not enabled was Professor Simonsen's testimony. But Simonsen was not capable of providing competent testimony about whether one of skill in the art could have made the products disclosed in Modern Plastics without undue experimentation. This is because he admitted he was not such a person. (April 8, 2005 Trans. at 924-26.) Therefore, the Court should rule as a matter of law that the '553 and '027 patents are invalid as anticipated by Modern Plastics.

## III. Conclusion

For the reasons shown above, Fiber Composites respectfully requests that the Court grant its renewed motion for judgment as a matter of law that the '553 and '027 patents are not infringed and are invalid pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.

Dated: June 16, 2005

FISH & RICHARDSON P.C., P.A.

By: s/Katherine A. Moerke

Katherine A. Moerke (#312277)
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 335-5070

John M. Skenyon
Michael E. Zeliger
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804
Tel.: (617) 542-5070
Fax: (617) 542-8906

Attorneys for Defendant
FIBER COMPOSITES, LLC.