# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Andersen Corporation,

Plaintiff,

v.

Fiber Composites, LLC,

Defendant.

CIV NO. 00-CV-2548 JEL/JGL

---

**EXPERT REPORT OF DR. JOHN SIMONSEN IN REBUTTAL TO EXPERT OPINIONS AND TESTIMONY OF FIBER COMPOSITES' EXPERT DR. MOHINI SAIN**

---

## INTRODUCTION

I have been retained by counsel for Andersen Corporation to provide analysis and opinions related to the inventions and teachings of U.S. Patent Nos. 6,015,612 ("the '612 Patent"); 6,015,611 ("the '611 Patent"); 5,932,334 ("the '334 Patent"); 5,827,607 ('the '607 Patent"); 5,486,553 ("the '553 Patent"); 5,539,027 ("the '027 Patent"); to respond to the analysis and opinions contained in the Report of Dr. Mohini Sain, including providing analysis and opinions regarding the teachings and disclosures in the prior art, including the prior art identified or relied on by Fiber Composites and Dr. Sain; and to provide analysis and opinions regarding Fiber Composites' defenses as those defenses have been explained by Fiber Composites in the course of discovery in this case, or by Dr. Sain.

12. The file history for the '612 Patent;

13. various alleged prior art references identified by Fiber Composites in its Prior Art Statement;

14. The Complaint & Answer filed in this case (including Amended versions of those documents);

15. The deposition testimony of various witnesses, including: Michael Deaner, Kurt Heikkila, Joe Puppin, Michael Koenig, Jack Piepel, and Donald Garofalo;

16. The Court's Claim Construction Order;

17. The Report of Dr. Mohini Sain;

18. The Report of Gardner & O'Neill on the Manufacture and Testing of Rigid PVC-Wood Composites;

19. Fiber Composites' Prior Art Statement including the references cited in that Statement;

20. Andersen's Response to Fiber Composites' Prior Art Statement.

21. Portions of Robert Harmon's Treatise Patents and the Federal Circuit, the Supreme Court's decision in Graham v. Deere, various statutes governing the validity of patents including 35 U.S.C. §101, §102, §103, and §282.

22. The Declaration of Douglas Gardner filed in Support of Fiber Composites' Motion for Partial Summary Judgment;

23. Portions of the deposition testimony of Dr. Mohini Sain;

24. Various additional documents produced by either Fiber Composites or Andersen in this case.

My review of materials in this case is continuing, and I expect that review to continue up to and possibly through trial. Therefore, I reserve the right to supplement this Report and my opinions based on that continuing review. In particular, there is one reference cited in the Expert Report of Mohini Sain that remains untranslated and I specifically reserve the right to respond to such

from invalidating any of the asserted claims. I have not addressed all of these missing elements here, but I do rely on all the deficiencies I have identified in my review in reaching these conclusions.

**1. Wuorela, WO 90/08020, "Process of Producing A Wood-Plasctic Agglomerate and Use Thereof;**

In my opinion, the Wuorela PCT patent neither anticipates nor renders obvious any of the asserted claims. Dr. Sain has only cited the Wuorela PCT patent against the '607 and '334 Patents. That wood can be used as a filler in plastics was not a novel idea in the early 1990's. Wood has been used as a filler in plastics, both thermoset and thermoplastic, since the dawn of the plastics age. Andersen does not purport that adding wood to a thermoplastic is novel or was patentable in the 1991-92 timeframe. Neither does the Wuorela patent make this claim. Wuorela is addressing the problem of how to utilize plastic film as a raw material for wood-filled thermoplastics. To this end his process requires "moist" wood, of higher moisture content than the Andersen patents.

While Wuorela makes reference to using an extrusion process, in my opinion, he has described only a method of chopping up plastic film and mixing it with wood. In addition, there is no information on the aspect ratio of the wood component. In general, Wuorela discloses only producing a mix of materials, it does not teach one of skill in the art how to produce a WPC that can be used to extrude something else that's advantageous. Nothing in the Wuorela reference would teach one of skill in the art how to manufacture a WPC using an extrusion process, especially a WPC with good dispersion of the fibers in the material. Further, since the disclosed process takes the wood from a very high to a very low moisture content using heat, there would be a significant risk of discoloration of the material.

