# EXHIBIT 5

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Andersen Corporation, ) Civil No. 00-2548 (JNE/JGL)
)
Plaintiff, ) St. Paul, MN
) April 8, 2005
vs. ) 9:00 a.m.
)
Fiber Composites, LLC )
)
Defendant. )

---

VOLUME IV
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOAN N. ERICKSEN
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiffs: RONALD J. SCHUTZ, BECKY R. THORSON, NICHOLAS S. BOEBEL, MISTI NELC
Robins, Kaplan, Miller & Ciresi
800 LaSalle Avenue
Suite 2800
Minneapolis MN 55402

For the Defendant: JOHN M. SKENYON, MICHAEL E. ZELIGER, KATHERINE A. MOERKE
Fish & Richardson
3300 Dain Rauscher Plaza
60 South 6th Street
Minneapolis, MN 55402

Court Reporters: Maria V. Weinbeck, RMR
Myrina Kleinschmidt, RMR





THE COURT: All right. Is the machinery working, do you think?

MR. SKENYON: It's a new world record, continuous streaming here compared to yesterday. It's been running for a while.

THE COURT: Okay. Should we bring the jury in?

MR. SCHUTZ: Yes, Your Honor. I just want to make a point for the record here. I've been told by the person that we have on-site that Professor Sain has only until 11 o'clock available. And I don't know what his conflict is, it's never been said; but depending on the length and the technical difficulties, I have some concern that I'm not going to get a chance to cross-examine him or I'm going to be cut to a short amount of time. I don't know when he might come back.

I have a problem with my expert. Professor Simonsen's mother went into the hospital two days ago. She had an adverse reaction to chemotherapy as a result of lung cancer. And she's had renal failure. And he really -- I can't risk having the possibility that he might not be able to come back here to testify.

MR. SKENYON: I would suggest this, if that's the case for Dr. Simonsen, that what we can do is finish up with Professor Sain and Professor Gardner who is the





next expert witness, and we'll let them take Simonsen out of turn today.

THE COURT: All right. Don't you think we can get done with Professor Sain in two hours?

MR. ZELIGER: I've spoken with Professor Sain, he has a teaching commitment, but that 11:00 o'clock time is not a hard number. And I've worked with him, and we've made every effort to shorten the direct as much as possible.

THE COURT: Okay. All right. That's great. Bring the jury in.

You know, I did fire that juror.

MR. SCHUTZ: I assumed so.

THE COURT: Yeah, I know you assumed that. And I don't really know what the story was; it was -- I got it third-hand. Something about she doesn't have a phone. She didn't want to leave her children to go next door and use the neighbor's phone. The children are eight and ten. I chose not to do any more inquiry. I just had her told she doesn't have to come back.

THE COURT: Mr. Zeliger, are you ready to go ahead? I see we have Professor Sain on the screen.

MR. ZELIGER: Yes, we are ready, Your Honor.

THE COURT: You know, is there -- Do you know is there a back-up telephone line?





MR. ZELIGER: We have a telephone as a back-up.

THE COURT: Are we going to be hearing from him over the Internet primarily or is the video going to be Internet and the audio telephone?

MR. ZELIGER: We will do it by Internet only unless and until we have a problem.

THE COURT: Okay. Dr. Sain, you are still under oath from yesterday. Were you able to hear that?

MR. ZELIGER: He isn't hooked up.

THE COURT: Dr. Sain, you are still under oath from yesterday, are you able to hear that?

MR. ZELIGER: Please remove your telephone.

THE COURT: You do it this time.

BY MR. ZELIGER:

**Q Professor Sain, do you remember you're still under oath from yesterday? You have to turn on your polycom audio. Not your telephone, just the polycom audio.**

A Well -- the polycom is on, yes.

