# EXHIBIT 1

sample was stretched.
**Q I see you've drawn a graph. Can you plot something when you do that?**
A Yeah, I can. If I pull in a certain force, I'm going to move the material a certain distance. If I pull with twice the force, I'll pull the sample stretch twice the distance. Think of it as kind of a spring. While this is true for a certain point where as I start to pull harder, all of a sudden I don't wind up with anything anymore. I've broken the sample.
**Q So you have those datapoints, then what do you do next?**
A Well, then what you do next is first of all you need to understand what the cross-sectional area of the material that you're pulling on is because you use that then to calculate something called stress, it's simply the force that you're pulling with divided by the cross-sectional area of the material that you're pulling.
Second thing you do is to divide the distance that you're pulling, the distance that you're stretching by the original dimension of the sample, by the original distance of the sample. In that case, that property is called the strain of the





material.
**Q So you have now have stress and you now have strain?**
A Now you have stress and now you have strain. If I start to connect these dots, I have a stress/strain curve for the material. The slope of this line is the Young's modulus of the material. So the slope is the Young's modulus.
**Q Now, you mentioned that you can stress this object different ways and you've illustrated one here by pulling on it?**
A Mm-hm.
**Q Is there another way that you can stress that object and also measure a modulus?**
A Yes, there is. Among other ways, one of those ways would be to measure a long sample by pushing down on the middle of it while supporting both ends.
**Q And --**
MR. SKENYON: Your Honor, I have an objection to the line. If we can have a quick sidebar, please.
(Whereupon, sidebar conference.)
MR. SKENYON: The objection is this: He's a fact witness. This sounds like -- an awful lot like expert testimony to me. He's going into





theoretical stuff. And that's the province of the experts not the fact witness.
MR. SCHUTZ: There's -- this isn't theoretical at all. He's an inventor on the patent and modulus is a term in the patent. He's just explaining that.
(Sidebar conference concluded.)
BY MR. SCHUTZ:
**Q Mr. Deaner, I can't remember exactly where we were, but you are now illustrating another way to stress an object?**
A Yes, I am.
**Q And can you measure what happens when you apply stresses in the way you've illustrated here?**
A Yes, yes. I certainly can. I can with a similar type of a -- with a similar type of a graphic measure the force versus distance, force that it takes to bend this sample versus the distance that it actually moves as it's bending.
**Q And if you do those measurements, do you plot the results on the graph?**
A Yes, you can. And you wind up with another force versus displacement curve. The lineal or the linear portion of the initial part of that curve, the slope of that line is now not equal to the





flexural modulus, but it's proportional to it because there's -- because there's a lot of other sample geometry that needs to be noted in order to calculate the actual flexural modulus.
**Q What's flexural modulus?**
A Well, flexure is this whole idea of bending the sample.
**Q So if you take the same product, a piece of pine or oak or something like that and you did a tensile test and then you did a flexural test, would the Young's modulus be the same?**
A It depends. Because what's really happening to the sample, when you think about it, is you're pushing down on the middle of the sample, when the material on this side is actually being stretched actually being pulled in the tensile mode; however, the material on this side of the sample is being pushed together, it's being compressed. And some of the material like that material that's out at the end of the sample is being sheared. So the flexural modulus is really some combination of tensile modulus, the compressive modulus, and the shear modulus of the material.
**Q Okay. You can return to your seat.**
MR. SCHUTZ: Your Honor, I'm looking for

A Yes, I do.
**Q 500,000 what?**
A 500,000 psi because those are the units used in the specification.
**Q Pounds per square inch?**
A Pounds per square inch.
**Q Now, why did Andersen select 500,000 as the lower level here for Young's modulus?**
A Well, basically, as we studied the needs of a number of window components, we found that 500,000 was kind of a rule of thumb minimum for satisfying structural needs in window components.
**Q I want to talk just a little bit more about this number. The 500,000 is the Young's modulus for the composite, is that my understanding of that?**
A That's correct.
**Q And the two major parts of the composite are what?**
A They are wood and PVC.
**Q And does wood have a Young's modulus?**
A Yes, it can be measured.
**Q And does PVC have a Young's modulus?**
A Yes, it does.
**Q If you put the wood and the PVC together and you extrude it, as you talk about in your patent, can you get a Young's modulus higher than the highest modulus of**





**one of the components?**
A No, it's going to be somewhere in between the two components.
**Q So if you use -- pick a wood, pine, for example, do you know what the approximate Young's modulus is for pine?**
A Pine, of course, varies from piece to piece to piece a great deal, but it's about one-and-a-half million psi.
**Q And what's the Young's modulus for the type of PVC specified here in the patent?**
A It's stated in the patent that it's 430,000 psi.
**Q So is it possible looking at this patent and making a product under this patent that you have a product with a Young's modulus greater than 1.5 million?**
A No.
**Q And you would know that by reading the patent?**
A One of skill in the art would understand that by reading the patent, yes.
**Q I mean, I believe Mr. Skenyon in his opening statement said there's no upper bound on this. It could be a billion or whatever figure it is, millions and millions, is that true?**
A No, that's not true.
**Q Now, let's go to a couple of other claim terms**





**here. We've got coefficient of thermal expansion. And let's just talk about that a little bit. I'm not sure we covered it in quite the detail I want to make sure we have. Just tell as again what the coefficient of thermal expansion is?**
A It's a measure of how much a material expands or contracts when you change it's temperature.
**Q Okay. I can't remember, did we talk yesterday about if that's important in making the window?**
A I think we did talk about it, but I'll reiterate it. It's very important.
**Q Just briefly again.**
A Yeah, I'll reiterate it. It's very important for making a window because windows are exposed to exterior temperatures which aren't constant. They're hot in the summertime and very cold in the wintertime. And as materials expand and contract with that change in temperature, you don't want the window lineal to be expanding and contracting significantly more than the glass member does.
**Q Next, we have a phrase in here that says, "the composite member comprises a continuous organic phase comprising PVC and then dispersed in that continuous phase, 30 to 50 percent wood fiber," do you see that?**
A I see that.





