# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - -x

Andersen Corporation

Plaintiff,

vs.

Fiber Composites,

Defendant.

- - - - - - - - - - - - - - - - -x

00-CV-2548 RHK/AJB
December 10, 2001
St. Paul, Minnesota
9:00 a.m.

TRANSCRIPT OF PROCEEDINGS

(Markman Hearing)

BEFORE THE HONORABLE RICHARD H. KYLE

UNITED STATES DISTRICT COURT JUDGE

--oOo--

Robert W. Riley
United States Court Reporter
646 U.S. Courthouse
316 N. Robert St.
St. Paul, MN 55101
(651) 848-1220

Before I get into that I want to set as an overview for the Court here what I called at some level here the answer slide, because they throw the file history up repeatedly in their brief.

]



What I've tried to do here, judge, as a shorthand for plowing through this three-ring binder which has all of the prosecution history -- it would take us three to four hours to plow our way through all the arguments in detail -- I have come up with a template shorthand to answer every single argument they have got, judge.

The first thing to keep in mind is that in the prosecution we often distinguished our claims over the prior art, but we did so by citing several differences with the prior art. We never said, when the patent office confronted us with a reference we never said, we're different from that reference because we make a pellet and that reference doesn't and that's why we're entitled to a patent. We never said that.

That's a classic case of prosecution history estoppel. It's a classic case of how a statement in a prosecution could limit a claim. That never happened here. What Andersen did, and I have just set forth some examples here, Your Honor, when confronted with a piece of prior art by the Patent Office in rejection of our claims, which happened during the prosecution of this large portfolio, our response was always like this; we're different from this prior art for a host of reasons and here are some examples.

Particle size is different. We use a thermoplastic agent, which is important. In fact, that's one of the key themes throughout this entire prosecution -- is that our

invention used a thermoplastic instead of a thermosetting material. The difference here, and this is important, is that a thermoplastic can be remelted nad reblended. If you have some scrap in the manufacturing process, for example you are making a rail or a door jamb, or any other piece out of this material, and if you have scrap, you have some reject, you have something that hasn't met quality control for some reason, you can grind it up and use it again because it's a thermoplastic. The prior art often used when it was dealing with wood substitutes thermoset materials. Make once, that's it. If it doesn't come out right you have to throw it away. You can't regrind it and reuse it because it's a thermosetting agent.

We often distinguish the prior art based on the modulus. Prior art often had low modulus materials. Our composite compositions had high modulus. In other words high strength characteristics.

We often said also that we use a pellet and that describes our preferred embodiment. But, again, we always listed several. What allows us then to get an allowable claim is merely to distinguish the prior art and incorporate in our Claim 1 the differences over the prior part. Sometimes we incorporated the difference of a pellet. Sometimes we stressed thermoplastic. Sometimes we stressed different particle size. Sometimes we stressed combinations. And where we limited it to a pellet, those claims are not being asserted in this case.

So if we go back again through those, Your Honor, you can see all the places where they want to add claim language and rewrite this claim. There is nothing ambiguous about this claim. This claim covers the composite structural memeber. It does not cover a pellet, doesn't cover a process for making a pellet, but they want you to read those limitations into this claim and rewrite the claim.

How do they try to get there. They try to get there by saying that the specification trumps the claim language. As we will see, that's not the case. Their proposed construction would transform what is a products claim, something you can touch, something you can feel, a structural member, into a method claim.

Let's look at the specification for the structural member patents. Because they came from the same prosecution the structural member patents, the '027 and the '553, share the same specification. In column one, right up front when we say what the field of the invention is, we say it relates to an improved



structural member that can be used as a direct replacement for wood and metal components having superior properties, et cetera.

Here I'd like to digress for just a second and touch on the issue of public policy and notice to competitors. A lot of decisions coming out of the Federal Circuit, they're cited in our brief, they're cited in Fiber Composites' brief, stress the idea that for purposes of claim construction and the purpose of claims is to put a competitor, a reasonable competitor, on notice as to what is covered and what is not. And in doing so you can look at not only the claims and the specifications and

the prosecution history, but let's keep in mind and use that as we go through this.

How could Fiber Composites, in the light of the entire prosecution of the Andersen patents, in light of all the different patents they have in these different areas, say to themselves, these patents cover pellets, or pelletizing processes or methods only? The *Def limitation is always in there and that we should be free to operate as long as we don't make something with the pellet or intermediate step.