2. **Fill Thermoplastics with Wood (Modern Plastics, May, 1974)**

In my opinion, this article neither anticipates nor renders obvious any of the asserted claims. First, nothing in this article discloses whether the wood and PVC components are measured by weight or by volume. One of skill in the art would need to know this in order to obtain the material with the properties described in this article. Second, nothing in this article tells one of skill in the art what type of wood to use - there is no information on dimensions, aspect ratio, or moisture content. Third, nothing in this article tells one of skill in the art how to process this material. In fact, the article makes reference to a "undisclosed compounding step", which could, in addition to obvious undisclosed processing, mean that additional undisclosed components are used. The article provides no assistance to those of skill in the art in manufacturing the described Sonwood composite. In addition, I note that contemporaneous testing of a Sonwood sample by Andersen shows a lower MOE than that reported in the Modern Plastics article. A061390-93. This is suggestive that the Sonwood process may not have produced material with the properties reported in the Modern Plastics article. The fact that similar results in WPCs using PVC were unknown to me until the early 1990s further suggests that the article did not enable the manufacture of the alleged Sonwood composite.

The 1974 article discloses that the wood component is "wood flour." While there has been an emerging consensus among those who practice with WPCs as to the aspect ratio of "wood flour" and "wood fiber," at the time the Modern Plastics article and as of the date the Andersen patent applications were filed, there was no such consensus among those of skill in the art. For example,

patents filed roughly contemporaneous with the Andersen patent applications frequently chose the term "fiber" to refer to a filler with an aspect ratio between 2 and 4. For example, the Hopperdietzel patent relied upon by Fiber Composites and Professor Sain described cellulose fibers as having an aspect ratio of between 2 and 10. Patent No. 4,851,458 col. 2, ll. 21-30. One of skill in the art would understand, however, that a reference to "wood flour" indicated something of lower aspect ratio than "wood fiber."

In addition, I note that Andersen witnesses who have testified regarding the definition of "wood flour," including those who were involved in the early research on WPCs within Andersen during the 1970s, have all testified that "wood flour" was a dimensionless, meal-like substance. Koenig Depo., p. 41, l. 9-15 (equating "wood flour" with the "flour you use to bake bread")(April 2, 2002); Deaner Depo., p. 31, l.9-16 (differentiating "wood dust" or "wood meal" composites from "wood fiber" composites) (May 22, 2002); Puppin Depo., p. 25, l. 17 (describing flour as "a very small particle of wood")(May 23, 2002); Piepel Depo., p. 34, l. 8-10 (describing "wood flour" as having the consistency of "wheat flour")(February 22, 2002); Garofalo Depo., p. 13, l. 15-19 (describing "wood flour" as similar to "bread flour" and "nonstructural")(July 3, 2002).

**3. DE 2042176**

This patent from the German Patent Office is cited by Dr. Sain only against the '553, '027, and '607 Patents. It is not cited against the '334, '611, and '612 Patents. This patent does not disclose either a modulus or coefficient of thermal expansion value within the scope of the Andersen patents. Moreover, the disclosed processing temperature is below the melt temperature for typical extrusion-grade PVC.

4. **U.S. Patent No. 4,851,458 (Hopperdietzel)**

Dr. Sain relies on this reference for all of the Andersen patents. In my opinion, this patent neither anticipates nor renders obvious any of the asserted claims of the patents against which Dr. Sain cites this patent. This patent discloses the use of very small diameter fibers (typical of those used in the manufacture of paper), and even makes reference to the problem of larger fiber sizes "knotting" in the polymer. In addition, the teachings of this patent would persuade me as one of skill in the art to avoid, that is not pursue, a wood-filled PVC composite. The inventors teach the use of only pure cellulose while citing the disadvantages of using wood. Patent No. 4,851,458, col. 1, l. 55; col. 4, ll. 1-15. Wood is approximately 50% cellulose, and, in fact, the first claim requires 99.5% cellulose. The teaching of this patent is to reduce heat shrinkage. The inventor assumes everyone knows you can do that by adding wood, then describes how using 99.5% cellulose as opposed to wood gives lowered heat shrinkage without any loss in appearance to the final product. He also describes how using wood instead of cellulose produces an inferior product for the applications he has in mind (furniture). The inventor is telling you not to use what's used in the Andersen patents. Heat shrinkage is related to thermal expansion, but the teachings in this patent would not allow one of skill in the art to predict the coefficient of thermal expansion of a WPC used in a structural application.