**Q And turn off your telephone, please. Now, you have to turn up the volume on the polycom because when you turn your telephone off we're no longer getting audio. Try it again.**

**All right. We'll switch to the tele -- Use your telephone audio only. Can you hear us, Professor**

**continuous phase; correct?**
A Correct.
**Q You could look for a month of Sundays and you won't find those words in the Modern Plastics article; correct?**
A I agree.
**Q And so in of both those circumstances where it talks about in organic phase and dispersement, you just say that's inherent even though the words --**
A Yes.
**Q Even though words are not in there, correct?**
A Yes, that's correct.
**Q Professor Sain, there is no author listed on the Modern Plastics article; correct?**
A It's anonymous.
**Q It's an anonymous article, correct?**
A Yes.
**Q You never made any attempt to find out who the author of the Modern Plastics article was, did you?**
A I did not because Modern Plastics is a (inaudible) journal; therefore, they must have some author. I know that.
**Q But you never made any attempt to find out who?**
A No, I never made any effort to find out.
**Q So there is nobody that you could question or**





**nobody listed that I could question asking where this information came from; correct?**
A I definitely could because Modern Plastics article is a (inaudible) journal, (inaudible) journal, and therefore --
**Q Professor Sain, you need to slow down and give that answer again. I'm sorry. The court reporter did not get it. Could you give the answer again, please?**
A Yes. In my opinion, Modern Plastics, the (inaudible) journal; therefore, any article to have some validity before it's admitted. It's my opinion.
**Q And yet nobody put their name on this article; correct?**
A Yes, it's anonymous.
**Q Did you ever contact Sonesson, the company that supposedly manufactured some product described in this article?**
A No. I have never done that.
**Q The article makes reference to something called "Sonwood," do you recall that?**
A I see that they mentioned that, but it doesn't refer to my asserted claim.
COURT REPORTER: I didn't get that.
**Q He said it doesn't refer to his asserted claims.**
A Yes.
**Q I understand that, but you made no attempt to**





**obtain a sample of Sonwood; correct?**
A No, I did not because it is not my objective.
**Q Now, Professor Sain, I would like to move on to the second part of what we talked about a little earlier, and that is that the teaching part of this article. Are you with me?**
A Yes.
**Q This article makes no reference to the type or brand of extruder used to produce any sample or wood plastic composite; correct?**
A The first part of the article that does not, but it is also not in the asserted claim.
**Q I'm sorry. I understand the article is not. There is no mention in here of how to make the product; correct?**
A They say I tried to look at the asserted claim and I tried to find out the disclosure. Therefore, I didn't want to see how they are made because then it will be not in the asserted claim, so that was not my objective.
**Q I understand that, Professor Sain, but it's a requirement that there be at least a teaching so that one could make this product. You understand that?**
A I understand that.
**Q So I'm trying to determine if there is any teaching in the Modern Plastics article about how to make the**





**product.**
A Okay. Let's refer back to the Modern Plastics article. And if you look at Modern Plastics article, you will see that this says that they have some patent application on the broad sense.
**Q Okay. And, so, but the article itself, if you have to look at the article itself, you can find no teaching in the article itself; correct?**
A As I say, the asserted claim doesn't call for any of the teaching of the processing, but the Modern Plastics article refers to the particular patent, and that refers, if you want you can go and get the teaching from there.
**Q Well, it doesn't mention any patent by number; correct?**
A No, you can search that and find it.
**Q It doesn't mention any patent, in fact, the year it was filed, makes no reference as to what patent it's talking about; correct?**
A As I say, that you could research the first patent and if you go back to the patent to find the prior art, you will be able to find the patent.
**Q But my point still remains, Professor Sain, that in the article itself --**
A Yes.
**Q There is no teaching; right?**

A Teaching is inherent in the article.
COURT REPORTER: What?
**Q Teaching is what? Inherent in the article?**
A Yes.
**Q In fact, what the article does is refuses, refuses to say what or how the product is made; correct?**
A I -- I didn't get -- would you repeat your question.
**Q Doesn't the article in fact hide from the readership how to make the product?**
A I do not think so because any article if they have a patent by under process, I think they refer back as a prior art. And it is different in the article that they have five patents on the broad sense.
**Q Okay. What patent number would that be, Professor Sain?**
A Well, I don't recall exactly what. I think that one of the patents, if I can recall, is called, I think, Bowman is an example of that.
COURT REPORTER: I didn't hear that.
**Q I think he said, "Bowman would be an example"?**
A Yes.
**Q You didn't discuss any of that in your report; correct?**
A I did not discuss that in my report because at that point in time I was going through all those information.