BY MR. SCHUTZ:
**Q. So, I am concerned about this phrase, here, "dispersed into continuous phase." Is that what you were illustrating here?**
MR. SKENYON: Objection, this is leading.
MR. SCHUTZ: I'm sorry, I didn't hear the objection.
THE COURT: Leading.
BY MR. SCHUTZ:
**Q. Mr. Deaner, would you go ahead and explain to us what "dispersed into continuous phase" means?**
A. I think the top half of that diagram is very illustrative of wood fiber that is dispersed in a continuous phase of PVC.
**Q. That diagram is 501.**
**The next phrase in here is aspect ratio. Do you see that?**
A. Yes, I see it.
**Q. Now, I'm not sure I had you explain aspect ratio.**
**Can you explain to us what aspect ratio is?**
A. It is a ratio of dimensions. In this particular case it is talking about wood fibers, so it is a dimension of the ratios of wood fiber, the longest dimension divided by the shortest dimension of the wood

fiber.
**Q. Now, if you were going to extrude wood fiber with the PVC, as the patent talks about, are there practical limits on the aspect ratio of the wood?**
A. Well, yes, there are.
**Q. And would someone in your position know, as a practical matter, what those were in the exclusion process?**
A. As a practical matter, you can get material that is only so long to stay in tact as it is put -- as it is conveyed through these screws of an extruder.
If those fibers are very, very long they will be broken down by the screws as they pass through the extrusion process.
**Q. I think that basically covers the claim terms, Mr. Deaner.**
**I would now like to ask you -- I have just got two quick areas to finish up, here -- a little bit about the economics of your invention. Of the major components, which are PVC and wood.**
**Which is cheaper?**
A. Wood fiber is less expensive.
**Q. And a little bit? Or, can you give us some idea of the magnitude of the difference?**
A. Okay, let's just say at Andersen Corporation,





the value placed on wood fiber is about .2 cents per pound.
**Q. .2 cents per pound, okay.**
A. The value of a PVC compound is about 50 cents a pound or so.
**Q. So, quite a bit higher?**
A. Quite a bit higher.
**Q. What is PVC made of? What is the basis for PVC?**
A. Well, oftentimes, the basic raw material of PVC is petroleum products of some sort or another.
**Q. As between wood and PVC, is either one of them a renewable resource?**
A. The wood is a renewable resource. The PVC, because it comes from petroleum products, is not.
**Q. So, in making a composite product, what is the impact of the ratio of wood to PVC on the cost of the final product?**
A. Well, as you increase the ratio of wood to PVC, the product becomes less and less expensive, because wood fiber is so inexpensive.
**Q. Finally, Mr. Deaner, has your invention and the Fibrex product been a commercial success?**
A. Yes, it has.
**Q. And what is your basis for saying that?**





A. Well, I look at all of the products that have been developed out of Fibrex. I mentioned the sill cover for our standard tilt-wash window unit. We sold, I am sure, at least 10 million of those window units in the years since Fibrex has been used on it.
Renewal by Andersen is a business of the Andersen Corporation that is very successful. Very recently they made their one-millionth window unit out of Fibrex.
**Q. Thank you, Mr. Deaner, I have no further questions.**
THE COURT: Mr. Skenyon?
CROSS EXAMINATION
BY MR. SKENYON:
**Q. If Mr. Deaner can retain Plaintiff's Exhibits 1 and 2, I think he had 43 and 177 up there.**
THE COURT: You can just go on up and get them from him.
MR. SKENYON: Excuse me.
THE WITNESS: 1 and 2? This is 177.
(Discussion off the record.)
MR. SKENYON: Could I have just a second?
THE COURT: Sure.
BY MR. SKENYON:
**Q. May it please the Court? Good morning, Mr.**





**Deaner?**
A. Good morning, Mr. Skenyon.
**Q. Let me start off at this point, here, and that is, I understood that in connection with the research project that resulted in the invention, here, you worked on that from approximately 1991 through 1992, at least as far as these two patents are concerned?**
A. That is correct.
**Q. But, in the course of the overall project, Andersen and you actually obtained a number of patents beyond the two that are in suit now?**
A. Yes.
**Q. In fact, if you take a look at Plaintiff's Exhibit 177, which I left up on your table -- I will just put it on the elmo.**
**Okay, that is the cover of that. And if we can take a look at what is labeled here, I think, as page A061437, it is a couple of pages in.**
**Do you see that?**
A. I have it.
**Q. That is a list of patents that Andersen has obtained relating to this technology, correct?**
A. Yes.
**Q. And you are the inventor on a number of them, are you not?**

**modulus would increase, true?**
A. True.
**Q. So, in the claims you set the modulus number. At least if we go back to that claim, you set the modulus number of 500,000. I think you said something on direct -- well, this is what we were getting the good results on, the good numbers on, the good properties?**
A. Those were values that make for good window components, good structural window components.
**Q. The claim, itself, however, does not put an upper limit on modulus, though?**
A. The claim does not. And again, one who is skilled in the art knows that you can't get any higher than what wood is in terms of the Young's modulus.
**Q. But, as a practical matter, if you look through your book, your examples there in your book, I didn't see anything in the examples that were higher than 1.1 million, is that correct? And there is only very few of those.**
A. That is correct.
**Q. Is that about right?**
A. That is correct.
**Q. If we go back to the table, that is the modulus table. If you can blow that up, please?**
**Again, you reported some values, here of the**





**modulus values you attained in testing, true?**
A. True.
**Q. For each of those percentages -- and the highest one I see is about 1.1 million, a little over 1.1 million?**
A. Yes.
**Q. So, in testing for this invention, not much gets above 1.1 million, true?**
A. True.
**Q. In your claim, it is 500,000 and above?**
A. That is what the claim says, but again, one skilled in the art knows that if you are combining the wood and the PVC, you can't get any higher than what wood is.
**Q. And wood is what?**
A. About 1.5 million, about.
**Q. So, you can't get above 1.5, because that is what wood is?**
A. True.
**Q. Let me direct your attention to a portion of the specification. Let's stick with Plaintiff's Exhibit 1.**
**(Discussion off the record.)**
**Let me see if I can direct your attention to it. I seemed to have misplaced this. Exhibit 1, if we**





**can take a look at column 9, blow up that second column? You have to go a little more, just the bottom paragraph.**
**(Discussion off the record.)**
**Okay. Do you see that?**
A. Not very well, but go ahead.
**Q. It is at the bottom of column 9, line 40. It refers to the pellet. And that is the composite you make, composite doing the first step, doing the combining wood fiber and polyvinyl chloride to make the pellet. So, that is a composite made with the pellet, right?**
A. Right.
**Q. And you report that the Young's modulus has at least 500,000 and commonly falls in the range greater than about 800,000 and preferably between 800,000 and 2 times 10 to the sixth, correct?**
A. Yes, two times 10 to the sixth is two million --
**Q. Two million, correct.**
A. Correct.
**Q. And you just said it is impossible to get to two million by compounding wood and polyvinyl chloride?**
A. I maybe incorrectly said 1.5 for wood. I was thinking pine. If you have a denser species like oak and some of those, you can get to two million.