Now they can find some support for a preferred embodiment of a pellet because it is our preferred embodiment and we talk about pellets, but for them to take the position that as a competitor to Andersen, they can look at the entirety of what's going on here and come to the unmistakable conclusion that pellets and pellets only is simply not supported by this

]



record and is simply not supported by the way we drafted the claims. It's not supported by the spec and it's not supported by the file history. Right up front we say the invention relates to an improved structural member.

They want to ignore this language. They can find all kinds of language that talks about pellets, and we are not running away from that language. We're embracing it. It's our perferred embodiment, but we're not limited to that. But there is all kinds of language in here that supports the alternative embodiments that we claimed and right up front we tell anyone who cares to read it that the invention relates to a structural member.

Fiber Composites would like to ignore teachings that this definition contradicts. They say the specification

describes only one way to accomplish the end of the invention and that's by first pelletizing the composite material.

Several times during the course of their briefs they took the position that you only get to these desired structural materials by using this intermediate pelletizing step. The three properties they cite that go with this pelletizing step are an intimate add mixture, an orientation to fibers and control of moisture content. That's just flat wrong.

In Column 6 of the '553 patent, and later on with the other set of patents that's in Column 7, it talks about a process for direct extrusion. In other words, going from the



bulk materials to the final product without an intermediate pellet step. Here it is, Column 6, it's taught. You can see it goes through -- if you go through Column 6, it talks about the blending, the mixture. It lists all three properties; the oriuentation to fibers, moisture content and the intimate add mixture. All three properties that Fiber Composites claims you can only get with this pelletizing step are listed right here at the top of Column 6 and concludes with, lastly, the polymer fiber is aligned and extruded in a useful form, not extruded into a pellet. It's direct extrusion into a useful form. We teach it. They want to ignore it.

Now pelletizing is preferred. There's no doubt about that. We spend a lot of time talking about a preferred embodiment. The law requires that we do that, but it's not limited and they want to ignore the other discussions where we talked about the alternative embodiment. Here, again, if you go on in Column 6, if you read the patent, at the top it starts

with this direct extrusion and then toward the bottom of Column 6 it says, in a preferred mode. And then we go and talk about how you make the pellet because that's the perferred mode. But we go from a more generic mode of being able to directly extrude into a discussion about preferred mode.

Again we state in Column 9, the preferred pellet, because it's our preferred mode, not the only way of doing it. We refer to the pellet as an alternative to composite material



in the extrusion process. You go to Column 4 and you can see that. Frequently in the specification we will say composite material, or pellet, not "just" pellet.

Further evidence in the specification, Your Honor, that these claims are not limited to a pellet, if you go to Column 14 in Table 5 where we list products tested, we have pelletized strips. You can see that. No. 3. But look at what I've highlighted. Nonpelletized strip.

So why should Fiber Composites be entitled to put blinders on, stick their head in a hole and say, pellets, all we see is pellets, when the specification clearly shows alternative embodiments, clearly teaches direct extrusion.

There is a statement right before you start with the direct exclusion in Column 6. This is at the bottom of Column 5, Your Honor, where there is the language that I have quoted here that says, "In the manufacture of the composition and pellet, the manufacture and procedure requires two important steps." ...blending step and --

THE COURT: Wait, wait. When you start reading you start speeding up. The court reporter has some problems.

MR. SCHUTZ: I'm sorry. I've cited this

language, Your Honor, and I'll read it again more slowly for the record, because they cite it in their brief repeatedly. That is where it says composition and pellet manufacture. The introductory paragraph there we've put on this slide and it



says, "In the manufacture of the composition and pellet of the invention, the manufacture and procedure requires two important steps. A first blending step and a second pelletizing step."

Immediately after that the Column 6 language appears that teaches how to directly extrude with no intermediate pelletizing step. If you look at what follows in the spec, you clearly see that in making a composition, you blend and you extrude. In making the pellet you blend, pelletize and then further extrude.

And then if we jump ahead, again we're back to Column 6 which ends in being able to extrude into a useful form. If you then jump ahead to Column 10 you will see that it says, The pellet then can be used in further extrusion process to form a useful extruded structural member.

The key here, Your Honor, is that this term useful, useful form or useful structural member, it's the end product. And you can get to the end product two ways. We teach two ways to get there. In the first part of Column 6 of those patents we teach you get there using a direct extrusion process. Then we later teach how you get there using a pellet, which is an intermediate process and then re-extruding or further extruding the pellet.

We claim that. We have claims limited to pellets. We have claims limited to making structural members with pellets.