5. **"Processing conditions and coupling agent effects in polypropylene/wood flour composites," M. Xanthos, 3 *Plastics & Rubber Processing & Applications* (1983).**

Dr. Sain relies on this article only for purposes of the composite composition patents. I note, however, that Dr. Sain is not offering any opinion as to the validity, whether by anticipation or

obviousness, as to the '334, '607, or '611 Patent. Sain Depo., at 134-136 (August 21, 2002) [1]. In my opinion, this article neither anticipates nor renders obvious the asserted claims of the Andersen patents. This article teaches the use of polypropylene (PP). There are no disclosures in this article on the use of PVC. Further, this article teaches that strength properties much below those disclosed and claimed in the Andersen patents are achieved with the use of coupling agents. The Andersen patents disclose a composite material that does not use coupling agents. Finally, this article does not teach the use of wood fibers, it talks about using "reeds," which I understand would be bamboo.

6. **The Efficiency of Cellulosic Fillers in Common Thermoplastics. Part 1. Fillings without Processing Aids or Coupling Agents,**" C. Klason, J. Kubat, H.E. Stromvall, 10 ***Int'l J. Polymeric Materials*** 159 (1984).

Dr. Sain relies on this article for purposes of the composite composition patents. I note, however, that Dr. Sain is not offering any opinion as to the validity, whether by anticipation or obviousness, as to the '334, '607, or '611 Patent. Sain Depo., at 134-136 (August 21, 2002). In my opinion, this article neither anticipates nor renders obvious any claim of the Andersen patents. This article does not teach the use of PVC. While there is mention of the use of PVC in composite materials, all of the examples the authors tested and reported on in this article involve different polymers. Furthermore, in my opinion, the authors' acknowledgment about the quantity of information in the literature reinforces my earlier point: one of skill in the art would not simply substitute one polymer for another, or a different type of wood component for another and expect

[1] The cited deposition transcript of Dr. Sain is the rough draft, and the pagination may change once the final transcription is made.

to get the same, similar, or even close results. For this reason alone, one of skill in the art could not combine the PVC in the 1974 Modern Plastics article with the Klason article and get the asserted claims of the Andersen '612 Patent. The quantity of information in the literature confirms that advances in the field of WPCs are the result of experimentation, trial and error, and both basic and applied scientific investigations (including unexpected results and properties) on specific wood-polymer systems.

- **Obviousness (Section 103).**

Since hindsight is not allowed in deciding obviousness, let's look at the business and scientific situation that existed in the early 1990's. Some background: During the decade of the 1980's, scientists and regulators began to realize that our landfills were producing hazardous waste streams as rainwater percolated through the landfill. These hazardous wastes then threatened to flow underground into the drinking water aquifers of nearby cities. This prompted a revision in landfill technology, with a resulting drastic increase in disposal rates. It also gave rise to a general sense in the population that existing landfills were closing and the political process involved in obtaining a permit for a new landfill was prohibitive. This in turn precipitated an intense search for alternatives to landfilling. Recycling became a household word. One answer to the problem of what to do with discarded plastics came about in the mid to late 80's from Rutgers University. It was called plastic lumber and consisted of mixed waste plastics that had been melted and extruded into the shape of dimension lumber: 2X4's, 4X4's, etc. This (all-plastic) plastic lumber had poor properties, but gained much notoriety because it was "green," meaning environmentally benign. Academic researchers saw this as an important research topic, and many were drawn to investigate ways to improve the properties of these materials.

be made available for inspection prior to trial at a time that I expect will be agreed upon between counsel for the parties.

---

I declare under penalty of perjury that I have personal knowledge of the foregoing unless otherwise stated and that the foregoing is true and correct and if called as a witness, I could and would testify to the truth of these matters.

Dated: Aug 23, 2002

John Simonsen