**Q So you have never provided us a report as required under the Federal Rules of Civil Procedure with an analysis of any patents?**
A No, because --
MR. ZELIGER: Objection.
THE COURT: Professor Sain, hold it. Stop. Stop. Stop. Dr. Sain, stop.
MR. SCHUTZ: Stop there's an objection.
THE COURT: Just rephrase the question.
MR. SCHUTZ: Yeah, he cut me off before I even finished asking the question.
BY MR. SCHUTZ:
**Q Let me ask the question, Professor Sain. You made a reference to a patent, the Bowman patent, did you say?**
A Right now, yes, I said, yes.
**Q You had nothing in your report about the Bowman patent; correct?**
A Correct.
**Q Now, back to my point that the article itself hides from the readers how to make the product. I would like you to look at the article. Do you have it in front of you?**
A Yes.
**Q And just so we're clear with a little context, the article talks about products from two companies; right?**





A Yes.
**Q The first one is a company, I think it's called a G.O.R.; correct?**
A Correct.
**Q The other company is a company called Sonesson; correct**
A Correct.
**Q The part of the article about the product from G.O.R. has nothing to do with your opinion; correct?**
A No, nothing to do with my opinion.
**Q And because it's completely different. It's made out of a different product; right?**
A Right.
**Q So even though the article may look like it is two pages much less than the two pages actually relate to Sonesson; correct?**
A That's all it provides.
**Q Now, let's look at what the article says about Sonesson. If you look at the page that has the table on it. Are you there? I believe that -- I don't know if there's a page number on it, but it's basically the second page of the article. Are you there?**
A Yes.
**Q In the left-hand column, it says "two types of extrusion"; right?**
A Are you looking at the text?





**Q I'm looking at the text, yes. The paragraph that's headed "Two Types of Extrusion", do you see that?**
A Just a moment. Is it the far column or the second column?
**Q It's the first column, please.**
A Okay. Two types of extrusions, yes. I've got it.
**Q About halfway down that first paragraph, it says, "While G.O.R." -- and we really don't care about G.O.R.; right?**
A No, I don't.
**Q "Combines conventional compounding with proprietary extrusion process, Sonnesonplast," and that's who we do care about; right?**
A Yes.
**Q "Adds an undisclosed compounding step"?**
A Yes.
**Q And "then processes the material invented extrusion equipment used for PVC processing," do you see that?**
A Yes.
**Q And it goes on to say "patents have been applied for in the process for making Sonwood, the trade name for the product," do you see that?**
A Yes, I do.
**Q And that is all this article says about how you make the product, correct?**

A Right.
**Q And you knew this at the time you did your report; correct?**
A What I knew?
**Q Well, you had read this article at the time you did your report?**
A Yes, I did. And I read this, and (inaudible) so I agree with you, I knew that, but it doesn't prevent me to go and look because as a scientist, I will always go and look at whatever information they give in the patent, so I tried that after that, and I found it.
**Q And, but you never told us about that, did you, Professor?**
A No, because at that point, I didn't have that information with me. I didn't read that information at that time.
**Q Right. I understand that. You didn't put it in your report. But we have rules that people are supposed to follow so we're --**
THE COURT: That's -- rephrase that.
MR. SCHUTZ: I'm sorry, Judge. I just didn't catch that.
THE COURT: The objection is with respect to --
MR. ZELIGER: The rules.
THE COURT: The Rules. So if you could just





get the facts from him. Thanks.
BY MR. SCHUTZ:
**Q Anyway, we never had an opportunity to see any opinion you had about some patents that there is no number for or no names on; right?**
A Yes, because I, in my position, I mentioned that I continue to (inaudible).
**Q Slow down. You have to slow down. Start over, Professor Sain.**
A Yes, excuse me, I continued to look at a document and start (inaudible) by two of my knowledge even after study, and it doesn't necessarily mean that it has to be with the context or without the context.
**Q When you applied for your patent --**
A Yes.
**Q You had to tell the patent office how to make your invention, right?**
A I don't doubt them.
**Q You did not tell them how to make your invention?**
A I said, yes, I'm sorry, I can't hear you. What is the question please? Can you repeat?
**Q Yes. When you went to the United States patent office?**
A Yes.
**Q And applied for your patent?**