**Q. You were using a pine here, were you not?**
A. We were using pine here, but these are wood fibers we are talking about.
MR. SKENYON: Your Honor, is this a good break time or do you want me to continue?
THE COURT: Oh, just two more minutes.
BY MR. SKENYON:
**Q. So, the claim, itself, doesn't say where the upper boundary of the Young's modulus is. Is it 1.5, is it 2? Is this something that gives you 2.1, 2.3?**
A. It would be dependent on the wood fiber that you are using.
**Q. But, my point is here that in all of your experiments and of all your experiments of people working with you, you didn't actually get to anything that was much above 1.2, correct?**
A. That is correct.
**Q. So, how is it that your invention is, according to this claim, something that would extend up as far as two million?**
A. Because I think one skilled in the art would see that if you used a different wood fiber other than pine, you would get something that is different than the 1.1, 1.2 million.
**Q. But you and your co-inventors never did that.**

**At least, it is not reflected in that exhibit?**
A. It is not reflected here, yes.
**Q. It is not reflected in your lab notebook, is it?**
A. I don't recall that part.
**Q. All right. Let's deal with the other aspect of this. If you would go back to Claim 1, again, the '027 Patent. Okay, and let's deal with the coefficient of thermal expansion.**
**Do you have that?**
A. I have it.
**Q. And what that measurement is -- it looks fine, but what that measurement is actually saying is there will be some expansion of the part per every degree Fahrenheit that it is subjected to, right?**
A. Yes.
**Q. And you want that as low as possible, don't you?**
A. Yes, you do.
**Q. And you picked 3 times 10 to the minus fifth inch per inch Fahrenheit. That is actually about 3/10,000ths of an inch, isn't it?**
**Did I do the math right?**
A. I think it might be 3/100,000dths.
**Q. You are right, it might be 3/100,000dths.**





**But, that in the claim is the upper limit, right?**
A. Yes.
**Q. And the claim literally says that it needs a coefficient of thermal expansion of less than that?**
A. That is correct.
**Q. And it doesn't specify where the end is to the less than that?**
A. Well, once again, if you are combining wood to PVC, wood has a coefficient of thermal expansion depending on which -- I'm sorry, depending on which direction on a piece of wood you are measuring would have a coefficient of thermal expansion of .2 in the lengthwise direction to about 2 times 10 to negative fifth in the radial and tangential directions.
**Q. But, in terms of what you claimed as your invention, you didn't set a lower limit on it, did you?**
A. There is not a lower limit specified in the claim.
**Q. And in terms of your investigation and your experimentation and your research, you never got below, I think, about 1 times 10 to the fifth?**
**In fact, I think that has given you some benefit of the doubt, true?**
A. True.
THE COURT: All right. We will take our





morning break. Come back in about fifteen minutes.
(Recess.)





(Reporter Anderson replaced by Reporter Weinbeck)
THE COURT: Go ahead, Mr. Skenyon.
MS. SWENSON: May it please the Court, if we could go back to claim 1 of the '553 patent, please.
BY MR. SKENYON:
**Q Just to finish, do you have that, Mr. Deaner?**
A I have it in front of me.
**Q One of the other things that is in that claim is aspect ratio of the wood fiber being at least about 2, do you see that?**
A I see it.
**Q And there is no upper limit on that either in the claim?**
A There is no limit in the claim, but there's a practical limit in terms of being an extrudate or an extruded member.
**Q And in terms of your development of the product here, at least up until the time the application was filed, isn't it true that the biggest aspect ratio you used was maybe about 5 or 10?**
A Probably closer to 10.
**Q So you never used an aspect ratio of wood fiber that was 20 or 25?**
A It's not talked about in the specification. During the first year, we may have.

to test materials. And once the report is written, to basically discard those materials.
**Q. Now, this window -- or excuse me, this sash, can you tell by looking at it, if you were to come down here and look at it, what its modulus of elasticity is?**
A. No, I can come down there and look at it if you want to, but I won't be able to tell, no.
**Q. I mean, if you were, could you tell what the modulus is?**
A. No, I can't.
**Q. You would have to run a test?**
A. Yes. Yes, you do.
**Q. Could you tell by looking at this window what its coefficient of thermal expansion is?**
A. No, I can't.
**Q. You have to test?**
A. You have to tear it apart and run a test.
**Q. Okay, thank you. I will put this up here. Let's now pick up, as long as we are talking about some earlier work that Andersen had done, and I would like you to take a look again, if you have it up there Mr. Deaner, at Exhibit 40, Defendant's Exhibit 40.**
A. Yes, I have it here.
**Q. This is it?**
A. Yes.





**Q. Defendant's Exhibit 40. And I believe that Mr. Skenyon had asked you some questions as to whether Andersen could have made, at the time, or whether there was anything in this letter indicating that Andersen could not have made the Sonwood product. And does this letter mention anything about that would relate to making a product and issues that might be confronted with that?**
A. Well, yes, it -- you know, they might have been able to make a product, but as it states in the second paragraph of the second page, and I think we read through this yesterday, there are still some technical problems to be solved.
I don't know, Mr. Schutz, if you want me to read that paragraph again.
**Q. No, we read it yesterday. I have got it up there. It is just the -- I mean, it is the first sentence of that paragraph?**
A. Right.
**Q. Okay. Next, I would like us to go back and look at one of the patents. And I am going to use the '553 Patent at this point. I have been using the '027, but the specifications -- one thing we hadn't talked about, and let's just clear this up, the claims of the '553 Patent and the claims of the '027 Patent, are they**





**the same or are there differences in the --**
A. They are different.
**Q. What about the drawings? Are the drawings the same in the two patents?**
A. Yes, they are.
**Q. And is the specification the same in the two patents?**
A. Yes, it is.
**Q. Now, let us take a look at -- which one do I have up there, '553? Let's just run down here to the claims at the end. Just look at Claim 1, for example.**
**Now, I want to ask you some questions about the use of some recycled or waste material. Are you with me?**
A. I am with you.
**Q. Is there anything in this claim language that would say that you can't make this product with recycled or waste PVC in it?**
A. No, there is nothing that says you couldn't.
**Q. And in fact, does it care where the wood comes from here, other than it be what it says in here, a wood fiber with a certain aspect ratio?**
A. No, it doesn't matter where it comes from.
**Q. Does it matter where the polyvinyl chloride comes in?**