A Yes.
**Q You told the patent office and disclosed --**
A Yes.
**Q -- how to make your invention, correct?**
A Yes, I disclosed with my knowledge how that it is my invention, yes, I testified to that.
**Q Yes. And how to make your invention?**
A How to make my invention, yes.
**Q Yes. That's a rule to get a patent, you have to teach how to make the invention; right?**
A Yes. It is.
**Q You could not go to the patent office and say, "I want an invention, but there's a step that I'm not going to tell you about." You can't do that, can you?**
A No, I don't.
**Q Because the patent office would say, "I'm sorry, but you have to tell us how or we won't give you the patent", right?**
A I agree.
**Q Now, would you also pull out, if you have in front of you, the Exhibit 1, Plaintiff's Exhibit 1 which is the Deaner '527 patent. Okay.**
A Yes, that's the patent '527. Right?
**Q Yes. Do you have that please?**
A Yes.





**Q And I would like to have the Modern Plastics article close at hand because I'm going to ask you questions about both of these, all right?**
A Yes.
**Q And what you are saying is that this article from Modern Plastics?**
A Yes.
**Q Invalidates this patent; correct?**
A Not all the time. Asserted claims. That's what I said.
**Q Okay. The asserted claims of this patent?**
A Yes.
**Q All right. Would you turn to the patent at column -- let's start at column 6. Would you go there?**
A Column 6, yes.
**Q Right. And if you would look at column 6 at about line 20.**
A Yes.
**Q And in the patent, Mr. Deaner and his co-inventors talk about an extruder device, and they give a specific brand name of the manufacturer of an extruder, do you see that?**
A Yes.
**Q Can you find reference to any brand name of an extruder in the Modern Plastics article?**

A I am referring to the asserted claims, so, therefore, asserted claims doesn't give any reference to extruder or the extruder brand name so therefore, I think that --
**Q Would you slow down again.**
A Okay. I look at asserted claims by Andersen in the claims.
**Q Slow, slow, slow.**
A I don't see any extruder name or extruder ties, so therefore I don't think that is relevant to the asserted claim invalidation.
**Q To make the extruded structural member, do you need an extruder?**
A Sure, I do.
**Q And so to make whatever it is that was in the Modern Plastics article, do you need to use an extruder?**
A Yes.
**Q But they don't tell you anything about the extruder, do they?**
A Well, as I said, again, I don't want do go back to my earlier answer. In my earlier answer, you have to look at the Modern Plastics article very carefully. They said that they have applied for patent for the process, for the process, and I think that someone will be able to define that, and to be diligent enough to get





that information.
**Q Okay. Professor Sain, if -- and you, when you went to get your patent, you had to tell the patent office how to make whatever it was that you claimed; correct?**
A I agree.
**Q And when Mr. Deaner and his co-inventors went to the patent office, they had to tell the patent office how to make what it was that they claimed; correct?**
A I agree.
**Q And if you -- and you understand again patents are presumed valid; correct?**
A Yes.
**Q And they can only be proved invalid by clear and convincing evidence, you understand that, correct?**
A I do.
**Q And do you understand that the rules in invalidating a patent are basically the same as for getting it in terms of what has to be taught; right?**
A I didn't hear your question, would you please repeat.
**Q To get a patent, you have to teach how to make what's in the claim, do you understand that, correct?**
A Yes.
**Q And the converse of that rule which is if you want to kill the patent with an article like Modern Plastics,**