A. No.
**Q. All right. Now, let's, again, and we can stick with -- although I would like to go back to the '027 Patent for a change, even though the specification is the same, it is just easier for me because I have got a different copy up here.**
**Keeping in mind the claims again in these patents, does the specification teach how to make the product that is talked about in the claims?**
A. Yes, it does.
**Q. And can you point out places in the specification -- and let's use the '027 Patent, for example, where it teaches how to make this composite structural member that is talked about in the claims?**
A. Yeah, there are a few places. One of them would be at the bottom of column 6.
**Q. Where does it start? I will bring it up on the screen if you tell me which line number.**
A. Approximately line 53 the paragraph starts: "In a preferred mode, the wood fiber is placed in a hopper volumetrically controlled to meter the sawdust at a desired volume ..."
THE COURT: Whoah, whoah, whoah, whoah.
BY MR. SCHUTZ:
**Q. You don't have to --**

A. I'm sorry, I'm sorry.
**Q. -- read the whole thing.**
A. I'm sorry about that.
**Q. I just want to identify those portions of the specification where it gives the detail and the teaching on how to make the composite structural member. You identified, and I will put them up on the screen and leave them there for just a brief moment so the jury can see them.**
A. All right.
**Q. They will have the patents at the end of the trial to look at for themselves, again. And is this one place in the specification?**
A. This is one such place, and it continues to the next page, top of column 7.
**Q. Okay, let me bring that up a second. And how far on column 7 should I highlight here?**
A. Well, halfway down the page there to the last sentence is a minimum of 180 degrees to 190 degrees C in eight successive steps.
**Q. So, keep looking, is there anyplace else in this patent where it gives detail on how to make the composite structure?**
A. Yeah. Now you would go to column 8, and there is an example given there, example one, where it





talks about the type of extruder that is used, the type of barrel that is used on the extruder, the type of pelletizer screws used within the extruder, and the type of pelletizing head with great detail on the extruder.
That goes down to the bottom of column 8 and extends past the table into column 9 where we talk about the specific vinyl compound that is used, vinyl molecular weight that is used. And then we start talking about the specifics of how the products were tested.
**Q. Do you learn anything about how any of the products were manufactured by looking at the tables in the patent?**
A. Well, yes, because the tables tell you melt temperatures, pellet lengths, densities, moisture contents, things of that nature, as well.
**Q. I would now like to go back to -- and let's just pick Claim 1 of the '533 Patent. I am going to put that up there, Mr. Deaner. And it lists certain physical properties of a wood thermoplastic composite structural members.**
**Do you see that?**
A. Yes, I see it.
**Q. And does it also list the ingredients of that wood thermoplastic composite structural member?**





A. Yes, it talks about 30 to 50 weight percent of a wood fiber.
**Q. I'm sorry, I think you are on a different patent. I am now on '553?**
A. Oh, I'm sorry.
**Q. Yeah, different patent. Claim 1 of the '553 Patent.**
A. Okay. And in that one it talks about 35 to 65 weight percent of a polymer-comprising vinyl chloride.
**Q. And is there another component to this composite structural member?**
A. Dispersed in that continuous phase about 35 to 55 weight percent of wood fiber.
**Q. Let me ask you a question, here. If you take some PVC in, let's say, a range of PVC of 65 percent, the top range, there?**
A. Uh-huh?
**Q. And 35 percent wood. That is within the range as specified?**
A. Yes, it is.
**Q. Without knowing anything else, can you just take 65 percent PVC and 35 percent wood and throw it in an extruder and get a product that has these physical characteristics set forth in the claim?**





A. No, you can't.
**Q. In fact, how long did Andersen spend experimenting with various combinations of wood and PVC to come up with a product that had these physical characteristics?**
A. Approximately nine months.
**Q. One final area I want to ask you about, Mr. Deaner. Would you look at Defendant's Exhibit 19, which is the Hopperdietzel Patent. Do you have that in front of you?**
A. Yes, I have it in front of me.
**Q. And I have it on the screen, here.**
A. Okay, I see it there, as well.
**Q. I would now like you to look at the lists of prior art that were cited by the Patent Office on the first couple of pages of both the '553 and the '027 patents, and tell us whether the Hopperdietzel Patent is listed there.**
A. Okay. I am looking at the '027 Patent and I find Hopperdietzel cited on page two, about halfway down.
**Q. Okay. Is that it? That I put on the screen, here?**
A. Yes, that is it.
**Q. Is that the same patent that is Defendant's**

**Q If some editor submitted to you, for purposes of peer review, this article, would it past muster?**
A Not in a peer-review journal. It's not a scientific study. It's a journal account.
**Q Do you have an opinion, Professor Simonsen, whether this one-page article would teach one how -- one of ordinary skill in the art how to make Mr. Deaner's invention?**
A My opinion is that this article does not teach how to make that invention or any other really.
MR. SCHUTZ: Thank you. No further questions.
THE COURT: Mr. Skenyon or Mr. Zeliger?
CROSS-EXAMINATION
BY MR. ZELIGER:
**Q Good afternoon.**
A Good afternoon.
**Q I think might be able to cut some of this pretty short. I've got all these claim charts and we can walk through them as we did with Professor Sain this morning; but I gather you're not contesting that the Modern Plastics article discloses the elements that are in those claim charts. Is that right?**
A I think if you make some reasonable assumptions, then yes. That's -- you can get at least some of





that. I would have -- we would have to go through each one for me to be sure.
**Q Okay. Well, let's do that because I want to be clear. I thought from your direct testimony your opinion is that the Modern Plastics article doesn't teach you how to do it?**
A That's true.
**Q Well, let's get some of the charts then. And understand my questions at this point are does the article disclose either explicitly or inherently or as you put it, you know, gives you a safe assumption that these things are disclosed. We're setting aside the issue of whether they are taught. I understand that's a distinction you're drawing.**
**Does the Modern Plastics article disclose a polymer wood thermoplastic composite structural member, suitable for use as a replacement for a wood structural member?**
A It mentions in certain applications, yes.
**Q So it does?**
A Yes, for certain applications.
**Q Which thermoplastic composite structural member comprises a composite member with a Young's modulus of greater than 500,000?**
A Modulus listed in the table in the Modern