**you need to teach how to make what's set forth in the article; right?**
A Well, it is inherent in the article inherent that teaching is that definitely, I agree.
**Q But there's nothing in this article about an extruder or the type of extruder used to make whatever is being talked about in this article; correct?**
A Again, I will go back to my other answer.
**Q Let's go on just a little farther in this patent. And let's look toward the bottom of column 6?**
A Yes.
**Q And it talks about blending the fibers, how they're introduced into a twin screw extrusion device, that it's got a mixing section, transport section, it's got heat profiles. It talks about the extruder rate, the initial temperature, lots of details like that; correct?**
A Correct.
**Q No details like that can be found in the Modern Plastics article; right?**
A I'm asserting that I'm looking at the claims asserted and in their claims asserted by Andersen, there is no such information at a level, so therefore, I did not try to examine that.
**Q But I'm talking about the Andersen patent, and the Andersen patent teaches how to make their claimed**





**product?**
A Yes. But I'm looking at asserted claims. Claims doesn't give any specific extrusion or extrusion required or the temperature or anything like that.
**Q Okay. Do you think that if Andersen went to the patent office and they sent in one piece of paper and it just had the claim with some physical properties?**
A No, I don't ever (inaudible) paper, I agree.
**Q Okay. So you have to give detailed information to the patent office before you can get a patent?**
A I agree.
**Q And you have to give a lot -- you have to have a lot of detailed information and a piece of prior art before you can kill a patent?**
A I agree.
**Q But there is none of that detail in the Modern Plastics article?**
A I'm not saying that. I don't think that I give an opinion on that. I'm not brought up into (inaudible.) I think the teachings are there.
**Q Well, show me in the Modern Plastics article where it talks about the temperature profiles through the length of the extruder?**
A As I said before, that it is interesting that when you make a profile, you have to have an extruder, you

SHEET 1 PAGE 1036

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---------------------------------------------------

Andersen Corporation, ) Civil No. 00-2548 (JNE/JGL)
)
)
Plaintiff, ) St. Paul, MN
) April 11, 2005
vs. ) 9:00 a.m.
)
Fiber Composites, LLC )
)
Defendant. )
)

---------------------------------------------------

VOLUME V
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOAN N. ERICKSEN
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiffs: RONALD J. SCHUTZ
BECKY R. THORSON
NICHOLAS S. BOEBEL
MISTI NELC
Robins, Kaplan, Miller & Ciresi
800 LaSalle Avenue
Suite 2800
Minneapolis MN 55402

For the Defendant: JOHN M. SKENYON
MICHAEL E. ZELIGER
KATHERINE A. MOERKE
Fish & Richardson
3300 Dain Rauscher Plaza
60 South 6th Street
Minneapolis, MN 55402

Court Reporters: Maria V. Weinbeck, RMR
Jeanne M. Anderson, RMR

PAGE 1037

1037

THE COURT: Do you all recieve the jury instructions?
MR. SKENYON: Yes, Your Honor.
THE COURT: And they're all fine with you basically?
MR. SKENYON: Yes, Your Honor.
THE COURT: Mr. Skenyon, I heard that you had an issue about the amount on the verdict form, is that resolved?
MR. SKENYON: Well, I think so. Mr. Schutz is going to just tell them what number to fill in. That number isn't really very much in dispute. That's resolved.
THE COURT: Okay. I have one, maybe two things on my mind. You look like you might have something on your mind. Why don't you go first.
MR. SKENYON: The other issue on the verdict form. On the form that we had proposed, we had an instruction, I think, that said if they decided a claim was anticipated, you don't decide obviousness with the claims. It's an either or proposition. And on the verdict form we have here, it looks like they decide anticipation and then go on to obviousness.
THE COURT: And you do not want them to decide, similar to damages, you don't want and

PAGE 1038

1038

alternative verdict --
MR. SKENYON: No, I think that creates a possibility of an appeal issue that shouldn't exist, if that's so. And I think what will be satisfactory would be if the Court just instructs them on that. I'm willing to ask them not to do that in my closing.
THE COURT: Okay.
MR. SKENYON: But basically it would be a problem to say, for example, claim 1 is anticipated and claim 1 is also obviousness. That's not how the evidence came in and so we would --
THE COURT: Okay. And do you have some language that you would like or just is it the concept? I'm happy to do it either way.
MR. SKENYON: Just the concept.
THE COURT: All right. That's good. Anything else?
MR. SKENYON: No, that's all.
THE COURT: Ms. Thorson, what about you?
MS. THORSON: Your Honor, I want to confirm that the objections that were made on the record at the charge conference are preserved.
THE COURT: For both sides, yes.
MS. THORSON: And then as to the special verdict form, we would like to object to the inclusion