Plastics article is greater than 500,000.
**Q And a coefficient of thermal expansion of less than 3 times 10 to the negative 5 inch per inch degree Fahrenheit?**
A Yes, it discloses that.
**Q And which composite member comprises a continuous organic phase comprising about 35 to 65 weight percent of a polymer comprising vinyl chloride?**
A You have to go to "about there," right, because it's not 35 to 65. It's 33/67.
**Q Is that disclosed, though, is 33 about 35?**
A I would call it "about," yeah.
**Q Dispersed in the continuous phase about 35 to 55 weight percent of wood fiber?**
A Again, it's "about," but it's about the same, yeah.
**Q Okay. And having an aspect ratio of at least about 2?**
A In my experience most wood flour has an aspect ratio of 2 or better.
**Q So the wood flour indicates to you an aspect ratio of at least about 2 and less than 10?**
A I think you could go out and find people selling wood flour that had all kinds of aspect ratios; but





typically because wood is a fibrous material, it's generally longer than it is wide. And of course you can't have an aspect ratio less than 1, because that's a sphere or a cube.
And in my experience most of the wood flours have aspect ratios in the neighborhood of somewhere between 2 and 7, something like that.
**Q So based on the term "wood flour", does that indicate to you an aspect ratio at least about 2 and less than 10?**
A Well, again, I'm not -- you might be able to find wood flours that had aspect ratios, people selling wood flours that had aspect ratios greater than 10; but it would be greater than 2, I would think.
**Q Do you recall I asked you that same question at your deposition?**
A You probably did.
**Q Okay. Would you like to see your deposition transcript, or should I just ask you again: Does wood flour indicate an aspect ratio at least about 2 and less than 10?**
A Yes, I think what I said at the deposition is that if the aspect ratio goes to 10 or higher, I think it should be called a fiber.

MS. MOERKE: Or the "Transitional Statement" before it.
MS. NELC: Sorry. I misspoke.
THE COURT: Right now, it goes number 13, and then we will take what's number -- we'll go right from that -- well, we're not going to have 13, but we'll go from what is currently number 12 to what is currently number 15. It's called "Parts of a Patent."
Wait a second. Oh, there we go. We're going to take what's now number 17 and make it the new number 13.
MS. NELC: Okay.
THE COURT: So then we do "Defendant's Contentions." Then we do "Transitional Statement." Then we have 14, "Constitutional Basis for Patent Grant." That's fine, right?
"The Parts of a Patent," "Summary of Patent Issues."
18, "Significance of Patent Claims." "Claims of the Patents in Suit." "Construction of Claims."
MR. SKENYON: There is an issue as to whether or not there are things that the jury needs to be instructed on. It comes later, but there is an issue on that.
THE COURT: Yeah, they might not be. I'd





rather not. I think my guess is that it's fairly clear to them what their job is. I think they understand what they -- that they have to do damages, and I think they understand that they need to figure out whether or not the Modern Plastics article -- I think that -- I think they can handle that, I mean in terms of understanding what their job is.
MR. SKENYON: When we get to the construction issue, we'll see what --
THE COURT: Okay. All right. I'm just going to put a tab on that, and maybe we won't do it.
"Independent and Dependent Claims." Do you really care about that?
MR. SKENYON: It probably is an issue. I could make it an issue.
THE COURT: All right. Leave it in for now.
22, "Limitations of the Claims at Issue." That's what you're talking about. Right?
MR. SKENYON: Yes.
THE COURT: Okay. "I instruct you that composite structural member, as found in claims 1, 2, and 3 of the '553 and 1, 2, 3 of the '027 means a polymer and wood article having load-bearing capacity which can be obtained through a direct extrusion process or made from a composite material without a particular





form."
MR. SKENYON: That's really the Court's order. Right?
MS. NELC: Yes, that's directly from -- it's exactly Judge Kyle's language from his claim construction order.
MR. SKENYON: I'm not sure we actually need that, but it's the ones below that we have some issue with.
THE COURT: Do you think that's right, though? "A polymer and wood article have a load-bearing capability, which can be obtained through a direct extrusion or made from a composite material without a particular form"?
Do you think that's right? Well, let's not go -- let's see if we have to give that.
MR. SKENYON: Well, I didn't think so at the time.
THE COURT: After hearing all this, it's -- the "or" really bothers me. But maybe it doesn't matter.
MR. SKENYON: I'm not sure that one matters.
THE COURT: "In addition, I instruct you that 'about 35 percent to 55 percent wood fiber' means that it cannot have less than 30 percent wood fiber by





weight." Right. That's fine.
MS. NELC: Just -- we'll agree to that if the following language is added. "In addition, I instruct you that," quote, "'about 35 percent to 55 percent weight wood fiber' means that it literally does not have less than 30 percent wood fiber by weight."
MR. SKENYON: The reason I put it in was because of all the -- because Mr. Schutz's cross-examination of Professor Sain today, where he pointed to the Modern Plastics article, which is 33 percent wood, 67 percent polymer, and pointed out that in the '553 patent that we're dealing with, it's about 35 percent. Okay? So it's not 33. And then the other end of it was about 65 percent, suggesting that the Modern Plastics article was outside of those claims, when, in fact, those are the same percentages that we admitted literal infringement for our product, and everybody agreed that the "about" here extended those end points at least enough to cover 33 and 67.
THE COURT: Well, doesn't that say -- I mean, I'm saying "about 35" means it can't be less than 30.
MR. SKENYON: Well, maybe the better way to say it is that "about 35 to 55" means that it extends it at least to -- well, it extends to 30.
THE COURT: And then are you concerned about

I think that the following instruction would be one where we could fix any confusion, especially if it turns out in argument that plaintiffs try to make a point that the fact that it's not signed means that it doesn't qualify as prior art.

We -- set that 27 aside. That will be fine as prior art. And then in "Anticipation," there's more discussion of prior art.

MR. SKENYON: Well, I think in this case the Modern Plastics article applies both to, obviously, the standard anticipation and to stip -- anticipation would be far too limiting.

THE REPORTER: "Would be," what?

THE COURT: "Too limiting."

Where did this come from? "In this case the defendant relies on the Modern Plastics article, the" -- what patent? Is that "Heiderbroder" or something?

MR. ZELIGER: No, it's "Hopperdietzel."

THE COURT: "Hopper" -- just spell it for me.

MR. ZELIGER: I have to look.

THE COURT: H-o-p-p-e-r-d-i-e-t-z-e-l. The Hopperdietzel patent.

And what else have you got?

MR. SKENYON: Bowman.

THE COURT: Oh, yeah. And the Bowman. That





Bowman patent; that's the one that tells you how not to corrode your machine.

MR. SKENYON: It does.

THE COURT: "As prior knowledge before the date of invention of the patents." That seems clear.

Then I don't have to say that Modern Plastics article shouldn't be excluded simply because it's a anonymous.