PAGE 1039

1039

of the enablement instruction and the written instruction for the same reasons we objected to the jury instruction.
MR. SKENYON: I do have one more issue. And it's the Court's preference in the closing, I may use parts of the trial transcript. I'm not sure whether the Court has any preference whether I do so or not. It depends on what Mr. Schutz says.
THE COURT: Well, my natural preference is to not prefer it just because it increases the likelihood that the jury will think that there's a transcript available. Now if you have it incorporated into your closing and you want to do it, could you just say something like I've got part -- can you add some words that will protect me from --
MR. SKENYON: Yes. A request.
THE COURT: A request. And it's not so bad if they get a request, but it's a little hard to say there's not transcript, if they've already been read part of a transcript. What I don't want to do is have to give them a full transcript of the trial.
MR. SKENYON: I understand that, but I think because of the problems transcribing parts of it -- I think --
THE COURT: Well, they know it's being

column is exactly the same matchup we just showed you with Modern Plastics. The column on the right-hand side is what we did, particularly in that period of time from the time they brought suit, post, until December 31, 2000. And that is how we match up. We extruded the railing, without question.

It is, according to Mr. Mancosh, about in the neighborhood of 725,000, that is the modulus. The coefficient of expansion is 1.5. When we used PVC, there was no PVC that was used for fiber. We used 33 percent, which is the same as in the article. And of course, we used wood flour, which has an aspect ratio of 2 up to 10.

So, we are not telling the story or trying to come up with an excuse that matches up. It matches up because what we are doing is really what the same thing is on the prior art 17 years before they applied for their patent.

Now, so, we admit infringement as to that, and we are not backing away from that at all. It is just that what Andersen only likes in that comparison is the fact that we infringe it. They don't like to look at that middle set of boxes as to what Modern Plastics discloses. And they scrambled around to try to come up with something to convince you that this is not a good





reference, it is anonymous. It is only short. As for shortness, you could write down the chemical formula for hydraulic fluid on one piece of paper and any chemist in America would know how to read it. You don't need -- it doesn't necessarily need to be a big thing to disclose something like that.

You could write a program on two pages of paper that any computer person in America would know how to handle it. You don't need 40 pages. You don't need 50 pages. It is not a requirement of the prior art, it is what it discloses.

The third piece of evidence that we have on this as to this matchup comes from Andersen's expert; that was Professor Simonsen. Professor Simonsen testified this way.

You remember Mr. Zeliger asking him here on Friday afternoon how these things matched up and he checked them off when he told him that they did. So, we are not going to go through each of the boxes. But, basically, Professor Simonsen's testimony was that most of them would match up. Modern Plastics discloses all of the elements of Claim 1 of '553 Patent. You saw the boxes being checked off and you saw everything done.

Same thing here, as to the dependent claims 2 through 6, except for the case of Claim 4 where it was





talking about a square section, cross-section. And Professor Simonsen said it was a reasonable assumption that it disclosed that. What I think about anticipation is this, is that you can have -- it can be inherently in the article, and that is what he is really saying, it is inherently there. So, that is the what matches up. So, someone could look at those things and know inherently that you could also extrude a square section. So, he concluded that that was all right.

DDX22, this is the '553 Patent, you need some understanding and reasonable assumption as to the wood rail. And I think when you're given an instruction as to the rail, you probably realize that it is there, actually, exactly, but in any event he concluded that it is a reasonable assumption that someone inherently could make that it matches with the Modern Plastics article. All of the check marks, all of the other boxes are check marked on that, too.

The same thing for DDX35, for the '027 Patent, all of the boxes are checked by Professor Simonsen.

DDX36, which is all of the dependent claims and they are all checked off, too.

So, where we are at the end of the day with that is, despite what you might have been told in Mr.