MR. SKENYON: Yeah, I think so, as long as they know it's prior art. I think that's probably sufficient. I'm just concerned that they would not.

THE COURT: You make sure that Mr. Schutz doesn't get up and argue that there's some legal requirement that things be signed.

I mean, I can imagine what his argument's going to be. "You can't" -- "nobody could do it. It's short. It's crummy. Nobody read it. The Patent Office didn't know about it. "It doesn't tell you anything. It's mostly about this other stuff. Nobody signed it anyway." That's all fine.

MS. NELC: Your Honor, there is case law out there that talks about whether there is an author on the prior art in the realm of the obviousness inquiry; it goes to weight and credibility. So that's -- yeah.

THE COURT: "Anticipation." "Something is





inherent in an item of prior art if it is always present in the prior art or always results from the practice of the prior art and that the skilled person would understand that to be the case." Is that the language you want now?

MS. NELC: Yes.

MR. SKENYON: Okay.

MS. NELC: We fixed a typo. We changed "patent" --

MR. SKENYON: To "prior art."

MS. NELC: -- to "prior art."

THE COURT: I see.

MS. NELC: Right.

THE COURT: You know, there's a reference here to "the prior public use or sale." That's not at issue here. I'm looking at the second paragraph of the "Anticipation" instruction.

MR. SKENYON: Mm-hmm.

THE COURT: "In order for a patent claim to be anticipated by the prior art, each and every limitation of the claim must be present within a single item of prior art. You may not find that the prior art anticipates a patent claim by combining two or more items of prior art" I think is better than "whether that prior art is a publication, prior patent, prior





invention, prior public use or sale or some other item of prior art."

MS. NELC: That works, Your Honor.

THE COURT: We've got three, and the point is don't pick and choose from them.

MR. SKENYON: That's what the point is, yes.

THE COURT: Okay. Right.

What do you think that means, Mr. Skenyon? Do you think that means that you can't make the Modern Plastics and go to the Hopper -- not the Hopper. Bowman. You can't go to Bowman?

I mean, it sounded to me -- this is really beside the point of the instructions, but it sounded like you are saying, "Take the Modern Plastics article; any person reasonable skilled in the art would know enough to go to the Bowman patent. The Bowman patent will tell you how to do what has to be done"?

MR. SKENYON: That's -- there's two issues here. For anticipation to match up with the elements, we're dealing with instruction number 28, which is the elements have to match up in that particular one reference.

It's the enablement defense that they raise; they say, "Okay, Modern Plastics, by itself, does not enable one to make that device."

What the law is, and the additional instruction that we requested is, it is essentially that on that enablement issue for the anticipation question, when a particular one piece anticipates, is that additional references may be relied on to show that -- the enabling quality of the single reference as an anticipation.

In other words, the enabling information does not have to be within the four corners of that one anticipatory piece of art. And if what they're arguing here is, "Okay, from Modern Plastics, you can't tell."

We can argue, on the enablement side of things, Bowman, within the same -- a patent with the same company, provides that enablement.

I think the law is pretty clear that that's exactly what --

THE COURT: Is that in here somewhere?

MR. SKENYON: No. We ask that it be included. I'm not sure that it's been written in.

MS. NELC: Your Honor, this is something that just got brought to our attention an hour or so, when we started meeting and confirming, so we did agree on this "Anticipation" instruction.

I think what Mr. Skenyon wanted to do is add -- add another instruction that we haven't seen.





MR. SKENYON: Add -- yes. I'm sorry. I don't have it. I thought it was in the original, something similar to the original set that we had. But that is, in fact, an additional one. Because of the enablement defense that they raise to -- as anticipatory, the fact that Modern Plastics was anticipatory.

And the law is absolutely clear on that; it's that you can go to another reference for that enablement. You can't go to another reference for matching up the elements, but you can go to -- and I have the cases here.

THE COURT: No. I am only concerned that that concept is not in these instructions at all right now. And the way the instructions read right now, we can't be combining any of those, the jury would think, for any purpose.

So you'll have to get me an instruction, and I will give it, explaining that you can do that combining as a response to the enablement defense. A response.

MR. SKENYON: We'll prepare that right away and send that over.

But Your Honor is exactly correct; it has nothing to do with matching up the elements of the claim, and I think we want to make that perfectly clear.

THE COURT: Can you -- do you have plaintiff's





counsel's e-mail? I'd prefer to get that by e-mail, if you could.

MR. SKENYON: Yeah, sure.

THE COURT: And I'm going to give you a different e-mail address to send that to. Don't use this e-mail address for anything else, but for this weekend, if you want to e-mail me anything --

Off the record.

(Off the record.)

THE COURT: So that's my own personal e-mail. So if you could just send me that, and don't -- I mean, you can use it if you want to, like, send me a personal note later, but don't start filing things in that.

MR. SKENYON: All right. We'll take care of that one.

MS. NELC: Right. And one of us, of course, will get a copy to you.

THE COURT: And send two up to the chambers so that Jen can see it.

MR. SKENYON: I'll --

THE COURT: To the chambers. Chambers' e-mail. Right? And then copy to whoever --

MS. NELC: Right.

THE COURT: -- wants it over there.

Do you think that is going to be added as a





separate instruction?

MR. SKENYON: I think so, but there's a possibility of including it with the original one.

THE COURT: All right.

MR. SKENYON: Let me see how it looks.

THE COURT: Also, tell me where you want it to fit in the instructions too.

MR. SKENYON: Yes, I will, Your Honor.

THE COURT: Okay. "Same Claim Interpretation." You don't need that, do you?

MS. NELC: No.

MR. SKENYON: Yes, I think I do, Your Honor, because I opened on the fact that the claims match up both ways; infringement, and we put in evidence as to what we -- what we had in the accused product and how -- and how --

THE COURT: Okay. Yeah, you can have it if you want. I was just --

MR. SKENYON: Yeah, I do want it in.

THE COURT: Okay. All right.

MS. NELC: Your Honor, we object to it.

THE COURT: You do?

MS. NELC: Because we think it's confusing. We think it's confusing and it's not supported by a model rule. It's just -- I don't think it's necessary,

would cover what we would say would be inoperative embodiments or experimentation involved to make the ones operative.

In other words, if he's going to have a limit in his claim from 500,000 till the upper limit of pine, or wood or whatever it is, he didn't get there.

MS. NELC: And, Your Honor, we object to these because we don't think that there's been evidence put on to support these defenses.

No Fiber Composites' expert has opined on the 112 defenses, and we just don't think these are appropriate.