Schutz' opening, the proof here is that for that first part of that test, did all of the claim elements match up? They all in fact do, every single one. Our expert says it. We showed it in our column, why we infringe. And their expert says it.

So, let's deal with the next part, the next part. Since they couldn't prove that any of those claim limitations were missing, now I'm on to something else, and it is this enablement business.

And if I can flip back to this, what Mr. Schutz pointed you to here is what I have in the blue box, a printed publication or patent will not be an anticipation unless it contains a description of the invention covered by the patent claims that is sufficiently detailed to a teach a skilled person how to make and use the invention without undue experimentation.

The claims, themselves, here, let me go on to the next part. That is only part of the test. The part of the test that he missed is in the next paragraph which I kind bracketed in blue. What you are dealing with, what it says is that means that a person skilled in the field of the invention, reading the printed publication or patent should be able to make and use the invention using only an amount of experimentation that

is appropriate for the complexity of the field of the invention and for the level of the expertise and knowledge of persons skilled in the field.

Additional references may be relied upon to show that one skilled in the art could make and use what is disclosed in the prior art reference relied on for anticipation. A couple of things, here.

Number one, the first thing is that you are not dealing with, you or I, looking at what Modern Plastics is. You are dealing with how someone skilled in the extrusion art would look at that and know what to do, that is number one. And when they do that, they get to bring all of their knowledge, their extrusion knowledge to bear on that issue.

Here is something that is missing here. Andersen has been in the extrusion business for decades, decades. They have been extruding things, I don't know how long it goes back. I know it goes back at least until the 1960's. I can't tell you how many extruders they have. It is an enormous facility.

They didn't bring one extruder. One of their extruders into this court, to tell you that they would look at this, the Modern Plastics article, and tell you you couldn't do it, not today, not in 1980, not in 1990, not in 1974. And on that, it is anything that is before





the patent is applied for and before that invention date, 1982. That is the time frame we are looking at, not necessarily 1984.

So, the first source of information is what this person skilled in the art would bring to the table here looking at this to try to make this. The second thing is, they could go to other sources of information. And the third thing is that it doesn't have to be a blueprint. It doesn't have to give you all of the details. You might have to do some experimentation. You might have to do some fine tuning. It is not required.

And the other thing is, there is no requirement for someone to make a commercial product of this, what is in Modern Plastics. That is not a requirement. We had problems with our commercial product. They referred to it in great detail. And one of the problems we had with Mr. Mancosh's home, we didn't have -- when we started out, not knowing much about the problems, a problem extruding the composite, which is the tan material. We can do that, that is what Modern Plastics talks about. What we had a problem trying to make work was trying to get the right coating.

So, let's take a look at what the evidence actually is about whether or not something like Modern





Plastics could have extruded anytime up to the time of this patent. There are a couple of things.

There is Professor Gardner, and I know Mr. Schutz said some things about his testing and report and stuff. None of which is actually supported by anything in the evidence. But, what it amounted to was this. We gave the professor one task, and that was, take 33 percent wood, take 67 percent polyvinyl chloride, extrude something and make those two measurements many ways. We didn't give him one other piece of information. We didn't have the Modern Plastics article, nothing. And he did it. He made five samples, tested them, they were within the range of the claims.

If he wanted to play with it some and fine tune it some, he probably could have gotten even better results; but, that is what he did.

Did he use it on a new extruder? Yeah, that is what he had. But, you didn't hear from the company that has been extruding for decades that there would be any difference in how the results come out using this extruder or any other extruder that ever existed.

It is like a toaster. When I was growing up I had a toaster. My mother had a toaster. It went down, came up, made toast. Well, I have a toaster today. It doesn't look like the same thing; but, you





get the same result. If you get a different toaster, the results will be the same. When did they show you the results would be different using an older machine? And I suggest to you, they are in an abundance of knowledge in this area.

Another thing, Mr. Schutz criticized us for bringing in Professor Gardner who made something. Did Andersen -- did you hear any testimony, see any documents that Andersen tried to make the Modern Plastics material and failed? Did you ever see an attempt and a fail? Did they bring in any test people that said, well, we tried to do it and it doesn't work?