MR. SKENYON: And our view is that an expert wasn't necessary if the inventor says that the claims are this, and "I invented actually less than that," we didn't come up with that," and I think that's what he said.

THE COURT: That's that whole line of questioning; his only answer to you is, "I think that sounds like a legal conclusion."

MR. SKENYON: Yeah. Well, some disagreement even if the Federal Circuit, as to what it is. But as it stands now, it's one of those fact law questions on these things that the jury -- like obviousness, the jury gets to decide.





But the specific written description, and the next one, the inoperative -- probably that's a bad title for that, but the "Enablement" one is directed to that. He didn't enable someone to make an invention which would take the composite -- the modulus, for example, even up to the limit the Court says.

THE COURT: No, I understand it. I just am trying to understand the difference between the plaintiff's proposed and the defendant's proposed instruction in this regard, and they seem to give the same -- I'm not sure what the plaintiff's adds. It says that --

MS. NELC: We do have language in the first paragraph talking about the patent law requires that a patent application contain an adequate written description of the invention to ensure that the inventor was in possession of the invention at the time the patent application was filed. That's language that was not in --

THE COURT: Where is that from?

MS. NELC: That is from Delaware. It's the 2004 draft model instructions. And that's from -- that's the white paper, the bright white piece of paper.

THE COURT: No, I just wondered where you got it.





MS. NELC: Oh, yes. Yep.

THE COURT: Okay. Mr. Skenyon, does it really matter to you? You've got the same argument, no matter which instruction is given, I think.

MR. SKENYON: I was working on it just a second.

THE COURT: Sure. Go ahead.

MR. SKENYON: Just quickly looking at it.

THE COURT: No, it's okay. Really, I'm fine.

MR. SKENYON: It doesn't matter. I don't really see anything that jumps out as being bad in it. It was the other thing proposed, and that's the problem there.

Yeah, I don't -- I don't really see anything wrong with that.

THE COURT: All right. Bright white it is. "Enablement."

MR. SKENYON: That's the bright white one?

MS. NELC: Right. We agreed to the one I had send to the Court today. It's the bright white number 75. And, Your Honor, if you don't have a copy of it, I think I have an extra.

THE COURT: Is there a 75? No, there's not.

So you want -- there's something, 75, that takes the place of this? I don't have that.





MS. NELC: I have that, Your Honor, and I can hand it to you.

THE COURT: Okay. All these new ones are really wordy, aren't they?

MR. SKENYON: The one thing I don't like with the new one is that all the Delaware practice is citing cases in the text. And we've got to move that down.

MS. NELC: We can move that down to the source.

MR. SKENYON: We can move it down.

THE COURT: So, Mr. Skenyon, if we take out the citation to the case, is that instruction all right?

MR. SKENYON: Yes, it is, with the next one, which is our 43, being out.

THE COURT: Okay. 42 is out, then?

MR. SKENYON: 43.

THE COURT: Okay. And then we're talking about 43, "Inoperative Embodiments"?

MR. SKENYON: Yes. And the reason is that based on what the Court indicated the claim construction would be on that issue of, you know, where does 500 extend to, I don't think we have an inoperative embodiment case, but I just want to preserve my objection; it will be based on that claim construction.

But if the Court is inclined to give the claim

the level of ordinary skill in the pertinent art include the education level of the inventor, the types of problems encountered in the art, the prior art patents and publications, the activities of others and prior art solutions to the problems encountered by the inventor, the sophistication of the technology and the education of others working in the field.

Once the prior art is assembled and considered, you should determine whether the prior art considered as a whole suggests the claimed invention. Prior art references may be combined to show obviousness if there is some motivation or suggestion to combine the references, and if the combinations would be reasonably likely to achieve the goal of the invention. Both the suggestion and motivation to combine and expectation of success must be found in the prior art.

Before reaching your decision on the obviousness question, you must also consider what I will refer to as objective indications of nonobviousness. Some of these are commercial success of products covered by the patent claims or made by a process covered by the patent claims, a long-felt need for the invention, failed attempts by others to make the invention, copying of the invention by others in the field, unexpected results achieved by the invention, praise of the





invention by the infringer, or others in the field, the taking of licenses under patent by others, expressions of surprise by experts in those skilled in the art at the making of the invention, and the patent owner proceeded contrary to accepted wisdom in the prior art. Those are some of the indications.

The presence of any of these objective indications may suggest that the invention was not obvious. These objective indications are only relevant to obviousness if there is a connection or nexus between them and the invention covered by the patent claims.

For example, commercial success is relevant to obviousness only if the success of the product is related to a feature in the patent claims. If the commercial success is as a result of something else, such as innovative marketing, not the patented feature, then you should not consider it to be an indication of nonobviousness.

In your deliberation on the issue of obviousness, you must not equate simplicity with obviousness. The statute does not require the invention be complex in order to be patentable.

In determining nonobviousness, you may not consider the manner in which the invention was made. Technological advance is often the fruit of persistent





investigation or methodical persistent investigation and not a flash of genius.

In deciding the obviousness and nonobviousness question, you should not base your decision on what you think ought to be or ought not be patentable.

Fiber Composites contends that the claims of the '027 and '553 Patents are invalid because they lack an adequate written description. The patent law has required that a patent application contain an adequate written description of the invention to ensure that the inventor was in possession of the invention at the time the patent application was filed.

The specification and claims as originally filed must convey to persons of ordinary skill in the art that the inventor had invented the subject matter that is spelled out in the claims that ultimately issued as the patent.

The description must be sufficiently clear that persons of ordinary skill in the art recognize that the applicant made the invention having each of the elements described in the claims; that is, to prove a claim invalid for lack of adequate written description, Fiber Composites must prove by clear and convincing evidence that the patent application does not reasonably





convey to a person of ordinary skill in the art that the inventors had possession of the invention at the time of the application, as that invention was finally claimed in the issued patent. And no particular form of written description is required.

The patent laws require that the disclosure or written description portion of a patent be sufficiently detailed to enable those skilled in the art to practice the invention. The purpose of this requirement is to ensure that the public, in exchange for the patent rights given to the inventor obtains from the inventor a full disclosure of how to carry out the invention.

If the inventors failed to provide an enabling disclosure, the patent is invalid. However, because descriptions in patents are addressed to people who are skilled in the art to which the invention pertains, an applicant for a patent need not expressly set forth in his specification subject matter which is commonly understood by persons skilled in the art.

The enablement defense does not require an intent to withhold. All that is required is how to teach how to practice the process. In other words, if a person of ordinary skill in the art could not carry out the process without undue experimentation, the patent is

invalid. A specification need not contain a working example if the invention is otherwise disclosed in such a manner that one skilled in the art to which the invention pertains will be able to practice it without an undue amount of experimentation.