Professor Gardner did. And their response was to say, maybe he phonied up the test. All right. How about Professor Simonsen? What did he say? Well, in this case, we found -- I have taken a small portion of his transcript, just that little piece of it and blown it up for you because I had that piece of the transcript. If I can put that up?

Mr. Zeliger questioned him about his deposition. And this is what he said about whether he could make it.

**Q. "Do you recall I asked you at your deposition whether you could make the material disclosed in the Modern Plastics article?**

A. Not specifically, I'm sorry.
Q. I'm going to hand you a copy of your deposition.
A. Good, thank you."
We will skip on to the next question.
Q. "At the beginning of line five did I ask you: Could you make the material disclosed in the Modern Plastics article if I asked you to do so? If I retained you to make something?"
And you said: And you pay me?
And I said: And I pay you.
And you said: Well, I don't -- I don't know if I could reproduce it exactly, but we could probably make something similar with a little effort.
And then you went on to say, especially, well, when it was 1974 and 2002, there's been a lot that has happened.
Then next he says: I didn't mean to suggest the -- flip, Mr. Zeliger said: I think I asked you whether you could do it. And your answer in 2002 was, I could do it with a little effort in 2002.
Do you have a different answer today than you did at your deposition?
Professor Simonsen says: Well, like I said, I didn't think my answer was 2002 when I said a little





effort -- when I said a little effort, I meant a significant effort.
But, you didn't say a signature effort?
No, I didn't say a significant effort.
So, when we asked him that question in 2002, when Andersen will still tell you these claims didn't match up, Professor Simonsen says: Yeah, I could do it with a little effort. Today he said, it would be a substantial effort. He never actually did try, nor has anyone that we know of from Andersen that tried, either.
Let me turn to something else here that would be available. I will go back to the Modern Plastics article. And this is DDX11. It is true, there is not much detail about how to make this particular product in here, but it does refer to patents that have been applied for on it.
And the Sonesson Plast Company is identified in the article as being the company that has done this. So, if we turn to the Baumann Exhibit, Defendant's Exhibit 24, that is the Baumann Patent. I want to point out a couple of dates. It was applied for October 31st, 1973. It is in the name of Sonesson Plast, AB, and it issued on April 15th, 1975.
The Modern Plastics article would have been between those two dates. So, this patent would have





been applied for when that article comes out. But, it is not -- it would not have issued by the time the article came out.
So, the patent, itself, is directed to a method of preventing corrosion in the process of extruding polyvinyl chloride and wood fiber products. It is incorrect to say it has nothing to do with that.
The claims are directed to that, preventing that corrosion. The patent discloses other things. And it discloses things about -- it also discloses the 33-67 percent wood polymer polyvinyl chloride material in Modern Plastics.
It discloses things about the overall process of making that extrusion, including stabilizers, extruding temperatures and dyes. And I am going to contrast this with something in the actual patents we have here in suit. Because I am going to turn -- if I can turn to Column 7 of Exhibit 1?
Remember Mr. Schutz was showing you all this stuff in that patent? It is the same for both, both patents, here. All of this stuff in the patent that dealt with details with method -- details are significant. Excuse me.
That patent, if you look at it, covers a lot of things. It discloses a window that is being made





with this stuff, and it discloses something else. And what it discloses is, and in fact everything that he pointed to except this portion of Column 7, when it talked about a method, it had nothing to do with the method of actually extruding the part, and that is the only thing the patent here is dealing with, an extruded part, the ultimate end part.
Everything that he pointed to, including example one, deals with creating the pellets, here, that you put in another extruder to make the part.
The paragraph I have shown you here is the only disclosure in the Andersen Patents dealing with the process of in fact making the actual part, itself. All of the rest of it deals with how they make the pellets.
So, when we are comparing disclosures, here, it is not fair to compare the disclosure of the entire patent here with what is in Modern Plastics. That is what it is telling you. And what it is telling you, it says, is things like this, it is like -- we have identified the extruder. Well, I suggest to you that someone skilled in the extrusion business in 1974, 1980, today, knows the names of various extruders. They know how to set these things up.
Now, another source that someone could consider would be the thing here. Those are the