One aspect of the enablement requirement is whether or not the claims cover a significant number of inoperative embodiments. If they do, undue experimentation may be involved to make the operative ones, and that would render the claims invalid, unless the specification clearly identified the inoperative embodiments.

I have now instructed you as to the law governing Andersen's claims of willful patent infringement and Fiber Composites' claims of invalidity. I must now instruct you as to damages. The fact that I am asking you to calculate damages doesn't mean that Andersen is going to be entitled to recover damages.

I am expressing no opinion one way or the other. We do ask that you calculate damages, regardless. When calculating damages, when you are doing that part of the special verdict form, you should assume that the patents are valid and infringed. Andersen must prove the amount of damages by a preponderance of the evidence.





Andersen is asking for damages in the amount of a reasonable royalty for Fiber Composites' infringement of its patents. A reasonable royalty is the minimum permissible measure of damages set by the patent laws, and is not necessarily the actual measure of damages, but is merely a floor below which damages should not fall.

A reasonable royalty in this case is the amount of money that would be agreed to in hypothetical arm's length negotiations between Andersen and Fiber Composites, with both operating under the assumption that the negotiated patent is valid and is being infringed, i.e., that absent the reasonable royalty payment, Fiber Composites would respect the patent.

In determining a reasonable royalty, you should place yourselves at the point in time at which you believe the arm's length negotiation that I just referred to, this hypothetical negotiation, would have been likely to have occurred.

You should assume that Fiber Composites and Andersen knew at the time such things as the level of sales and profits that Fiber Composites would make using the invention. You should also assume that Andersen was willing to grant Fiber Composites a license to use the patented invention and that Fiber Composites was willing





to pay for that license.

In deciding what is a reasonable royalty, you may consider the factors that Andersen and Fiber Composites would consider in setting the amount of Fiber Composites' license, the amount that they should pay. And you will recall that experts from both sides who testified relied on the same 15 factors when determining a reasonable royalty.

The parties have stipulated that the hypothetical arm's length negotiation in this case would have taken place in about August of 1998. The parties have further stipulated that for purposes of arriving at your verdict on Andersen's claim for damages, you should consider Fiber Composites' sales or inventory from November 16, 2000 through December 31st of 2000.

In determining a reasonable royalty, you may consider whether Fiber Composites' had any noninfringing commercially acceptable alternatives to taking a license from Andersen and whether or not that would have effected the reasonable royalty the parties would have agreed upon.

In order for you to consider a noninfringing alternative in the reasonable royalty analysis, Fiber Composites bears the burden of proving that there was such a non-infringing, commercially acceptable





alternative.

You must award all damages that can be proven with reasonable certainty. Reasonable certainty does not require proof of damages with mathematical certainty. However, you are not to award damages based on conjecture. If you have any doubts about the reasonable certainty of damages, those doubts should be resolved against the infringer.

And the fact that we are asking you to come up with this number about damages should not be -- and that I have instructed you on, that should not be construed as suggesting which party is to prevail in this case on the other two issues.

Now, you are about to retire to the jury room to begin your deliberations. The first thing you should do is elect one of your members to serve as the foreperson. The foreperson will preside over your deliberations and also be your spokesperson here in court.

Your verdict must represent the collective judgment of the jury. In order to return a verdict, it is necessary that each juror agree to it. In other words, your verdict must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with one another with a view

your opinions or the deliberations other than in writing or orally here in open court.

And I am about to give an oath to the bailiff. And you will note from that -- do we have a bailiff here? I guess we do.

You will note from that oath that they, as well as all other persons are forbidden to communicate in any way or manner with any member of the jury concerning the evidence, your opinions or deliberations.

Bear in mind, also, that you are never to reveal to any person, not even the Court, how the jury stands numerically or otherwise until after you have reached a unanimous verdict.

(Bailiff sworn.)

THE COURT: Thank you very much. All right, ladies and gentlemen, will you please go with the Marshal?

(Jury excused for deliberations.)

THE COURT: Please be seated. Do we know where you will be?

MR. SCHUTZ: What we would like to do is give whoever you deem appropriate, Judge, a list of phone numbers and contacts where you can get ahold of us.

THE COURT: All right, I do need somebody to at least be in the court in St. Paul. Don't go running





back to your Minneapolis office.

MR. SCHUTZ: We were going to be at the Radisson. Do you want somebody in the courtroom here?

THE COURT: No, somebody has to be in the courthouse.

MR. SCHUTZ: Okay, that is fine.

THE COURT: We will let you know when they go to lunch. You can obviously leave when they go to lunch. I expect that they will go now and then come back in an hour or so, but especially this afternoon it is important to have you here because we are bound to have some questions, I would think.

MR. SCHUTZ: We will have somebody here and we will be back at the Radisson.

THE COURT: Okay, if you could just go back and tell Sheri Frette, my calendar clerk, what all your information is, that would be great.

And then also, go through with her the exhibits, unless you have already agreed on them, and we should get that sent back before lunch. And we will get the jury instructions and all of the exhibits sent back to the jury before they go to lunch.

MS. MOERKE: Your Honor, we wanted to make sure our objections are preserved for the record to some of the instructions.





THE COURT: The ones that you made before?

MS. MOERKE: Yes.

THE COURT: You don't have any new ones, do you?

MS. MOERKE: We don't have new ones.

THE COURT: All right. And Andersen?

MS. THORSON: Same for us, no new ones.

THE COURT: Okay. And the others are preserved. Anything else before we take these things back? Okay. Well, thank you all very much. I will be seeing you soon.

(Recess.)





JURY QUESTION #1

(In open court; jury not present at 2:45PM.)

THE COURT: Would you mind getting the door?

The question has been put by the jury as follows, and I understand that you have copies of it?

MR. SKENYON: We do, Your Honor.

THE COURT: Okay. "Judge Ericksen, when looking at invalidating a patent, do you consider just the claims or do you also look at specifications or teachings?"

For Andersen, have you folks talked about a proposed response?

MS. NELC: They are actually running over here.

THE COURT: I said I wanted people in the courthouse. So, if the left you in the courthouse, they must trust your judgment. So, that is the purpose of having people stay here is we take the answers from people who are here.

So, tell me your view on what to do.

Mr. Skenyon, what is your view?

MR. SKENYON: My view is that of all of the invalidity questions here --

THE COURT: You have to use the podium. The Court Reporter is having too hard a time hearing.